No. 24-40779

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MATTHEW JOHN THEILER; SUSAN L. HERTZBERG;
DAVID WELDON KRAUS; THOMAS GRAY HARDAWAY,

Defendants-Appellants.

On Appeal from the United States District Court for the Eastern
District of Texas, District Court No. 6:22-CR-3-SWS
(Honorable Jeremy D. Kernodle)

OPENING BRIEF OF APPELLANT SUSAN L. HERTZBERG

<div style="margin-left:50%">

Matthew S. Hellman
David Bitkower
Keisha N. Stanford
Shreve Ariail
Emanuel Powell III
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
Telephone: (202) 639-6000
mhellman@jenner.com

*Counsel for Appellant Susan L. Hertzberg*

</div>

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

*United States of America v. Matthew John Theiler, et al.*, No. 24-40779

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Matthew John Theiler, Defendant-Appellant.

    a. Daniel L. Geyser, counsel for Mr. Theiler.

    b. Haynes and Boone, LLP, counsel for Mr. Theiler.

    c. Jason D. Cassel, counsel for Mr. Theiler.

    d. Cassell Law Firm, P.C., counsel for Mr. Theiler.

    e. Danielle M. Corcione, counsel for Mr. Theiler.

    f. Christopher R. Paldino, counsel for Mr. Theiler.

    g. Kathryn Pearson, counsel for Mr. Theiler.

    h. Chiesa Shahinian & Giantomasi PC, counsel for Mr. Theiler.

2. Susan L. Hertzberg, Defendant-Appellant.

    a. Matthew S. Hellman, counsel for Ms. Hertzberg.

    b. David Bitkower, counsel for Ms. Hertzberg.

    c. Keisha N. Stanford, counsel for Ms. Hertzberg.

    d. J.E. Shreve Ariail, counsel for Ms. Hertzberg.

    e.  Emanuel Powell III, counsel for Ms. Hertzberg.

    f.  Jenner & Block LLP, counsel for Ms. Hertzberg.

3.    David W. Kraus, Defendant-Appellant.

    a.  Jeffrey J. Ansley, counsel for Mr. Kraus.

    b.  Arianna G. Goodman, counsel for Mr. Kraus

    c.  Samuel M. Deau, counsel for Mr. Kraus.

    d.  Katherine M. Devlin, counsel for Mr. Kraus.

    e.  Vedder Price P.C., counsel for Mr. Kraus.

    f.  Ryan Hedges, counsel for Mr. Kraus.

    g.  BakerHostetler LLP, counsel for Mr. Kraus.

4.    Thomas Gray Hardaway, Defendant-Appellant.

    a.  Gene R. Besen, counsel for Mr. Hardaway.

    b.  Elisha Kobre, counsel for Mr. Hardaway.

    c.  Sheppard Mullin Richter & Hampton, LLP, counsel for Mr. Hardaway.

5.    Jeffrey Paul Madison, co-defendant below.

6.    United States of America, Plaintiff-Appellee.

    a.  Traci Lynne Kenner, counsel for the United States.

    b.  Terri Lynn Hagan, counsel for the United States.

    c.  Stephan Edward Oestreicher, Jr., counsel for the United States.

    d.  Bradley Elliot Visosky, counsel for the United States.

    e.  Adrian Garcia, counsel for the United States.

Dated: June 12, 2025          *s/ Matthew S. Hellman*
                              *Attorney of record for*
                              *Appellant Susan L. Hertzberg*

## STATEMENT REGARDING ORAL ARGUMENT

Susan L. Hertzberg respectfully requests oral argument in this matter because this appeal follows a 23-day trial, with dozens of witnesses and hundreds of voluminous exhibits. The appeal concerns multiple defendants, and the government's case against her was distinct from the case raised against her co-defendants. The issues raised in this appeal are also factually and legally complex. Counsel therefore submits that oral argument would significantly aid the decision process. Fed. R. App. P. 34(a)(2)(C); 5th Cir. R. 34.2.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .........................................i

STATEMENT REGARDING ORAL ARGUMENT..............................iv

TABLE OF AUTHORITIES.................................................................vii

STATEMENT OF JURISDICTION .........................................................1

STATEMENT OF THE ISSUES...............................................................2

INTRODUCTION ...................................................................................3

STATEMENT OF THE CASE .................................................................6

I.      Susan L. Hertzberg and Boston Heart Diagnostics ..........................6

II.     Boston Heart and Little River Hospital Partnership.........................7

III.    The Conspiracy ..........................................................................18

IV.     The Federal Criminal Investigation and Indictment.......................22

V.      Trial and Sentencing ..................................................................23

SUMMARY OF ARGUMENT ...............................................................29

ARGUMENT..........................................................................................31

I.      Standards of Review .................................................................31

II.     Legal Standards.........................................................................33

III.    There Is Insufficient Evidence that Ms. Hertzberg Had
        Knowledge of the Conspiracy, Let Alone that She Agreed
        to Join It..................................................................................35

IV.     The District Court Erred in Denying Ms. Hertzberg's
        Motion for Acquittal...................................................................41

A.  The government faces a heavy burden in proving a defendant agreed to join a conspiracy through circumstantial evidence.............................................41

B.  Guilt cannot be reasonably inferred from Ms. Hertzberg's position as an "active" CEO. ..............................43

C.  The evidence does not support an inference that Ms. Hertzberg concealed the conspiracy. ......................................47

D.  The evidence does not support an inference that Ms. Hertzberg ignored warnings about the conspiracy or silenced those who raised them. .............................................53

V.  There Was Insufficient Evidence of a Federal Nexus.......................58

VI.  There Was Sufficient Evidence of Withdrawal. ...............................60

CONCLUSION.......................................................................................63

CERTIFICATE OF SERVICE ..............................................................64

CERTIFICATE OF COMPLIANCE.......................................................65

vi

# TABLE OF AUTHORITIES

CASES

*Bryan v. United States*, 524 U.S. 184 (1998)..............................................34

*Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823 (11th Cir. 1999), *amended in part*, 211 F.3d 1224 (11th Cir. 2000)..................................................................................62

*United States v. Bourrage*, No. 23-60286, 2025 WL 1453658 (5th Cir. May 21, 2025)....................................................................41

*United States v. Brown*, 459 F.3d 509 (5th Cir. 2006) ................................32

*United States v. Brown*, 727 F.3d 329 (5th Cir. 2013) ................................34

*United States v. Bullis*, 77 F.3d 1553 (7th Cir. 1996) ................................61

*United States v. Duruisseau*, 796 F. App'x 827 (5th Cir. 2019)....................................................................................45

*United States v. Falcone*, 109 F.2d 579 (2d Cir.), *aff'd*, 311 U.S. 205 (1940)..............................................................................40

*United States v. Ganji*, 880 F.3d 760 (5th Cir. 2018)...........31, 32, 34, 35, 37, 41, 42, 44, 45, 46

*United States v. Gentry*, 941 F.3d 767 (5th Cir. 2019)..............................42

*United States v. Gevorgyan*, 886 F.3d 450 (5th Cir. 2018)........................35

*United States v. Grimmett*, 236 F.3d 452 (8th Cir. 2001)..........................61

*United States v. Hammond*, 371 F.3d 776 (11th Cir. 2004) .......................32

*United States v. Heard*, 709 F.3d 413 (5th Cir. 2013) ...............................32

*United States v. Hoffman*, 901 F.3d 523 (5th Cir. 2018)...........................60

*United States v. Jackson*, 700 F.2d 181 (5th Cir. 1983)............................35

*United States v. Jordan*, 945 F.3d 245 (5th Cir. 2019)..............................32

*United States v. Mauskar,* 557 F.3d 219 (5th Cir. 2009)..............................33

*United States v. Moreland,* 665 F.3d 137 (5th Cir. 2011)................42, 43, 53

*United States v. Nerlinger,* 862 F.2d 967 (2d Cir. 1988)...................... 61, 62

*United States v. Nora,* 988 F.3d 823 (5th Cir. 2021).............34, 37, 39, 44, 47

*United States v. Pennington,* 20 F.3d 593 (5th Cir. 1994).........................31

*United States v. Pettigrew,* 77 F.3d 1500 (5th Cir. 1996)...........................58

*United States v. Read,* 658 F.2d 1225 (7th Cir. 1981)...............................60

*United States v. Schorovsky,* 202 F.3d 727 (5th Cir. 2000)................... 60, 61

*United States v. Shah,* 95 F.4th 328 (5th Cir. 2024), *cert. denied,*
   145 S. Ct. 518 (2025)...............................................................35, 58, 59

*United States v. Sorensen,* 134 F.4th 493 (7th Cir. 2025).........................10

*United States v. Torres,* 114 F.3d 520 (5th Cir. 1997)........................... 41-42

*United States v. Turner,* 319 F.3d 716 (5th Cir. 2003)..............................46

*United States v. Vargas-Ocampo,* 747 F.3d 299 (5th Cir. 2014) (en
   banc)......................................................................................33

*United States v. White,* 569 F.2d 263 (5th Cir. 1978).......................... 35, 44

STATUTES

18 U.S.C. § 371 ....................................................................22, 26, 33

18 U.S.C. § 3282(a) ........................................................................60

42 U.S.C. § 1320a-7b ................................................................. 10, 33

42 U.S.C. § 1320a-7b(b)(1)..............................................................33

42 U.S.C. § 1320a-7b(b)(2)..............................................................34

viii

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231. Jurisdiction of this Court is invoked under Sections 1291 and 1294, Title 28, United States Code, as this is an appeal from a final judgment of conviction and sentence in the United States District Court for the Eastern District of Texas. Notice of appeal was timely filed in accordance with Rule 4(b) of the Federal Rules of Appellate Procedure.

## <u>STATEMENT OF THE ISSUES</u>

1.    Whether the evidence at trial was sufficient to support Susan L. Hertzberg's conviction.

## INTRODUCTION

The government's pursuit of Susan Hertzberg resulted in the conviction of an innocent woman. The six-week, multi-defendant trial below revealed a conspiracy to pay physicians to refer laboratory tests to hospitals. The evidence was clear that the scheme was conceived and orchestrated by the owners of the hospitals and of the marketing services that identified and paid the physicians. The evidence was equally clear that Ms. Hertzberg, a respected healthcare executive with a decades-long record of ethical service, played no role in that conspiracy, knew nothing about it, and obtained no benefit from it. In prosecuting the eighteen defendants indicted in this case, the government wrongly swept Ms. Hertzberg into others' criminal conduct.

The trial below was lengthy, but Ms. Hertzberg was all but absent from the narrative presented by the government. Notwithstanding that Ms. Hertzberg was the CEO of one of the laboratory testing companies used by the hospitals, and notwithstanding that the government presented testimony from numerous conspirators, no witness testified that Ms. Hertzberg even knew about the conspiracy, let alone agreed to join it. Despite having the opportunity to ask multiple members of the conspiracy on the stand whether they had agreed with Ms. Hertzberg to carry out their

3

conspiracy or whether she knew about it at all, the government avoided asking these critical questions.

On the contrary, the evidence showed that conspirators had no need for Ms. Hertzberg in the conspiracy and affirmatively *concealed* their illegal conduct from her. Over and over, witnesses described hiding their unlawful conduct from Ms. Hertzberg and her team. The government itself conceded that the scheme was successfully concealed from the company's executives. Indeed, the prosecutors pointed to that concealment in summation as a reason to convict other defendants.

The trial record showed that Ms. Hertzberg acted with appropriate executive judgment based on the information that was presented to her. Regrettably, the jury, urged by the government's sweeping and inaccurate accusations at summation, convicted Ms. Hertzberg on a trial record that lacked sufficient evidence to meet the government's burden.

The district court denied Ms. Hertzberg's post-trial motion for acquittal on the narrowest of grounds. The court rightly did not suggest that there was any direct evidence to support a guilty verdict; there was none. But the court contended that there was sufficient circumstantial evidence to allow a reasonable jury to find guilt beyond a reasonable doubt. That

evidence collapses under the lightest scrutiny. Without exception, the limited evidence the district court cited was not just insufficient—it was either legally irrelevant or logically inconsistent with Ms. Hertzberg's guilt, or both.

For example, the district court's lead contention was that the jury could infer Ms. Hertzberg's guilt from the fact that she was an "active" CEO, but this Court has repeatedly rejected that kind of inference, especially where, as here, Ms. Hertzberg's conduct gave no indication that she had joined the conspiracy. The district court also contended that Ms. Hertzberg sought to conceal the conspiracy by restricting the dissemination of information. But the information was not indicative of any conspiracy, and the people Ms. Hertzberg restricted from getting information were the alleged *conspirators*. Inferring guilt from that conduct is not merely speculative, it is irrational.

Given the paucity of evidence, it would effectively criminalize an executive for being an executive to infer that Ms. Hertzberg, as a CEO, must have conspired because her subordinates committed a crime. Fifth Circuit precedent prohibits that inference and warrants intervention. This Court should reverse Ms. Hertzberg's conviction given the decidedly insufficient

5

evidence of Ms. Hertzberg's knowledge of, and agreement to enter into, the conspiracy.

<div align="center">STATEMENT OF THE CASE</div>

## I.    Susan L. Hertzberg and Boston Heart Diagnostics

Susan L. Hertzberg joined Boston Heart Diagnostics in September 2010 as the company's Chief Executive Officer. ROA.24-40779.7803. Boston Heart's primary business was providing leading laboratory testing to improve heart health. ROA.24-40779.12812-16. Boston Heart routinely entered into contracts with individual physicians and healthcare facilities to meet these customers' testing needs. ROA.24-40779.2330; ROA.24-40779.12698.

Ms. Hertzberg arrived at Boston Heart after serving in multiple roles devoted to improving the healthcare outcomes of people facing life-threatening illnesses. Prior to Boston Heart, she led the introduction of a test to screen for cervical cancer and launched a test to diagnose different forms of leukemia. ROA.24-40779.12808-09; ROA.24-40779.7673-74. As Boston Heart's CEO, Ms. Hertzberg focused on developing blood tests to diagnose heart disease and on bringing these tests to market. ROA.24-40779.12678-79; ROA.24-40779.7674.

Ms. Hertzberg ran the company with a commitment to patient care and a clinical focus, which her team members described as a "compass," ROA.24-40779.6783;    ROA.24-40779.10826-28;    ROA.24-40779.10840;    ROA.24-40779.12813-14; ROA.24-40779.12851, to ensure Boston Heart's work was centered on "the patient and the patient's benefit." ROA.24-40779.10826-27. While Ms. Hertzberg was at the helm, the company's mission stayed laser-focused on "helping people to live healthier lives in combatting heart disease," and all members of Boston Heart's team had a role in ensuring its customers did not perceive Boston Heart "to be influenced by . . . finance" or a focus on selling the most lucrative testing available. ROA.24-40779.12813-16.

## II.    Boston Heart and Little River Hospital Partnership

A.    In February 2015, Ms. Hertzberg received an email from one of Boston Heart's longstanding clients, Dr. Jonathan Sheinberg, "a . . . well-respected . . . cardiologist," military veteran, and active-duty police officer in Cedar Park, Texas. ROA.24-40779.8994; ROA.24-40779.12638-41. Dr. Sheinberg became one of Boston Heart's largest customers due to his use of the company's testing in clinical trials, specifically for those in "high-stress occupations" like law enforcement. ROA.24-40779.8997; ROA.24-

7

40779.12708. In his email to Ms. Hertzberg, Dr. Sheinberg explained that he had recently leased his practice to Little River hospital—a healthcare facility with campuses about 40 miles northeast of Austin, Texas—and that he believed Little River would be a great Boston Heart client. Dr. Sheinberg described Little River's CEO to Ms. Hertzberg as a "straightshooter" and "[g]reat guy." ROA.24-40779.4846. Noting her appreciation for Dr. Sheinberg's longstanding support for Boston Heart's work, Ms. Hertzberg encouraged her team to begin contract negotiations with Little River. ROA.24-40779.4346. Ms. Hertzberg did not play an active role in the contract negotiations. She was not asked to review the agreement and only became aware of it being finalized after Boston Heart's Chief Financial Officer, Kim Bracuti, signed the contract on or around March 2015. ROA.24-40779.2325-27.

Under the contract, Little River planned to introduce Boston Heart's tests to over 100 affiliated physicians. ROA.24-40779.2325; ROA.24-40779.4636; ROA.24-40779.4665; ROA.24-40779.6784. Little River would bill payors directly through favorable in-network insurance contracts and would provide phlebotomy services for its affiliated physicians. ROA.24-40779.9176-77; ROA.24-40779.9286; ROA.24-40779.9522. Boston Heart

8

would provide testing services based on orders from Little River-affiliated physicians. ROA.24-40779.11773. Boston Heart Texas sales representatives, who reported to Matthew Theiler, the Vice President of Sales at Boston Heart, were in direct contact with Little River to provide the on-the-ground support to manage the day-to-day of the business relationship. ROA.24-40779.11706-07; ROA.24-40779.9127.

B.     Beginning before its contract with Boston Heart, Little River paid five different intermediary institutions called management services organizations (MSOs)—interchangeably referred to as "marketers," ROA.24-40779.8651; ROA.24-40779.10144; ROA.24-40779.12986—to identify and recruit physicians for the hospital. ROA.24-40779.8651; ROA.24-40779.8778. Little River's CEO Jeff Madison decided in 2011 that the hospital could earn additional revenue by recruiting physicians to affiliate with the hospital and order procedures under the hospital's insurance contracts. ROA.24-40779.12909-13; ROA.24-40779.12983-86. It was only two months after Boston Heart contracted with Little River, in or around May 2015, that members of Boston Heart's Texas sales team learned about the hospital's use of MSOs. ROA.24-40779.9193; ROA.24-40779.9197. Little River, as well as Boston Heart's sales representatives, consistently told

9

Boston Heart leadership, including Ms. Hertzberg, that the MSOs were legitimate marketing entities that recruited doctors into the hospital's network. ROA.24-40779.4620; ROA.24-40779.4570.

C.  MSOs are lawful entities used in the healthcare field to provide marketing, advertising, or administrative support. ROA.24-40779.8027-28. The use of third-party marketers and advertisers—absent payments made to induce physician referrals—has been held not to violate the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b. *See, e.g., United States v. Sorensen*, 134 F.4th 493, 501 (7th Cir. 2025) (holding that payments to third parties for "only advertising services" did not violate the AKS).

D.  Little River's use of MSOs was unfamiliar to Boston Heart's leadership, however, and raised questions when first discovered. This was a new line of business for Boston Heart—its first major hospital billing relationship—and the structure Little River described was unlike what Boston Heart had encountered in its traditional physician-facing model. ROA.24-40779.4772; ROA.24-40779.11704. No one on the leadership team had prior experience with MSOs, and when they learned of their involvement, they approached it with caution and an effort to understand. Little River, as well as Boston Heart's sales representatives, consistently

10

told Boston Heart leadership, including Ms. Hertzberg, that the MSOs were legitimate marketing entities that recruited doctors into the hospital's network. ROA.24-40779.4640; ROA.24-40779.4590.

JoAnna Shore, Boston Heart's newly hired Vice President of Hospitals, was the first to raise concerns internally. ROA.24-40779.11577-78; ROA.24-40779.11587. Brought on by Ms. Hertzberg to build and oversee new hospital partnerships, Ms. Shore wrote to Ms. Hertzberg and other Boston Heart executives on November 2, 2015, stating that she did not yet "fully understand the Little River business model," including its "marketing arm (MSO?)" and "targeted provider market." ROA.24-40779.11713-14; ROA.24-40779.4420. Ms. Shore recommended that Boston Heart not pursue further growth to two additional Texas hospitals proposed by a member of Boston Heart's Texas sales team (Jeff Parnell).[1] ROA.24-40779.11719. Instead, she recommended that Boston Heart "reel this in" and direct Boston Heart sales team members in the field to halt any new hospital relationships in Texas

---

[1] The government alleged that Mr. Parnell was a member of the conspiracy and secretly worked with MSOs to provide kickbacks to physicians. ROA.24-40779.7089; ROA.24-40779.78. In exchange for his testimony, however, the government permitted him to deny his involvement in the conspiracy and plead guilty only to misprision of a false statement by a third party. ROA.24-40779.7115.

until they could properly assess and "have an opportunity to train" those on the ground on the Little River model. ROA.24-40779.4420. Ms. Shore did not, however, advise that Boston Heart cease operations with Little River. ROA.24-40779.4440.

Ms. Hertzberg agreed with Ms. Shore's recommendations, and the two were fully "aligned" in their concerns, approach, and actions. ROA.24-40779.11718; ROA.24-40779.11731-32. Expansion to the other proposed Texas hospital partnerships was halted, and Ms. Hertzberg tasked Ms. Shore with taking direct oversight over the Little River relationship moving forward. ROA.24-40779.11734. Ms. Hertzberg also emailed Little River's CEO and Dr. Sheinberg to communicate Ms. Shore's concerns and later attended a follow-up meeting with Ms. Shore to press Little River for answers. ROA.24-40779.4848; ROA.24-40779.4615.

At the meeting, Little River leadership assured Ms. Hertzberg and Ms. Shore that the hospital was using MSOs to identify physicians interested in affiliating with the hospital—a legitimate marketing function. ROA.24-40779.4421. Ms. Shore left the meeting reassured, describing the call as "great" to Ms. Hertzberg. ROA.24-40779.4421; ROA.24-40779.11735-36. After multiple trips to visit Little River (including a discussion in which Mr.

12

Madison again assured that MSOs were being used lawfully), Ms. Shore prepared a memorandum for Ms. Hertzberg and Boston Heart's Chief Compliance Officer, reporting that Little River had "a sound business model" (apart from infrastructure issues), and later supported the expansion of the Little River business. ROA.24-40779.6180-86. The government presented no evidence that Ms. Shore ever expressed any suspicion to Ms. Hertzberg that Little River used MSOs to pay kickbacks, induce physicians to make referrals, or do anything that might implicate the AKS.

Around the same time, Ms. Hertzberg took proactive steps to elevate compliance oversight of this new and growing business. She hired Rob Rossi as Vice President of Compliance, a former prosecutor with deep healthcare fraud experience. ROA.24-40779.11694-95; ROA.24-40779.9950-52; ROA.24-40779.10030. He immediately reviewed the Little River agreement, ROA.24-40779.9955, created a new hospital billing policy for Boston Heart, ROA.24-40779.9970-71, researched the history and propriety of MSOs, and consulted directly with Ms. Shore and Boston Heart's Vice President of Sales, Mr. Theiler, about Little River's use of MSOs, ROA.24-40779.9943-45; ROA.24-40779.9962; ROA.24-40779.10009-11; ROA.24-40779.11811. As with Ms.

13

Shore, the government presented no evidence that Mr. Rossi ever raised any concerns to Ms. Hertzberg about Little River's use of MSOs.

E.   As with Boston Heart's other various business partnerships across the country, Ms. Hertzberg, as CEO, had a limited role in the Little River relationship. She interfaced with Dr. Sheinberg at the start of the business relationship. ROA.24-40779.11146-47. Ms. Hertzberg also received regular finance updates regarding the Little River partnership. *See, e.g.,* ROA.24-40779.5357; ROA.24-40779.5360; ROA.24-40779.5363. When those updates were positive, she responded with encouragement. ROA.24-40779.4647. When concerns arose—such as when Texas sales team members were found to be gossiping externally about Boston Heart's revenue figures, ROA.24-40779.4548—she acted to address them. In the case of gossip about the company's sales, she restricted access to sensitive revenue information and reinforced internal controls. ROA.24-40779.4308. While Ms. Hertzberg did not supervise day-to-day sales activity, she would join calls with sales team members if there were "concerns" they elevated that required her attention. ROA.24-40779.10162. There was no evidence presented by the government at trial that the Boston Heart sales team raised any concerns involving kickbacks.

14

Ms. Hertzberg also attended senior leadership meetings where Boston Heart's team members presented updates on the company's work. In October 2015, for example, Boston Heart's Texas sales director David Kraus gave a presentation to approximately 40 members of Boston Heart's senior leadership, including Ms. Hertzberg and Boston Heart's Chief Compliance Officer, on Boston Heart's business with Little River. ROA.24-40779.10814. Mr. Kraus noted that Little River used MSOs to recruit providers but presented nothing suggesting unlawful conduct or a kickback arrangement. ROA.24-40779.4620. However, when the presentation strayed from the company's clinical mission to a discussion focused on revenue growth, Ms. Hertzberg interrupted the presentation, stating to the room that the presentation was "not medically related" or "clinically focused"—a clear departure from Boston Heart's mission and values. ROA.24-40779.10814; ROA.24-40779.10826-27. Her reaction was consistent with undisputed testimony regarding Boston Heart's policy of not exposing the clinical team to revenue information. ROA.24-40779.10814; ROA.24-40779.12815-16.

Throughout this time, Ms. Hertzberg kept Boston Heart's Board of Directors and its parent company, Eurofins, informed about Boston Heart's relationship with Little River. She freely shared information with them

15

about Little River's favorable in-network insurance contracts, revenues, and Little River's use of MSOs once she became aware of their existence in October 2015 through Mr. Kraus's presentation on the topic. ROA.24-40779.4642 (Aug. 5, 2015); ROA.24-40779.2985 (Aug. 13, 2015); ROA.24-40779.3005 (Oct. 15, 2015); ROA.24-40779.3035 (Nov. 15, 2015); ROA.24-40779.4665 (Dec. 5, 2015); ROA.24-40779.4570 (Dec. 11, 2015); ROA.24-40779.3066 (Jan. 15, 2016); ROA.24-40779.4529 (Feb. 2, 2016); ROA.24-40779.6684 (Feb. 15, 2016); ROA.24-40779.3092 (Mar. 10, 2016); ROA.24-40779.3124 (July 18, 2016) (metadata date); ROA.24-40779.10814.

F.    Boston Heart earned approximately $20.5 million in revenue from Little River between April 2015 and June 2016. ROA.24-40779.5794. That number was substantial, but also below the low end of the financial projections that Boston Heart had prepared at the beginning of the contract. ROA.24-40779.10776-80. Andy Flynn, the analyst who both developed the projections and tracked the revenue for the Little River arrangement, testified at trial that those projections were based on the average volume for Boston Heart's physician clients nationwide, ROA.24-40779.10778-79, and that nothing about the revenue made him suspicious that anything illicit was occurring, ROA.24-40779.10782.

G.    Ms. Hertzberg's relationship with Eurofins became increasingly strained as they sought to exert more control over employee pay and cut costs. ROA.24-40779.10614-15; ROA.24-40779.2940. On May 31, 2016, she submitted a formal "Notice of Good Reason" to Boston Heart Board Chairman Jonathan Lapin initiating her resignation. ROA.24-40779.6602-05. That same day, principals from another rural Texas hospital, Stamford, sent Boston Heart a partially executed contract negotiated by Mr. Theiler that would lead to what the conspirators described as an expansion of the conspiracy to the new hospital. ROA.24-40779.6591; ROA.24-40779.4855; ROA.24-40779.12308. As CEO, only Ms. Hertzberg had authority to sign the contract for Boston Heart, but she declined to do so. ROA.24-40779.9981-82; ROA.24-40779.6593-97. That decision was not surprising; it was undisputed that at that time the company faced substantial unpaid accounts receivable from its existing rural hospital clients. ROA.24-40779.5794. Ms. Hertzberg announced her resignation publicly at an all-hands meeting on July 26, 2016, and left the company on August 9, 2016. ROA.24-40779.10270; ROA.24-40779.11786; ROA.24-40779.6600.

## III.   The Conspiracy

The evidence at trial showed that Little River's CEO, Jeff Madison, spearheaded a kickback scheme as early as 2014, using MSOs to pay physicians for referring lab tests and services through the hospital. The other key "architect" of the scheme, Robert O'Neal, used his MSO, Ascend, to offer physicians the opportunity to "invest" and receive "distributions" based on the MSO's profits. ROA.24-40779.9666-68; ROA.24-40779.12418-21; ROA.24-40779.12276;     ROA.24-40779.12431-34.     In     reality,     these "investments" served as conduits for illegal remuneration: physicians received distributions tied not to business profits but to their volume of lab referrals. Several other MSOs, including Next Level and BenefitPro, adopted the same deceptive model.

Mr. Madison, Mr. O'Neal, and their fellow conspirators went to significant lengths to conceal the remuneration of physicians from others. For example, they masked these arrangements through sham contracts purporting to carve out federal reimbursements, *see, e.g.*, ROA.24-40779.8199-201; sham attestations that the physicians had no financial interest in the MSOs, *see, e.g.*, ROA.24-40779.8369-71; ROA.24-40779.12421; and sham responses to due diligence questions from legal counsel, *see, e.g.*,

ROA.24-40779.8534-41. There is no evidence that Ms. Hertzberg knew that any of these sham documents existed, let alone had any role in developing, authorizing, or disseminating them. Based on the communications she received from her subordinates about Little River's use of MSOs, Ms. Hertzberg—as well as Ms. Shore and Boston Heart's legal and compliance teams—believed the MSOs working with Little River to be legitimate marketing entities operating within legal bounds.

After Boston Heart's Texas sales team members became aware of the use of MSOs by Little River in May 2015, at least three—Jeff Parnell, Thomas Gray Hardaway, and Laura Howard (after joining the company in September 2015)—secretly began working with the MSOs in exchange for a share of the payments from Little River. Mr. O'Neal testified that it was "imperative" for him to have someone "on the inside" at Boston Heart and thus he recruited Ms. Howard for that purpose. ROA.24-40779.12253. While working as a Boston Heart sales representative, Ms. Howard secretly recruited physicians into the Ascend MSO. In exchange for recruiting physicians, Mr. O'Neal paid Ms. Howard a portion of his commissions. ROA.24-40779.10354-55; ROA.24-40779.10358. The sales representatives concealed their MSO relationships from Ms. Hertzberg and Boston Heart

19

leadership because they knew they would be fired if their actions were revealed. ROA.24-40779.9355-56; ROA.24-40779.9382; ROA.24-40779.10331-32; ROA.24-40779.10350-51; ROA.24-40779.10356-58; ROA.24-40779.10404-05; ROA.24-40779.10823-24.

Boston Heart's Texas sales representatives also went to other lengths to conceal physician remuneration from Ms. Hertzberg. In December 2015, for example, Boston Heart's Texas sales team created an executive summary regarding Little River for Ms. Hertzberg to present to Boston Heart's parent company Eurofins upon Ms. Hertzberg's request. ROA.24-40779.4389. Mr. Kraus's initial draft of the summary sent to Mr. Parnell and Mr. Hardaway stated that "practitioners become investors by purchasing shares in the MSO. Little River will remunerate the Marketers/MSO, which in turn disperse their profits among the investors." ROA.24-40779.439. The following day, Mr. Parnell deleted the language related to physician remuneration and MSO investments. ROA.24-40779.6586. The final version of the summary document sent to Ms. Hertzberg contained no reference to physician remuneration (or MSO investments). ROA.24-40779.4570-72.

Ms. Hertzberg had no notice of any potentially unlawful conduct with the Little River arrangement until after she had given her notice of

20

resignation. On June 3, 2016, Michael Ivers, a sales director for Boston Heart's southwest region, emailed a number of Boston Heart leaders, including Ms. Hertzberg, to share allegations of what he thought was unlawful remuneration in Boston Heart's hospital business in Texas. It was undisputed that Mr. Ivers sent his email directly to Boston Heart's then-acting Chief Compliance Officer Rob Rossi. Mr. Rossi "immediately" reached out to Mr. Ivers and met with him about the allegations. Mr. Rossi arranged a follow-up meeting with Boston Heart's Texas sales team. ROA.24-40779.11941; ROA.24-40779.11944; ROA.24-40779.11954; ROA.24-40779.11964; ROA.24-40779.4842.

Ms. Hertzberg, joined by Boston Heart's Vice President of Human Resources, met with Mr. Ivers personally. In her meeting with Mr. Ivers, Ms. Hertzberg was visibly upset and expressed that she "felt like she had been punched in the gut" by the surprise of these allegations. ROA.24-40779.11907. Up to that point, she had been consistently informed that MSOs were providing marketing services to the hospital and that Little River had a "sound business model." ROA.24-40779.6180. Her understanding was grounded in the representations made by both Little River and her internal team.

21

Mr. Rossi, rather than Ms. Hertzberg, investigated Mr. Ivers' email, consistent with the reporting structure at Boston Heart and the transition of authority already underway given her resignation. Ms. Hertzberg had submitted her formal resignation notice before receiving Mr. Ivers' email and had been instructed by Mr. Lapin that Mr. Rossi now reported directly to Mr. Lapin and the Board instead of to her. ROA.24-40779.6602; ROA.24-40779.10634-37. Further, Ms. Hertzberg was disinvited from the next compliance meeting even while still technically CEO following her resignation notice. ROA.24-40779.6733.

## IV.   The Federal Criminal Investigation and Indictment

On January 13, 2022, a one-count indictment was returned against 18 defendants alleging a violation of 18 U.S.C. § 371 for a conspiracy to commit illegal remunerations. ROA.24-40779.53. The indictment was riddled with inaccuracies, demonstrating that the government indicted Ms. Hertzberg based on an incomplete investigation in which it: failed to interview any of Ms. Hertzberg's twelve direct reports, ROA.24-40779.11406-09; ROA.24-40779.6609; failed to gather basic and exculpatory evidence, including the "sound business model" memorandum written by Ms. Shore, ROA.24-

40779.11421-23;[2] ROA.24-40779.6180-86; and relied on false accusations from Eurofins, including when drafting the indictment, ROA.24-40779.10663-85; ROA.24-40779.11395-97; ROA.24-40779.11431-32.[3] The indictment also was filed well over five years after Ms. Hertzberg separated from Boston Heart in August 2016.

## V.    Trial and Sentencing

A criminal trial proceeded against five of the indicted defendants, lasting approximately six weeks. The government called more than 20 different witnesses to testify in its case-in-chief, including eight alleged conspirators who were cooperating in the trial as part of their agreements with the government: Robert O'Neal; Laura Howard; Dr. Jason DeMattia; Dr. Heriberto Salinas; Ruben Marioni, Todd Cook; Jeff Parnell; and

---

[2] The documents described in the cited testimony as "Hertzberg Exhibit 170" and "Hertzberg Exhibit 171" are copies of Ms. Shore's email and memorandum admitted as Government's Exhibit 978. ROA.24-40779.6180.

[3] The indictment stated, for example, that Ms. Hertzberg signed the agreement between Boston Heart and Stamford Hospital, but in fact her successor, Tom Burnell, signed the agreement. ROA.24-40779.6613. The indictment also alleged that Ms. Hertzberg concealed Little River's revenues, its business model, and the hospital's use of MSOs despite ample documentary evidence directly to the contrary. ROA.24-40779.6670; ROA.24-40779.6671; ROA.24-40779.6684.

Christopher Gonzales. No witness testified that Ms. Hertzberg was a member of the conspiracy or even that she had done anything to support the conspirators' efforts. Of the conspirators who testified, only those who worked at Boston Heart even testified that they knew Ms. Hertzberg and even those former Boston Heart employees failed to testify that they had any significant relationship with her such that they would invite her into the conspiracy. In fact, multiple witnesses testified that they had intentionally concealed their involvement in the conspiracy from Ms. Hertzberg specifically. The government also offered hundreds of pages of documentary evidence, ranging from emails between alleged conspirators to revenue information regarding the Little River business. None of these documents described Ms. Hertzberg being informed of the conspiracy or agreeing to join it. Rather, certain documents demonstrated the lengths the alleged conspirators went to conceal the conspiracy, such as Mr. Parnell's removal of language related to physician remuneration and MSO investments in the summary document sent to Ms. Hertzberg. ROA.24-40779.6586.

At the close of the government's case-in-chief, Ms. Hertzberg moved orally for a judgment of acquittal. ROA.24-40779.12554. The district court reserved judgment at that time. ROA.24-40779.12612. After the defense case

24

and the government's rebuttal case, Ms. Hertzberg renewed her oral motion for a judgment of acquittal. ROA.24-40779.13332. The district court again reserved judgment. ROA.24-40779.13332.

At closing, the government relied extensively on inaccuracies and mischaracterizations to bolster its nonexistent case against Ms. Hertzberg. For example, the government told the jury that Ms. Hertzberg "directed Matt Theiler to work with Robert O'Neal," ROA.24-40779.13380, the known "architect" of the MSO kickback scheme, ROA.24-40779.11370, and that she "[did] business with" Mr. O'Neal "for years," ROA.24-40779.13385. Both statements were false. There was no evidence that she knew anything about Mr. O'Neal's role in the Little River business. In fact, the government put forward no evidence at all that Ms. Hertzberg was even aware of Mr. O'Neal's existence. The government similarly told the jury, incorrectly, that Ms. Hertzberg approved the Stamford Hospital agreement, ROA.24-40779.13631, and that she failed to end it, ROA.24-40779.13382. These statements were likewise false as Ms. Hertzberg's successor had approved the Stamford agreement after she resigned from Boston Heart, ROA.24-40779.6593-97, and Ms. Hertzberg could not have failed to end it given she was no longer employed by the company. The government made well over

25

20 different such misstatements and outright fictionalizations of the record during its closing argument. ROA.24-40779.18976-77.

At the close of trial, the jury convicted all defendants, including Ms. Hertzberg, of a conspiracy to violate the AKS (Count 1, 18 U.S.C. § 371). Ms. Hertzberg filed a written motion for a judgment of acquittal, ROA.24-40779.18939-90, that the district court denied by written order, ROA.24-40779.7088-143.

The district court upheld the verdict on exceedingly narrow grounds. Recognizing the lack of direct evidence elicited during trial, the district court ultimately held that "[a] jury could infer" Ms. Hertzberg's guilt from other circumstantial evidence. The district court also determined that Ms. Hertzberg's argument in the alternative that her disassociation from Boston Heart and decision not to sign the contract with Stamford Hospital demonstrated withdrawal from the alleged conspiracy was not sufficient evidence of withdrawal. The district court did not discuss the uncontroverted evidence that Ms. Hertzberg was reassured by Ms. Shore and others after investigation that the Little River relationship was not problematic, that the conspirators affirmatively took steps to hide the conspiracy from Boston Heart leadership, including Ms. Hertzberg, and that

26

the government did not ask a single testifying conspirator whether Ms. Hertzberg was part of the conspiracy.

On November 15, 2024, the district court held a sentencing hearing for Ms. Hertzberg. The sentencing record contained "[l]etters from dozens of colleagues who . . . worked with [Ms. Hertzberg] over the years" who "attest[ed] to [her] hard work, . . . [her] integrity and [her] contributions to society." ROA.24-40779.19569. At her allocution, Ms. Hertzberg reiterated that she was "innocent" and highlighted the paucity of facts providing "any logical or consistent explanation for when or how or [with] whom [she] joined th[e] conspiracy." ROA.24-40779.19565.

The district court determined that Ms. Hertzberg "was not as culpable" as the alleged co-conspirators and granted her motion for downward variance. ROA.24-40779.19569. The Court explained that "[i]mposing on Ms. Hertzberg a harsher sentence than the architects of the conspiracy and those who profited directly from it . . . would result in an unwarranted disparity." ROA.24-40779.19557. The district court verbally sentenced Ms. Hertzberg to 60-months' probation and ordered her to pay a fine of $100,000 to the United States.

27

The district court entered final judgment on November 22, 2024, ROA.24-40779.19394, and Ms. Hertzberg timely filed her notice of appeal on December 6, 2024, ROA.24-40779.19401.

## SUMMARY OF ARGUMENT

Ms. Hertzberg is an innocent woman. Any reasonable juror would have reasonable doubt that Ms. Hertzberg even knew of the AKS conspiracy, let alone voluntarily agreed to join it. More than 20 witnesses took the stand in the government's case-in-chief, but none identified Ms. Hertzberg as a conspirator. Tellingly, the government did not even ask them to do so. Nor did any of the documentary evidence elicited by the government show Ms. Hertzberg's awareness of the kickback scheme. Instead, the evidence showed that the conspirators hid their unlawful conduct from her.

The district court denied Ms. Hertzberg's motion for acquittal on the slenderest of grounds, and the court's reasoning is both legally and logically invalid. The district court's lead contention was that the jury could have inferred Ms. Hertzberg's participation in the conspiracy from the fact that she was an active CEO. This Court has reversed convictions for relying on that rationale, which punishes an executive for being an executive. And here, the record unequivocally showed that Ms. Hertzberg's involvement with her company was legitimate and that her subordinates repeatedly advised her that the MSO arrangement was appropriate.

29

The district court also contended that a jury could infer Ms. Hertzberg sought to prevent the dissemination of sales figures that were suggestive of the kickback scheme. Not only were those sales figures unremarkable, but it is undisputed that Ms. Hertzberg restricted that information from the alleged *conspirators* and provided it to *undisputed non-conspirators*. The district court likewise rested on irrational speculation when it contended that a jury could infer that Ms. Hertzberg ignored warnings about the conspiracy. Again, the evidence was unequivocal that Ms. Hertzberg's team advised her—after investigating at her direction—that the MSO arrangement was proper.

The evidence was also insufficient because the government entirely failed to establish an element of the offense: that Ms. Hertzberg knowingly agreed to join a kickback conspiracy that implicated *federal* funds. The district court's Rule 29 order did not even address this point. Reversal is warranted on that basis as well under Circuit precedent.

In the alternative, assuming Ms. Hertzberg was a knowing participant to the conspiracy—which she was not—she successfully established by a preponderance of the evidence that she withdrew from the conspiracy beyond the statutory deadline to file the indictment. Given her resignation

30

from her position as CEO of the laboratory testing company that was used by the architects of the conspiracy and her decision not to sign an agreement that the government alleged allowed the conspiracy to expand, Ms. Hertzberg demonstrated affirmative acts sufficient to show withdrawal.

Because the government did not carry its burden to prove guilt beyond a reasonable doubt, this Court should hold that there was insufficient evidence to support Ms. Hertzberg's conviction and reverse accordingly.

## ARGUMENT

### I.   Standards of Review

Sufficiency of the evidence determinations are reviewed *de novo*. *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018) ("When a defendant moves for acquittal in the district court, challenging the sufficiency of the evidence, this Court reviews the district court's denial de novo."). The Court must assess whether "a reasonable jury could find that the evidence establishes the guilt of the defendant beyond a reasonable doubt." *United States v. Pennington*, 20 F.3d 593, 597 (5th Cir. 1994).

For an affirmative defense such as withdrawal, however, the burden of proof is on the defendant. Accordingly, in reviewing the sufficiency of the evidence supporting the defense, the Court should vacate a conviction only

31

"if no reasonable trier of fact could have failed to find that [the defendant's] withdrawal from the conspiracy . . . was established by a preponderance of the evidence." *United States v. Heard*, 709 F.3d 413, 428 (5th Cir. 2013).

Where, as here, the district court reserved ruling on a defendant's motion for a judgment of acquittal after the close of the government's evidence, the Court's "review is limited to the evidence presented in the Government's case-in-chief." *United States v. Brown*, 459 F.3d 509, 523 (5th Cir. 2006). Because Ms. Hertzberg renewed her motion under Federal Rule of Criminal Procedure 29(c) at the close of all the evidence, this Court may also consider all the record evidence from the defense case in considering whether there was insufficient evidence at the close of all evidence. *United States v. Hammond*, 371 F.3d 776, 779 (11th Cir. 2004).

While this Court "read[s] the facts in the light most favorable to the jury's verdict," it must "dive into the record to understand what evidence was before the jury." *United States v. Jordan*, 945 F.3d 245, 252 (5th Cir. 2019). "[A] conviction cannot rest on an unwarranted inference, the determination of which is a matter of law." *Ganji*, 880 F.3d at 767 (quotation marks omitted). Accordingly, this Court must "consider[] . . . whether the inferences drawn by a jury were rational, as opposed to being speculative or

32

insupportable, and whether the evidence is sufficient to establish every element of the crime." *United States v. Vargas-Ocampo*, 747 F.3d 299, 302 (5th Cir. 2014) (en banc).

## II.    Legal Standards

To prove a defendant guilty of criminal conspiracy under 18 U.S.C. § 371, the government must prove beyond a reasonable doubt: "(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act." *United States v. Mauskar*, 557 F.3d 219, 229 (5th Cir. 2009) (quotation marks omitted).

The "unlawful objective" alleged here was to violate the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b. Subsection (b)(1) of the statute prohibits "knowingly and willfully solicit[ing] or receiv[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly . . . in return for referring an individual to a person for the furnishing . . . of any . . . service for which payment may be made in whole or in part under a Federal health care program." *Id.* § 1320a-7b(b)(1). Subsection (b)(2) makes it a crime to "knowingly and willfully offer[] or pay[] any remuneration (including any kickback, bribe, or rebate)" to induce someone to refer an

33

individual to a health care provider for which payment may be made under a federal health care program. *Id.* § 1320a-7b(b)(2).

To establish the requisite *mens rea* for a criminal conspiracy, the government must satisfy a showing of "two intent elements—intent to further the unlawful purpose and the level of intent required for proving the underlying substantive offense." *United States v. Nora*, 988 F.3d 823, 830 (5th Cir. 2021) (quoting *United States v. Brooks*, 681 F.3d 678, 699 (5th Cir. 2012)). To act "willful[ly]," a defendant must therefore "act[] with knowledge that his conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 192 (1998) (quotation marks omitted). "[A] person who has no knowledge of a conspiracy, but who happens to act in a way that advances some purpose of a conspiracy, does not thereby become a conspirator." *United States v. Brown*, 727 F.3d 329, 338-39 (5th Cir. 2013) (quotation marks omitted).

Knowledge cannot be ascribed also to an individual even if they "should have known" about a scheme or based on their "position in [a] company" where wrongdoing is taking place. *Ganji*, 880 F.3d at 776. In addition, to prove a conspiracy to violate the Anti-Kickback Statute, the government must prove that the defendant knew that the agreed-upon remunerations involved payments "that could be paid for through a federal

34

healthcare program." *United States v. Shah*, 95 F.4th 328, 352 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 518 (2025).

The government must also prove that the defendant knowingly agreed to join a conspiracy. "[A]n agreement to commit a crime cannot be lightly inferred." *Ganji*, 880 F.3d at 768; *United States v. White*, 569 F.2d 263, 267-68 (5th Cir. 1978). Nor can the government show guilt by placing a defendant near activity that "reek[ed] of something foul." *United States v. Jackson*, 700 F.2d 181, 185 (5th Cir. 1983) (quotation marks omitted). Rather, in the absence of evidence demonstrating an express agreement, the defendant's "actions and the surrounding circumstances must be incriminating enough to warrant a finding that the Government proved the existence of an agreement beyond a reasonable doubt." *Ganji*, 880 F.3d at 768.

## III.   There Is Insufficient Evidence that Ms. Hertzberg Had Knowledge of the Conspiracy, Let Alone that She Agreed to Join It.

This Court must reverse because the record is devoid of evidence that Ms. Hertzberg did what the government was obligated to prove beyond a reasonable doubt: that Ms. Hertzberg agreed to participate in a conspiracy. *United States v. Gevorgyan*, 886 F.3d 450, 454 (5th Cir. 2018).

The government did not elicit any direct testimonial or documentary evidence establishing that Ms. Hertzberg even *knew* of a conspiracy, let alone agreed to join one. On the contrary, the government's evidence demonstrated not just the lack of Ms. Hertzberg's involvement in the conspiracy but that the conspirators actively sought to conceal the conspiracy from her, that she was unnecessary to the conspiracy, and that she received no benefit from it.

*1.* This was a long trial where the government called more than 20 witnesses, including eight who the government alleged were participants in the conspiracy. ROA.24-40779.7089. The witnesses barely mentioned Ms. Hertzberg except to explain that they had *concealed* the conspiracy from her. For example, two of the alleged conspirators, Mr. Parnell and Ms. Howard, worked for Boston Heart, yet neither testified that Ms. Hertzberg was aware of a conspiracy. Mr. O'Neal, an admitted leader of the conspiracy at trial, never mentioned Ms. Hertzberg throughout the hundreds of pages of his testimony.[4]

---

[4] During trial, the government disclosed thousands of emails from Mr. O'Neal. ROA.24-40779.18981. While these emails were ultimately not admitted at trial, not one mentioned Ms. Hertzberg or indicated that she had any awareness of the conspiracy.

36

As this Court held in *Nora*, "[t]hat the Government had the cooperation of the chief orchestrator of [the] fraud but nevertheless failed to elicit testimony directly establishing the knowing complicity of [the defendant] is especially telling." 988 F.3d at 833. Nor, for that matter, was there any testimonial or documentary evidence that Ms. Hertzberg knew that any of the MSOs working for Little River offered physicians purported investment opportunities—nor, by the same token, that any resulting distributions were shams intended to induce referrals of any kind, let alone ones from federal payors.

Instead, the record evidence uniformly was that Ms. Hertzberg was consistently told both by Little River and by Boston Heart's sales team members that Little River used MSOs to recruit physicians into the hospital network using marketing and administrative means only—*without* any mention of kickbacks or physician remuneration. ROA.24-40779.4616-33 (Leadership Forum presentation); ROA.24-40779.4615 (Little River Webex); ROA.24-40779.4570-72 (Executive Summary); ROA.24-40779.6180-86 (Ms. Shore's memorandum). While witnesses "spoke of their own fraudulent actions, . . . they never testified that they agreed with [Ms. Hertzberg] to carry out these activities." *Ganji*, 880 F.3d at 770.

37

On the contrary, to the extent the witnesses mentioned Ms. Hertzberg at all, they uniformly explained that they had actively concealed from her and other leadership their relationship with MSOs and the conspiracy. Mr. Parnell explained that he hid his involvement with MSOs from Ms. Hertzberg while working at Boston Heart because he was afraid he would be fired. ROA.24-40779.9355-56; ROA.24-40779.9382-83. Mr. Parnell also removed references to physician remuneration in an executive summary explaining Little River's use of MSOs before Mr. Theiler shared the draft document with Ms. Hertzberg. ROA.24-40779.6586. Laura Howard similarly explained that she concealed her work with MSOs so she would not "lose [her] job with Boston." ROA.24-40779.10404-05. The government affirmatively acknowledged this pattern of concealment and argued in closing that it proved Mr. Kraus's guilt because he engaged in that concealment. ROA.24-40779.13645-46. But the other side of that coin is that the same record shows that Ms. Hertzberg was the person from whom the conspirators sought to conceal their activities.

*2.* The uncontroverted evidence also established that the MSO arrangements were successful and lucrative for the conspirators without the need for any involvement by Ms. Hertzberg. ROA.24-40779.9089; ROA.24-

38

40779.10331-37; ROA.24-40779.9381-83; ROA.24-40779.10331-37; ROA.24-40779.4722. Witnesses testified that sales team members were responsible for building connections with physicians and obtaining referrals for Boston Heart testing. ROA.24-40779.12276-77. Those who ran the MSOs, such as Mr. O'Neal, would then pay physicians for their referrals from the amount Little River would bill and collect from federal or private insurance. ROA.24-40779.12276-77.

Ms. Hertzberg played no role in this scheme. The government failed to even provide a basis that she was remotely "entangled" through her role as CEO "in . . . practices that were central to [Mr. O'Neal's and his conspirators'] fraud and kickback schemes." *Nora*, 988 F.3d at 827. As in *Nora*, the government failed to demonstrate that Ms. Hertzberg was aware of how kickbacks were being used, that she had any conversations with Mr. O'Neal or other conspirators about "the impropriety of paying kickbacks to recruiters," or that she was "trusted" by any conspirator. *Id.* at 833. Likewise, there was no evidence that Ms. Hertzberg knew that MSOs were being used as conduits for physician remuneration. On the contrary, Boston Heart's sales representatives, including those identified as conspirators, consistently told Ms. Hertzberg that MSOs provided only lawful physician

recruiting services for Little River. *See supra* pp. 12-13, 15. No one else who received the exact same information that Ms. Hertzberg received—including Ms. Shore, Boston Heart's Chief Compliance Officer, its Compliance Vice President Mr. Rossi, its Chairman Jonathan Lapin, and Eurofins—ever expressed any concern to Ms. Hertzberg that the MSOs might be paying kickbacks.

Further, the government's evidence demonstrated that Ms. Hertzberg received no financial benefit from the scheme. The record was clear that other conspirators benefitted financially. Mr. Madison, for example, made tens of millions of dollars from the conspiracy; Mr. O'Neal pocketed millions through his network of MSOs; even Laura Howard, a Boston Heart sales representative based in Texas, earned over a million dollars in personal profit from the scheme. ROA.24-40779.5745; ROA.24-40779.5721; ROA.24-40779.10371. Ms. Hertzberg, however, received nothing. The government thus failed to show a fundamental attribute of a member of a conspiracy, *i.e.*, someone with "a stake in [the conspiracy's] outcome." *United States v. Falcone*, 109 F.2d 579, 581 (2d Cir.), *aff'd*, 311 U.S. 205 (1940). This case is thus unlike others where a conviction has been affirmed on the ground that the jury could infer guilt from the defendant's profits from the illegal

40

conduct, *e.g.*, *United States v. Bourrage*, No. 23-60286, 2025 WL 1453658, at *11 (5th Cir. May 21, 2025) (noting that "shar[ing] money and profits from [a] venture" is an "indication of an agreement"); Ms. Hertzberg did not profit at all from the conspiracy.

It is an understatement to conclude that "the direct evidence favors [Ms. Hertzberg]." *Ganji*, 880 F.3d at 773. Far from establishing Ms. Hertzberg's knowledge and agreement to join the conspiracy, it shows the opposite.

## IV.  The District Court Erred in Denying Ms. Hertzberg's Motion for Acquittal.

The district court did not dispute that there was no direct evidence of Ms. Hertzberg's guilt. But it found that three pieces of circumstantial evidence would allow a reasonable juror to convict beyond a reasonable doubt. The district court's analysis is incorrect. With respect to each point, the inferences the district court suggested were not merely speculative but affirmatively *refuted* by the evidence.

### A.  The government faces a heavy burden in proving a defendant agreed to join a conspiracy through circumstantial evidence.

This Court does not "lightly infer a defendant's knowledge and acquiescence in a conspiracy," *United States v. Torres*, 114 F.3d 520, 525 (5th

41

Cir. 1997) (quoting *United States v. Cardenas Alvarado*, 806 F.2d 566, 569 (5th Cir. 1986)), particularly where, as here, the direct evidence is inconsistent with guilt and instead "favors" the defendant, *Ganji*, 880 F.3d at 773.

The government's burden is accordingly a heavy one: "[t]he actions and the surrounding circumstances must be incriminating enough to warrant a finding that the Government proved the existence of an agreement beyond a reasonable doubt." *Ganji*, 880 F.3d at 768. Above all, the prosecution cannot establish a conspiracy merely by submitting evidence that only places the defendant in "a climate of activity that reeks of something foul," *United States v. Gentry*, 941 F.3d 767, 786 (5th Cir. 2019) (quotation marks omitted), and it certainly cannot prove a defendant agreed to join a conspiracy—however foul—where that conspiracy was affirmatively hidden from the defendant.

"[C]onsider[ing] the countervailing evidence as well as the evidence that supports the verdict" as this Court must, *United States v. Moreland*, 665 F.3d 137, 149 (5th Cir. 2011) (quoting *United States v. Brown*, 186 F.3d 661, 664 (5th Cir. 1999)), the district court improperly "credit[ed] inferences

within the realm of possibility when those inferences [were] unreasonable," *id.* (quoting *United States v. Quattrone*, 441 F.3d 153, 169 (2d Cir. 2006)).

### B. Guilt cannot be reasonably inferred from Ms. Hertzberg's position as an "active" CEO.

*1.* The district court's lead contention was that the jury could infer guilt because the evidence showed that Ms. Hertzberg was "no hands-off CEO." ROA.24-40779.7108. In support of that assertion, the district court cited a variety of emails and other communications in which Ms. Hertzberg discussed Little River. ROA.24-40779.7108.

No one disputes that Ms. Hertzberg managed her company, but it is equally indisputable that none of the materials that the district court cited makes any mention, implicitly or otherwise, of the conspiracy or gives any indication whatsoever that something unlawful was afoot, let alone that Ms. Hertzberg joined the conspiracy when all the direct evidence indicated that she had no involvement, that non-conspirators like Ms. Shore consistently told her Little River's MSO relationships were lawful, and that the conspirators sought to hide the conspiracy from her.

The materials cited by the district court showed nothing more than normal CEO activity where Ms. Hertzberg learned about "the hospital landscape," ROA.24-40779.10161-62, and asked general questions to the

Boston Heart sales team about the status of the business arrangement, ROA.24-40779.4387 (email asking about relationship with Integrity Hospital). It would take an impermissible "speculative leap about the content of these [documents] and meetings" to infer "that they somehow alerted [Ms. Hertzberg] to the unlawfulness of" the MSOs' activities with Little River. *Nora*, 988 F.3d at 831.

*2.* This Court has long held that a jury cannot permissibly infer that a defendant joined a conspiracy based merely on her role and association, and in particular her role as CEO. *See Ganji*, 880 F.3d at 776 ("The Government's attempt to ascribe Davis with knowledge and agreement because of her position in the company falls far short of the necessary requirement for guilt beyond a reasonable doubt."); *White*, 569 F.2d at 268 ("[I]t is well-settled that a conspiracy cannot be proven solely by family relationship or other types of close association.").

In particular, this Court has emphasized that even if evidence of active management could allow an inference that a defendant executive *should* have known of a conspiracy, such evidence does not support the necessary inference that the executive *agreed* to join the conspiracy. "[A] defendant who provides leadership for a company may not be convicted simply because

44

the defendant 'should have known' that some employees under their oversight were committing fraud." *United States v. Duruisseau*, 796 F. App'x 827, 832-33 (5th Cir. 2019) (citation omitted). That is particularly so here given that the alleged conspirators on Boston Heart's Texas sales team (*e.g.*, Ms. Howard) were separated by several levels of corporate hierarchy from Ms. Hertzberg and had little contact with her.

In *Ganji*, for example, this Court reversed a conviction where the government argued that the jury could have "ascribe[d] [to the owner of a healthcare company] with knowledge and agreement because of her position in the company." *Ganji*, 880 F.3d at 776. In that case, the government asserted that the owner's "significant oversight" at the company was sufficient for the jury to convict, citing her use of incentives like paying bonuses to increase patient numbers, hiring staff who worked for a person who ultimately pleaded guilty to a healthcare conspiracy, and attending a meeting with a doctor who had recently been indicted for defrauding Medicare. *Id.* at 774-76. This Court explained that even if that evidence permitted the inference that an executive "should have known" a conspiracy was occurring, it could not support a conspiracy conviction, which requires

45

proof that the executive *actually* agreed to join the illegal enterprise. *Id.* at 776.

Here, as in *Ganji*, there was no evidence that would allow a reasonable inference that Ms. Hertzberg joined any conspiracy based on her management of a 400-person nationwide company. At most, the district court noted that there was evidence that a few of Ms. Hertzberg's *subordinates* "knew that, to obtain referrals, Little River paid MSOs, which in turn allowed referring physicians to purchase ownership interests and disperse their profits to the physicians." ROA.24-40779.7108. Subordinate knowledge of the conspiracy does not establish that Ms. Hertzberg knew of, let alone joined, the conspiracy herself—especially when those very subordinates sought to hide the conspiracy from her. *United States v. Turner*, 319 F.3d 716, 721 (5th Cir. 2003) ("Mere presence or association alone, however, are not sufficient to prove participation in a conspiracy.").

*3.* The district court also pointed to evidence showing that Ms. Hertzberg understood that MSOs recruited physicians. That is legally irrelevant and insufficient evidence to demonstrate knowledge of an unlawful scheme. The use of marketing, advertising, or administrative support to recruit physicians is common and lawful, and the district court

never suggested that it was unlawful to use MSOs notwithstanding its observation that Ms. Hertzberg was informed about the practice. The evidence showed nothing more than that Ms. Hertzberg's subordinates told her that the MSOs were providing marketing and administrative support, not illegal kickbacks. If anything, that evidence shows Ms. Hertzberg's innocence. If she were part of the conspiracy with her subordinates, they would not have mispresented the MSOs' role to her.

## C.   The evidence does not support an inference that Ms. Hertzberg concealed the conspiracy.

The district court also contended that the evidence could reasonably support an inference that Ms. Hertzberg "took steps to conceal aspects of the conspiracy." ROA.24-40779.7109. Again, that evidence would require the jury "to make a speculative leap." *Nora*, 988 F.3d at 831.

*1.* The district court primarily relied upon Ms. Hertzberg's October 12, 2015, request that Mr. Flynn not send weekly revenue updates to four sales team members who had previously received them—Mr. Theiler, Ms. Shore, Mr. Kraus, and Mr. Hardaway—as indicative of her knowledge and agreement in the conspiracy. It was undisputed, however, that Ms. Hertzberg limited the circulation of the update one day after receiving a complaint that the sales team was divulging this confidential data. ROA.24-

47

40779.4308; ROA.24-40779.4548. There was no question below that Ms. Hertzberg would be acting legitimately in her role as CEO to take steps to prevent the external dissemination of confidential sales data.

But the district court, without citation to the record, described "the revenue from the Little River relationship []as unusually high," and contended that Ms. Hertzberg's request permitted the conclusion she intended to hide the conspiracy. ROA.24-40779.7109. The record flatly refutes that inference on multiple levels.

To start, the revenue figures were not "unusually high." Rather, the record demonstrates that Little River's revenue fell *below* the forecasts prepared based on Boston Heart's nationwide average physician ordering levels (forecasts that were not predicated on the payment of kickbacks). The government's own witness, Andy Flynn, testified that he both developed the revenue projections and tracked the revenue for the Little River arrangement, and he explained that those projections were based on the average volume for Boston Heart's physician clients nationwide. ROA.24-40779.10778-79. Mr. Flynn testified further that nothing about the revenue made him suspicious that anything illicit was occurring, ROA.24-40779.10782, and that the revenue values were below the low end of the

financial projections that Boston Heart had prepared at the beginning of the contract, ROA.24-40779.10776-80. No testimony or other evidence contradicted these undisputed facts.

Nor was there any testimony from numerous other witnesses familiar with Little River's revenue, or any other evidence, that suggested that these revenues or ordering patterns for Little River-affiliated physicians were indicative of a kickback scheme. *See, e.g.*, ROA.24-40779.5357 (Bracuti, Craven, Theiler); ROA.24-40779.4300, ROA.24-40779.5689 (Wright); ROA.24-40779.11398-01, ROA.24-40779.11710-12 (Shore); ROA.24-40779.2985, ROA.24-40779.3005, ROA.24-40779.3035, ROA.24-40779.3066, ROA.24-40779.3092, ROA.24-40779.3124, ROA.24-40779.4529, ROA.24-40779.4642, ROA.24-40779.4665, ROA.24-40779.4684 (Lapin / Eurofins); ROA.24-40779.4529 (Albrecht); ROA.24-40779.10799-800 (McCormick). There was therefore no reasonable basis to infer that Ms. Hertzberg's decision to limit the circulation of the revenue was intended to conceal the conspiracy, because nothing in the record concerning the Little River revenue indicated that anything unlawful was occurring.

Moreover, three of the four people Ms. Hertzberg removed from receiving emails regarding Little River's revenue—Mr. Theiler, Mr. Kraus,

49

and Mr. Hardaway—were the very people the government identified as the conspirators. ROA.24-40779.4308. If Ms. Hertzberg wanted to hide the conspiracy, it makes no sense that she acted by blocking the alleged conspirators from getting the data. And no reasonable jury could infer that her "concealment" of these revenue figures from the Texas sales team was an effort to conceal the conspiracy when the figures were still provided to those the government concedes were not in the conspiracy—including Ms. Shore, ROA. 24-40779.11397-401, Boston Heart's legal team, the company's Board of Directors, and Eurofins.

The district court misstated the evidence on this point, asserting that "Hertzberg and others were concerned about sharing this information 'way too openly' within Boston Heart, 'which is not good.'" ROA.24-40779.7109 (citing ROA.24-40779.4548; ROA.24-40779.4308). But Ms. Hertzberg's express concern in that email was not that the information was being disseminated within Boston Heart, but that the salespeople receiving that information were sharing it "*outside* our company, which is not good." ROA.24-40779.4548 (emphasis added). Ms. Hertzberg's concern with the sales team's external dissemination of data was a legitimate basis for limiting its distribution to the sales team. Conversely, no reasonable juror could

50

conclude that Ms. Hertzberg sought to conceal the conspiracy by restricting information from supposed co-conspirators and sharing it with the company's control functions instead.

*2.* The district court also pointed to Ms. Hertzberg's interruption of Mr. Kraus's October 2015 presentation to Boston Heart's executive leadership team. The district court found that Ms. Hertzberg's actions suggested she sought to hide the conspiracy given that the "presentation . . . explicitly stated Little River used MSOs to recruit physicians to use its services." ROA.24-40779.7109.

But as noted above, Little River's use of MSOs for this purpose was both legitimate and known widely within Boston Heart, including to the Board and Eurofins because Ms. Hertzberg informed them about Little River's use of MSOs for that purpose. Interrupting Mr. Kraus's presentation did nothing to hide Little River's use of MSOs (which Mr. Kraus presented about) from the 40 Boston Heart employees present, let alone the conspiracy. Instead, the record makes clear what Ms. Hertzberg's actual purpose was: her (accurate) assessment that the information was "not medically related" nor "clinically focused," ROA.24-40779.10814, combined with her undisputed practice of not exposing the clinical team to revenue

51

information. ROA.24-40779.10814; ROA.24-40779.12815-16. Again, no one could reasonably conclude that Ms. Hertzberg was seeking to hide a conspiracy by interrupting a presentation that did not discuss the conspiracy and in fact described legitimate yet medically irrelevant conduct.

*3.* The district court also noted Ms. Hertzberg's awareness that the Stamford deal "would require Boston Heart, not the hospital, to bill Medicare and Medicaid for patients referred by MSO-participating physicians." ROA.24-40779.7109. The district court did not explain why these facts indicate that Ms. Hertzberg attempted to conceal the conspiracy, but the government argued below that the jury could have inferred that "this billing structure was chosen due to the conspirators' knowledge that, at minimum, paying for federal referrals violated federal law, and a carve out could . . . create the illusion that doctors were sending the tests to Boston Heart independent of the conspiracy." ROA.24-40779.19006.

The district court erred here as well. There is no record evidence that Ms. Hertzberg knew how Stamford requisitions were billed, specifically because no such billing took place until after Ms. Hertzberg left Boston Heart. ROA.24-40779.6593-97. The district court's opinion denying Ms. Hertzberg's motion for acquittal erroneously cited an exhibit discussing

deals concerning *other* hospitals, not Stamford. ROA.24-40779.7109 (citing ROA.24-40779.4549). Further, even assuming she was aware of the billing arrangement—which she was not—this information was also widely available to everyone, including experienced billing and compliance teams, and the government was unable to provide a coherent explanation why it would be indicative of a criminal conspiracy. Any conclusion that Ms. Hertzberg was attempting to conceal the conspiracy under these facts would require the jury to engage in "speculation and surmise"—precisely what the Fifth Circuit has warned against. *Moreland*, 665 F.3d at 149 (quoting *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994)).

**D.    The evidence does not support an inference that Ms. Hertzberg ignored warnings about the conspiracy or silenced those who raised them.**

Finally, the district court contended that the jury could infer guilt because Ms. Hertzberg supposedly ignored warnings about the conspiracy or attempted to silence those who raised them. Not so.

*1.* The district court cited Ms. Shore's November 2015 email to Ms. Hertzberg in which she recommended that Boston Heart not contract with two additional Texas hospitals proposed by Mr. Parnell, a Boston Heart sales team member, because she did not yet "fully understand the Little River

53

business model," their "marketing arm (MSO?)," or their "targeted provider market."    ROA.24-40779.4420;    ROA.24-40779.11603-04;    ROA.24-40779.11713-14. But the unrebutted testimony was that Ms. Shore's email was no "warning" of a potential conspiracy. On cross-examination, Ms. Shore made clear that the email was not a warning about kickbacks, because—as the government itself elicited more than once—she never learned about kickbacks during her time at Boston Heart. ROA.24-40779.11691; ROA.24-40779.11696-97; ROA.24-40779.11746-47. Even putting aside Ms. Shore's own testimony to the contrary, the contents of Ms. Shore's email itself explained that she did not understand the Little River business model initially and thus was uncomfortable with expanding to new hospitals—a concern that Ms. Hertzberg undisputedly agreed with and heeded. ROA.24-40779.4420. The record also showed—again without dispute—that after further meetings with Mr. Madison, Ms. Shore assured Ms. Hertzberg that Little River's use of MSOs was appropriate and its business model "sound," and recommended expanding the relationship. ROA.24-40779.6180-86. Contrary to the government's repeated and inaccurate insinuations at summation, neither in her November 2015 email nor at any other time did

54

Ms. Shore raise concerns about kickbacks or physician remuneration, nor did Ms. Hertzberg ignore any such warning.

*2.* The district court also cited Mr. Ivers' email to Boston Heart leadership in which he asserted allegations heard from others about unlawful remuneration in Boston Heart's Texas hospital business. ROA.24-40779.4577. But even Mr. Ivers described his email's allegations as "a surprise to [Ms. Hertzberg]," and he explained that he wrote to her because he wanted to "report . . . to someone who could do something about it." ROA.24-40779.11956-57. The district court faulted Ms. Hertzberg for only meeting with Mr. Ivers along with Boston Heart's Vice President of Human Resources and for later reassigning him to a different position in physician sales, which required him to report to a former colleague who had since been promoted to a Vice President role. The government put forward no evidence that Ms. Hertzberg learned at any point after receiving Mr. Ivers' email that the allegations were substantiated. And even had the government made such a showing, it would still be insufficient to demonstrate that Ms. Hertzberg agreed to join the conspiracy.

The district court found that Ms. Hertzberg either "took no action or attempted to silence" Mr. Ivers. ROA.24-40779.7109. But it was undisputed

that Ms. Hertzberg had already resigned when Mr. Ivers' email was sent and that she had been formally removed from any compliance function. It was likewise undisputed that Mr. Rossi immediately reached out to Mr. Ivers, met with him about the allegations, and also arranged a follow-up meeting with Boston Heart's Texas sales team. ROA.24-40779.11941; ROA.24-40779.11944; ROA.24-40779.11954; ROA.24-40779.11964; ROA.24-40779.4842. Upon her resignation, Ms. Hertzberg further instructed Mr. Rossi to provide information on all relevant legal matters to her successor. ROA.24-40779.6610. In short, Ms. Hertzberg was no longer in a position to "act" when she met with Mr. Ivers, and no evidence was put forward that Ms. Hertzberg encumbered Mr. Rossi's investigation of Mr. Ivers' allegations in any way. If anything, Ms. Hertzberg's lack of interference in Mr. Rossi's investigation of Mr. Ivers' allegations supports an inference of innocence. The district court also referenced Mr. Ivers being transferred to a new team, but even there recognized that this was no demotion as Mr. Ivers' new supervisor had the same seniority level as his prior supervisor. ROA.24-40779.7111; ROA.24-40779.4885 (noting Vice President title of Greg Quinn, Mr. Ivers' new supervisor). There was no reasonable basis for a juror

56

to infer that Ms. Hertzberg's inaction could serve as an inference of her knowledge of the conspiracy and agreement to join.

The district court also pointed to Mr. Ivers' testimony that "everyone" in the company knew about the conspiracy. ROA.24-40779.7113. But the district court (at the government's urging) misstated the testimony. Mr. Ivers' testimony—recounting his email, also in evidence—was that a *single* "key individual" told him about the conspiracy. ROA.24-40779.11899-900. By contrast, he said what was widely known was that the Texas rural hospital business would eventually "go up in smoke." ROA.24-40779.11900. The latter statement has nothing to do with awareness of a kickback conspiracy (and instead reflected the well-known financial difficulties of that business). Indeed, the government itself did not believe that "everyone" at Boston Heart knew of the conspiracy—the government submitted evidence and argued to the jury that multiple individuals who worked as or more closely on the Little River business than Ms. Hertzberg had no knowledge of the conspiracy, including Ms. Shore, Mr. Flynn, Mr. Rossi, and even Ms. Hertzberg's successors, who signed and oversaw the Stamford contract that allegedly allowed the conspiracy to continue.

57

Taken together, the district court's reasoning demonstrates "an overly attenuated piling of inference on inference" that this Court has held is insufficient to establish knowledge or voluntary participation beyond a reasonable doubt. *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996).

## V.    There Was Insufficient Evidence of a Federal Nexus.

The government not only failed to establish that Ms. Hertzberg knew about and agreed to join a kickback conspiracy, it also failed to establish the additional element that she knew about a kickback conspiracy involving *federal* payors—a point that the district court did not even address in its order on Ms. Hertzberg's Rule 29 motion. To establish a kickback conspiracy, the government must demonstrate that the defendant knew that the agreed-upon remunerations involved "payment[s] [that] may be made in whole or in part under a Federal health care program." *Shah*, 95 F.4th at 353. Thus, as this Court held in *Shah*, it is an element of the offense that the defendant must have been aware of the possibility of a federal payment.

The government offered no evidence that Ms. Hertzberg was aware of the conspiracy, let alone that the conspirators paid physicians kickbacks to refer "patients that *could* be federally insured." *Id.* at 352. In *Shah*, the Fifth

Circuit held that the government met this burden by adducing direct evidence that the defendant received kickbacks for referring a patient who used TRICARE as backup insurance. *Id.* at 352-53. Here, there was no evidence that Ms. Hertzberg knew how Little River paid its MSOs (and thus how certain MSOs remunerated physicians): she was entirely uninvolved in the arrangements, and even the government's theory was that the arrangements were intended to conceal the truth, rather than reveal it. ROA.24-40779.8538-41.

Further, the evidence at trial demonstrated that the financial arrangements between Little River and its MSOs were structured to carve out any commissions on claims that might be paid by federal insurance. ROA.24-40779.2296-309. There was testimony at trial that Mr. O'Neal and others understood that, despite the carve-outs, the payments were intended to induce both federal and commercial claims. ROA.24-40779.9666-68; ROA.24-40779.12418-21; ROA.24-40779.12276; ROA.24-40779.12431-34. But the government made no attempt at all to prove that Ms. Hertzberg knew those facts, and the district court's opinion is silent on them.

Pursuant to *United States v. Shah*, the absence of such evidence is fatal to an Anti-Kickback conspiracy charge.

## VI.  There Was Sufficient Evidence of Withdrawal.

There was insufficient evidence to conclude beyond a reasonable doubt that Ms. Hertzberg ever agreed to join the conspiracy. But even if there had been, the record shows that Ms. Hertzberg took steps that would have indisputably constituted a withdrawal from the conspiracy in 2016, such that the government's charge against her was time-barred given her withdrawal more than five years prior to the January 12, 2022, indictment. *See* 18 U.S.C. § 3282(a).

The Fifth Circuit recognizes that "disassociat[ion]," *United States v. Hoffman*, 901 F.3d 523, 545 (5th Cir. 2018), and "affirmative acts inconsistent with the object of the conspiracy," *United States v. Schorovsky*, 202 F.3d 727, 729 (5th Cir. 2000), are sufficient to show withdrawal. "By definition, after a defendant withdraws, he is no longer a member of the conspiracy." *United States v. Read*, 658 F.2d 1225, 1232 (7th Cir. 1981). Accordingly, a defendant "cannot be held liable for acts . . . committed in the five years preceding the indictment by other conspirators because his withdrawal ended his membership in the conspiracy." *Id.* at 1233.

Ms. Hertzberg refused to sign the Stamford contract and announced her resignation from Boston Heart at an all-hands meeting in 2016. Even if—

contrary to fact and evidence—Ms. Hertzberg had somehow joined the conspiracy, her refusal to sign the Stamford contract and thus not continue the conspiracy "qualifies as an affirmative act because it tends . . . to defeat the purposes of the ongoing conspiracy." *United States v. Grimmett*, 236 F.3d 452, 455 (8th Cir. 2001). After leaving her job with Boston Heart, Ms. Hertzberg "obviously neither could foresee, control or have any involvement in any activity involving [Boston Heart] beyond that date." *United States v. Bullis*, 77 F.3d 1553, 1562 (7th Cir. 1996). These "affirmative acts" were "inconsistent with the object of the conspiracy" and would constitute a withdrawal on the (false) assumption that she had joined the conspiracy in the first place. *Schorovsky*, 202 F.3d at 729.

For example, in *United States v. Nerlinger*, the Second Circuit considered whether a salesman employed by a trading company had withdrawn from a conspiracy after he resigned from the company and closed an account used to defraud customers. 862 F.2d 967, 974 (2d Cir. 1988). The court explained that the salesman's role "was to open and maintain an account at [the company] into which [his co-conspirator] could direct trades in exchange for fifty percent of the profits." *Id.* The Second Circuit concluded that the salesman "unquestionably disavowed the conspiracy when he

61

resigned from" the company and closed the account. *Id.* In an analogous antitrust case, the Eleventh Circuit similarly recognized that, "[i]n the context of a business conspiracy," "[r]esignation from the conspiring business has frequently been held to constitute effective withdrawal." *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 839 (11th Cir. 1999) (collecting cases), *amended in part*, 211 F.3d 1224 (11th Cir. 2000).

Courts have determined that there is no effective withdrawal after resignation where the conspirator continues to act on behalf of the conspiracy. *Id.* Here, however, Ms. Hertzberg completely disassociated from Boston Heart upon her public resignation from the company, and there was no evidence that she in any way participated in the conspiracy after resigning. The district court determined that the jury could have rejected Ms. Hertzberg's withdrawal defense because she retained a passive equity interest in Boston Heart. But given the ubiquity of executive equity interests, that reasoning is tantamount to concluding that no executive could ever withdraw from a conspiracy by leaving the company, creating an exception that would swallow the rule that disassociation is sufficient to establish withdrawal. That is just another way of inferring guilt from

corporate status, and this Court should reject that inference, as it has in other cases. *See supra* pp. 44-46.

Because Ms. Hertzberg took these affirmative steps in 2016, *i.e.*, more than five years before the government indicted her, the government prosecuted her after the statute of limitations had run.

## CONCLUSION

For the reasons discussed above, this Court should reverse the decision below and vacate Ms. Hertzberg's conviction.

Respectfully submitted,

JENNER & BLOCK LLP

Dated: June 12, 2025

By: s/ *Matthew S. Hellman*

Matthew S. Hellman
David Bitkower
Keisha N. Stanford
Shreve Ariail
Emanuel Powell III
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
Telephone: (202) 639-6000
mhellman@jenner.com

*Counsel for Appellant Susan L. Hertzberg*

63

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

<div align="right">

*s/ Matthew S. Hellman*

</div>

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 11,459 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.1.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Expanded LT Standard font.

*s/ Matthew S. Hellman*