No. 24-40779

# In the United States Court of Appeals
# For the Fifth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*

v.

MATTHEW JOHN THEILER; SUSAN L. HERTZBERG;
DAVID WELDON KRAUS; THOMAS GRAY HARDAWAY,
*Defendants-Appellants*

On Appeal from the United States District Court for the Eastern District of Texas
in No. 6:22-CR-3, Hon. Jeremy D. Kernodle, U.S. District Judge

**BRIEF OF DEFENDANT-APPELLANT THOMAS GRAY HARDAWAY**

GENE R. BESEN
Texas Bar No. 24045491
GBesen@SheppardMullin.com
ELISHA J. KOBRE
Texas Bar No. 24127663
EKobre@SheppardMullin.com
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
2200 Ross Avenue, 20th Floor
Dallas, Texas 75201
Telephone (469) 391-7400
Facsimile (469) 391-7401

ATTORNEYS FOR THOMAS
GRAY HARDAWAY

## CERTIFICATE OF INTERESTED PERSONS

**No. 24-40779, United States v. Theiler, et al.**

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Plaintiff-Appellee **United States of America**.

2. Defendants-Appellants **Matthew John Theiler, Susan L. Hertzberg, David Weldon Kraus, and Thomas Gray Hardaway**.

3. The following law firms and counsel have participated in the case:

| **Plaintiff-Appellee** | **Counsel** |
|---|---|
| United States of America | Traci Lynne Kenner<br>Abe McGlothin, Jr.<br>Stephan Edward Oestreicher, Jr.<br>Bradley E. Visosky<br>Terri Lynn Hagan<br>Adrian Garcia<br>United States Attorney's Office<br>Eastern District of Texas<br>101 East Park Boulevard, Suite 500<br>Plano, TX 75074 |

| **Defendant-Appellant** | **Counsel** |
|---|---|
| Matthew John Theiler | Daniel L Geyser<br>Haynes and Boone, LLP<br>2801 N. Harwood Street, Suite 2300<br>Dallas, TX 75201 |

| | |
|---|---|
| | Jason D. Cassel<br>The Cassel Law Firm<br>204 N. Fredonia Street<br>Longview, TX 75601 |
| | Danielle M. Corcione<br>Christopher R. Paldino<br>Kathryn Pearson<br>Chiesa Shahinian & Giantomasi PC<br>105 Eisenhower Parkway<br>Roseland, NJ 07068 |
| Susan L. Hertzberg | Matthew S. Hellman<br>David Bitkower<br>Keisha N. Stanford<br>J.E. Shreve Ariail<br>Emanuel Powell III<br>Jenner & Block, LLP<br>1099 New York Avenue, NW<br>Suite 900<br>Washington, DC 20001-4412 |
| | Jack Wesley Hill<br>J. Wesley Hill, P.C.<br>5380 Old Bullard Road, Suite 600<br>PMB 180<br>Tyler, TX 75703 |
| David W. Kraus | Jeffrey J. Ansley<br>Arianna G. Goodman<br>Katherine M. Devlin<br>Vedder Price, P.C.<br>300 Crescent Court, Suite 400<br>Dallas, TX 75201 |

| | |
|---|---|
| Thomas Gray Hardaway | Gene R. Besen<br>Elisha J. Kobre<br>Sheppard, Mullin, Richter & Hampton LLP<br>2200 Ross Avenue, 20th Floor<br>Dallas, TX 75201 |

Dated: October 2, 2025

*s/ Gene R. Besen*
GENE R. BESEN
Texas Bar No. 24045491
GBesen@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2200 Ross Avenue, 20th Floor
Dallas, Texas 75201
Telephone (469) 391-7400
Facsimile (469) 391-7401

*Counsel for Thomas Gary Hardaway*

## STATEMENT REGARDING ORAL ARGUMENT

Thomas Gray Hardaway respectfully requests oral argument in this matter because this appeal follows a 23-day trial, with nearly two dozen witnesses and hundreds of voluminous exhibits. The issues raised in this appeal are factually and legally complex. Counsel therefore submits that oral argument would significantly aid the decision process. Fed. R. App. P. 34(a)(2)(C); 5th Cir. R. 34.2.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................................ iv

TABLE OF CONTENTS ......................................................................................v

TABLE OF AUTHORITIES ............................................................................. viii

STATEMENT OF JURISDICTION ....................................................................1

STATEMENT OF THE ISSUES .........................................................................2

INTRODUCTION ...............................................................................................3

STATEMENT OF THE CASE..............................................................................7

A. Hardaway and His Employment with Boston Heart Diagnostics ..................7

B. Dr. Jonathan Sheinberg Asks Hardaway to Introduce Little River to Boston Heart.......................................................................................................8

C. Management Services Organizations ...........................................................9

D. The Agreements Between Little River and the MSOs Expressly Disallowed Payments for Federal Samples ....................................................10

E. The Absence of Evidence of Hardaway's Knowledge of the Activities of the Criminal MSOs..............................................................................12

F. Hardaway Operates a Lawful and Compliant MSO......................................15

G. Hardaway Leaves Boston Heart Before It Begins Working with Stamford Hospital............................................................................................17

H. The Federal Criminal Investigation and Indictment......................................17

I. Trial and the District Court's Denial of Hardaway's Request for a "Good Faith" Instruction .........................................................................18

J. The District Court Discloses, for the First Time Following the Verdict that It Had Received a Jury Note Stating that a Juror's "Moral Compass" Precluded

Him from Being "Open Minded" and that the Juror Stated that He Would "Hang This Jury" ....................20

K. Post-Trial Motions and Sentencing ....................23

STANDARD OF REVIEW ....................25

SUMMARY OF THE ARGUMENT ....................26

ARGUMENT ....................28

I. The Evidence Was Insufficient to Show That Hardaway Knowingly and Willfully Joined the Conspiracy. ....................28

A. The Evidence Failed to Show that Hardaway Knew the MSO Payments Were Intended to Induce Physicians to Refer Laboratory Tests Payable by Federal Health Care Programs to Little River. ....................29

1. There Is No Evidence that Hardaway Knew the Criminal MSOs Were Paying Doctors to Induce Federal Referrals. ....................31

2. The Evidence as to Hardaway Was Limited to Lawful Conduct....................36

3. Hardaway's Only Knowledge About MSOs Came from His Operation of Rise Which Was Fully Compliant. ....................39

B. The Evidence Failed to Establish Hardaway's Knowledge that Payments for the Referred Lab Samples "May be Made" Under a *Federal* Healthcare Program....................41

II. There was Sufficient Evidence that Hardaway Withdrew from the Conspiracy. ....................44

III. The District Court's Failure to Disclose a Critical Jury Note Was Prejudicial Error and Requires that the Verdict Be Vacated. ....................45

A. The District Court's Failure to Notify the Parties of the Existence and Contents of Note # 4 Was Error. ....................46

B. The District Court's Failure to Inform the Parties of Note # 4 Was Prejudicial Error and Requires that Hardaway's Conviction be Vacated. ....................49

IV. The District Court Abused Its Discretion by Denying Hardaway's Request for a Good Faith Jury Instruction. ....53

A. Hardaway's Proposed Good Faith Instruction Was Substantively Correct. ....53

B. The Good Faith Instruction was not Substantially Covered in the Charge Given to the Jury. ....54

C. The Good Faith Instruction Concerned an Important Point and the Failure to Give It Seriously Impaired Hardaway's Ability to Present Effectively His Defense. ....56

CONCLUSION ....58

CERTIFICATE OF SERVICE ....60

CERTIFICATE OF COMPLIANCE ....61

# TABLE OF AUTHORITIES

Page(s)

Cases

*Gomila v. United States*
146 F.2d 372 (5th Cir. 1944) ....................................................................46

*Rogers v. United States*
422 U.S. 35 (1975)....................................................................................46, 48

*Ruan v. United States*
597 U.S. 450 (2022)...................................................................................30

*United States v. Alikpo*
944 F.2d 206 (5th Cir. 1991) ..................................................................25, 52

*United States v. Barnes*
979 F.3d 283 (5th Cir. 2020) ....................................................................30

*United States v. Bass*
490 F.2d 846 (5th Cir. 1974) ...........................................27, 47, 49, 50, 51

*United States v. Brown*
186 F.3d 661 (5th Cir. 1999) ....................................................................25

*United States v. Davis*
132 F.3d 1092 (5th Cir. 1998) ..................................................................42

*United States v. Davis*
609 F.3d 663 (5th Cir. 2010) ....................................................................47

*United States v. Eghobor*
812 F.3d 352 (5th Cir. 2015) ....................................................................26

*United States v. Frame*
236 Fed. Appx. 15 (5th Cir. 2007)..............................................................54

*United States v. Guevara*
408 F.3d 252 (5th Cir. 2005) ....................................................................25

*United States v. Hagen*
542 F. Supp. 3d 515 (N.D. Tex. 2021) ........................................................53, 55

*United States v. Hagen*
No. 3:19-cr-00146 (N.D. Tex. filed July 8, 2021)........................................53, 55

*United States v. Harris*
No. 3:17-cr-0103 (N.D. Tex. filed May 24, 2021) ............................................54

*United States v. Heard*
709 F.3d 413 (5th Cir. 2013) ......................................................................25, 45

*United States v. Hillsman*
480 F.3d 333 (5th Cir. 2007) ..........................................................................25

*United States v. Hoffman*
901 F.3d 523 (5th Cir. 2018) ......................................................................41, 45

*United States v. John*
309 F.3d 298 (5th Cir. 2002) ..........................................................................26

*United States v. Lamb*
5:19-cr-00025 (E.D. Tex. filed Dec. 11, 2019) .................................................55

*United States v. Lucas*.
516 F.3d 316 (5th Cir. 2008) ......................................................................53, 58

*United States v. Lyons*
731 F.2d 243 (5th Cir. 1984) ..........................................................................27

*United States v. Marchetti*
96 F.4th 818 (5th Cir. 2024) ..................................... 3, 26, 27, 30, 33, 34, 35, 54

*United States v. McDuffie*
542 F.2d 236 (5th Cir. 1976) ..........................................................................47

*United States v. Mejia*
356 F.3d 470 (2d Cir. 2004) ......................................................27, 46, 48, 51, 52

*United States v. Miles*
360 F.3d 472 (5th Cir. 2004) .....................................................30, 31, 33, 35, 41

*United States v. Moreland*
665 F.3d 137 (5th Cir. 2011) ....................39, 44

*United States v. Nora*
988 F.3d 823 (5th Cir. 2021) ....................44

*United States v. Read*
658 F.2d 1225 (7th Cir. 1981) ....................45

*United States v. Ricard*
922 F.3d 639 (5th Cir. 2019) ....................42

*United States v. Shah*
95 F.4th 328 (5th Cir. 2024) ....................26, 30, 41

*United States v. Shoemaker*
746 F.3d 614 (5th Cir. 2014) ....................35

*United States v. Sila*
978 F.3d 264 (5th Cir. 2020) ....................41

*United States v. Simkanin*
420 F.3d 397 (5th Cir. 2005) ....................53

*United States v. Sorensen*
134 F.4th 493 (7th Cir. 2025) ....................11, 31

*United States v. Sylvester*
143 F.3d 923 (5th Cir. 1998) ....................46, 48

*United States v. Vargas*
6 F.4th 616 (5th Cir. 2021) ....................45

*United States v. Wilson*
203 Fed. Appx. 140 (9th Cir. 2006)....................48

Statutes

18 U.S.C. § 371 ....................17

18 U.S.C. § 1320a–7b(b)(2)(A) ....................30

18 U.S.C. § 3231 ....................1

18 U.S.C. § 3282(a) ....................45

28 U.S.C. § 1291 ....................1

28 U.S.C. § 1294 ....................1

42 U.S.C. § 1320a-7b ....................11

42 U.S.C. § 1320a-7b(b)(2) ....................28, 29

42 U.S.C. § 1320a-7b(b)(2)(A) ....................31

42 U.S.C. § 1320a-7b(b)(l) ....................29

Other Authorities

FED. R. APP. P. 4(b) ....................1

FED. R. APP. P. 28(i) ....................58

FED. R. CRIM. P. 43 ....................25, 45, 48

FED. R. CRIM. P. 43(a)(2) ....................46

U.S. Const. amend. VI ....................25

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231. Jurisdiction of this Court is invoked under Sections 1291 and 1294, Title 28, United States Code, as this is an appeal from a final judgment of conviction and sentence in the United States District Court for the Eastern District of Texas. Hardaway's notice of appeal was timely filed in accordance with Rule 4(b) of the Federal Rules of Appellate Procedure.

# STATEMENT OF THE ISSUES

1. Whether the evidence at trial was sufficient to support Hardaway's conviction?

2. Whether the district court deprived Hardaway of his right to be present and to have counsel present at every significant stage of his criminal proceeding when it failed to inform him of its receipt of Jury Note # 4 depriving him of the chance to object and/or participate in any response?

3. Whether the district court abused its discretion by giving a defective Allen charge in response to Jury Note # 3 and in not responding to Jury Note # 4?

4. Whether the district court erred in denying Hardaway's request for a good faith jury instruction where there was a likelihood of confusion with a separate instruction as to "good faith reliance on counsel" and where the Government intentionally confused the jury on this very issue?

## INTRODUCTION

Thomas Gray Hardaway did not knowingly join the charged conspiracy because he had no knowledge of, or visibility into, what this Court has termed the "key relationship" at issue in an Anti-Kickback Statute ("AKS") case—the relationship between the marketers and the "relevant decisionmakers," here the doctors who referred patient samples to Little River Hospital for Boston Heart Diagnostics testing. *See United States v. Marchetti*, 96 F.4th 818, 827 (5th Cir. 2024).

Hardaway is unlike any of the defendants who pled guilty or were convicted after trial of participating in this conspiracy. He did not work for Little River, which paid the kickbacks. He did not work for any of the relevant Management Services Organizations, or MSOs, which had the "key" relationships with the referring doctors. He was not a referring doctor. And he was not an executive or a supervisor at Boston Heart.

Hardaway's lack of insight into the activity of the criminal MSOs was disclosed by Jeffrey Parnell who—cooperated with the Government *without* pleading guilty to participating in this conspiracy—testified on behalf of the Government that he, too, had no visibility into the key relationship between the MSOs and the doctors, and conspired with no one.

As to Hardaway, the Government's case amounted to a simple, but legally and factually incorrect, thesis that knowledge that Little River was working with MSOs amounted to knowledge that payments to doctors were (1) designed and intended to unduly influence doctors to refer samples to Little River; and (2) specifically intended to induce the referral of federal samples—i.e., samples payable by a *federal* health care program.

But that glib syllogism finds zero support in this record. *Every* Government witness to testify on the matter stated unequivocally that MSOs can be legal, including the lead Government investigator, who described "legitimate" MSOs, and a government expert who testified that MSOs are not even a "red flag." Indeed, the lead agent also testified that he investigated a different MSO run by Hardaway—one that was not alleged to participate in any of the unlawful conduct at issue—and concluded that it had all the indicia of a compliant MSO, including a *bona fide* legal opinion certifying its compliance with the law.

To prove Hardaway guilty of conspiring to violate the AKS, the Government needed—but failed to produce—something more about what he knew. The evidence—which, as to Hardaway, was paper thin and demonstrated only lawful conduct consistent with Hardaway's duties as a sales representative—failed to show that Hardaway understood how the relevant MSOs were paying doctors or seeking to unduly influence their referral of federal samples. Because Hardaway did not

have knowledge of these critical elements, his conviction cannot stand. Hardaway also withdrew from the conspiracy when he resigned from Boston Heart in July 2016, well outside the five-year statute of limitations.

Two other serious errors infected the trial. *First*, the district court inexplicably withheld a critical deadlock note from the jury indicating that one juror's "moral compass" would not allow him to continue deliberations and that he intended to "hang this jury." Under this Court's clear precedents, withholding this note and failing to disclose its existence or contents to defense counsel was structural error. And failure to respond with an appropriate cautionary instruction, as required by this Court, was not harmless beyond a reasonable doubt.

*Second,* the district court denied Hardaway's request for a basic good faith jury instruction—*i.e.*, that a defendant's good faith belief that his conduct was legal is a complete defense—though identifying nothing in the proposed instruction inconsistent with the law. While a good faith instruction may sometimes be duplicative of instructions on knowledge and intent, this case is different because the district court provided the jury with a *different* good faith instruction—"good faith reliance *on the advice of counsel*"—with all its distinct technical requirements. The district court's denial of Hardaway's requested instruction likely led the jury incorrectly to believe that *only* "advice of counsel" could constitute "good faith," and the prosecution exploited that confusion to a tee in its summation. The denial

of the requested good faith instruction seriously impaired the jury's perception of Hardaway's core defense at trial.

Hardaway, an upstanding family man who has never been in trouble with the law, unfortunately found out years (more than five years) after ending his employment with Boston Heart, that the Government wanted to hold him criminally liable for the conduct of others who—unlike Hardaway—did have that "key relationship" with referring doctors, or at least visibility into that relationship. Hardaway did not, and on this critical "knowledge" element the Government's case fails.

Hardaway's conviction should be reversed.

## STATEMENT OF THE CASE

### A. Hardaway and His Employment with Boston Heart Diagnostics

Boston Heart Diagnostics is a Boston-based laboratory whose primary business was providing leading laboratory testing to improve heart health. ROA.12812-16. Boston Heart tests were uniformly considered excellent tests that allowed doctors to provide life-saving care to their patients. ROA.9558 (Dr. Salinas); ROA.10441-42 (Laura Howard); ROA.12718-19 (Dr. Sheinberg explaining how the Boston Heart test gave him "the ability to identify heart disease in early stage" and to predict "all the downstream consequences of untreated coronary disease"). Boston Heart routinely entered into contracts with individual physicians and healthcare facilities to meet these customers' testing needs. ROA.2330, 2698.

Hardaway was hired in 2012 as a sales representative for Boston Heart for the geographical area including Austin and San Antonio. ROA.9085, 22823. As a sales representative, Hardaway's duties included meeting with doctors within his service area and educating them on the clinical value of Boston Heart tests. *See* ROA.8514-15. Other relevant Boston Heart sales representatives included Jeff Parnell and Laura Howard, who covered the Dallas area, and Seth Morris who covered Houston. ROA.8705-06, 10103.

### B. Dr. Jonathan Sheinberg Asks Hardaway to Introduce Little River to Boston Heart

One of the doctors Hardaway covered as the Boston Heart sales representative in Austin was a cardiologist named Jonathan Sheinberg. ROA.12682 ("Hardaway . . . was the Boston Heart Lab sales rep that would come to our office to educate us about the [] test."). Sheinberg had long-running relationships with both Little River and Boston Heart that predated any of the alleged unlawful conduct in this case. Sheinberg began utilizing Boston Heart testing in his own practice in 2013. ROA.12724-25, 4345-46.

In 2014, long before the July 2015 alleged start of the conspiracy, Sheinberg leased his cardiology practice to Little River hospital—a healthcare facility with campuses about 40 miles northeast of Austin—and became an employee of Little River. ROA.12726, 12754.

Sheinberg was a strong believer in the clinical efficacy of Boston Heart's advanced lipid panel tests. ROA.12695 ("So this test, like I said, this test saves lives."); ROA.12718-19 ("This lab test gives me the ability to identify heart disease in an early stage, and by doing, so I'm predicting all the downstream consequences of untreated coronary disease."). Again, long before Little River ever contracted with Boston Heart, Sheinberg became one of Boston Heart's largest customers. ROA.8997, 12708, 9085-86.

At some point, Sheinberg began receiving increasing complaints from both his patients and the insurance companies themselves that the Boston Heart tests were not covered by insurance because Boston Heart was an out-of-network laboratory. ROA.12674 (describing complaints from his patients and "threatening letters" from insurance companies informing Sheinberg that he could no longer order the Boston Heart tests). Sheinberg sought Hardaway's assistance in introducing Little River to Boston Heart so that the tests might be billed and covered through Little River's in-network contracts. ROA.12674-90, 12681-82, 9085-86, 4433, 4846-47.

This introduction resulted in Little River entering a contract—common in the industry—under which Little River would utilize Boston Heart tests, billed in-network under Little River's contracts, for tests ordered through Little River. ROA.8705, 9280-81, 11836-37. There was nothing remotely improper about Hardaway's role in facilitating the relationship between the two entities, or with Hardaway receiving a commission for the tests Little River subsequently purchased from Boston Heart. ROA.11478-80.

### C. Management Services Organizations

The evidence was uncontroverted that MSOs at the center of this case are not *per se* illegal. As explained by the Government agent in charge of this investigation, Special Agent Jack Geren of the Health and Human Services Office of Inspector General, MSOs are "entities that provide administrative and support services to

physician practices. Basically, allowing doctors to . . . spend more time being doctors and less administrators." ROA.10974.

Agent Geren testified "MSOs aren't illegal," and provided examples of "legitimate MSO[s] that [he has] seen in the course of [his] work." ROA.10974, 11481.

The Government's own expert, Dr. Faisal Rahman, likewise testified that MSOs are "common" and that the term "MSO" is not a red flag. ROA.8027 ("[S]uffice it to say, the fact that when an MSO comes up in this context, it isn't a red flag to anyone, right? I mean, the term 'MSO,' that's a common thing in the practice of medicine, right? A. Yes.").

Numerous witnesses testified consistently with this fact. *See* ROA.12929-30 (Ryan Downton) (noting nothing is inherently wrong with MSOs); ROA.9085 (Todd Cook) ("there are legal ways to operate an MSO"); ROA.12122-23 (Adam Aseron) (same). There was no evidence to the contrary.

### D. The Agreements Between Little River and the MSOs Expressly Disallowed Payments for Federal Samples

Beginning even before its work with Boston Heart, Little River contracted with various MSOs to identify and recruit physicians for the hospital. ROA.8651, 10144, 12986, 8651, 8778. The primary MSOs working with Boston Heart during

the relevant period were Ascend Professional Consulting, Inc. ( "Ascend") and Next Level Healthcare Consultants, LLC ( "Next Level"). ROA.8694-95, 8810-11.[1]

Doctors ordered Boston Heart tests through Little River that were billed to commercial insurers and federal programs by Little River. ROA.11015-17. Little River paid its MSO marketers a percentage of the collections it received from commercial insurance carriers for tests ordered by the particular MSOs' affiliated doctors. *See* ROA.2272-91, 2296-309, 11498.[2]

Each of the contracts between Little River and the MSOs expressly stated that no marketer would encourage referrals payable by a federal healthcare program and that no payments would be made in exchange for any referrals payable by a federal health care program. ROA.8495-96, 11483-84, 2294-95, 5226-28.

Consistent with these written agreements, the evidence was that Little River *did not* pay the marketing companies for samples payable under a federal health care program. ROA.12989-90 (Downton) ("We don't pay for federal. We will never pay

[1] During the trial, various other marketing companies and MSOs were mentioned in passing, including Exit Therapy, Benchmark, Jacobs Marketing, S&G Staffing, and LGRB Management d/b/a Rise Health Solutions. However, Ascend and Next Level were the primary MSOs at issue in this case and the only MSOs the district court found were proven to be part of the criminal conspiracy. ROA.22740.

[2] The use of third-party marketers and advertisers—absent payments made to induce physician referrals—has been held not to violate the AKS, 42 U.S.C. § 1320a-7b. *See, e.g., United States v. Sorensen*, 134 F.4th 493, 501 (7th Cir. 2025) (holding that payments to third parties for "only advertising services" did not violate the AKS).

for federal."); ROA.10459 (Gonzales) ("Q. [s]o you have no reason to believe that Ascend ever got paid for the referral of federal specimens, correct? A. Correct."); ROA.10476 (Howard) ("no payments to Ascend on federal volume" and "none of the doctors that invested in Ascend MSO of Texas were going to get paid on federal samples"); ROA.8145 (DeMattia) ("To your knowledge, did Little River ever pay for federal referrals? A. To my knowledge, no."); ROA.8982, 9091 (Cook) (Little River never paid a commission to marketers for the referral of federal specimens and "had a very strong policy of 'we don't pay for federal specimens'").[3] [4]

### E. The Absence of Evidence of Hardaway's Knowledge of the Activities of the Criminal MSOs

As a Boston Heart sales representative, Hardaway was not involved in the set-up, management, coordination, or supervision of Ascend or Next Level, the MSOs allegedly involved in the unlawful payments (hereafter the "Criminal MSOs"). ROA.11471-75, 8513, 10474-75. It was sales personnel from the Criminal MSOs, or Boston Heart representatives from Dallas or Houston (where these MSOs operated) who partnered with the Criminal MSOs who told doctors that they could

---

[3] Even Agent Geren, when asked whether he took any investigative steps to determine whether Little River carved out payments for federal referrals, could not definitively recall seeing payments on federal samples. ROA.11484, 11487.

[4] On the few occasions when payments were inadvertently made on federal samples, Little River immediately reversed the payments. ROA.8567-68.

make money by ordering tests through Little River, not Hardaway. ROA.9085, 9414, 6787.

Hardaway's role was limited to explaining the tests to doctors and providing the necessary equipment for the doctors to draw blood and order the Boston Heart tests within his designated geography—hundreds of miles away from the activities of Ascend and Next Level. ROA.8515, 9085, 12717, 8262-63 (The Boston Heart representative would "speak about the technical, the laboratory, how it worked, what it tested for, what type of reports they would be receiving, and the logistics behind that."); ROA.9414.

Hardaway also had little or no communication with individuals involved with the Criminal MSOs. Indeed, Agent Geren testified that, during his years-long investigation, he did not recall seeing *any communications* between Hardaway and any of those operating Ascend, including Christopher Gonzales, Todd Hickman, Robert O'Neal, or Howard (other than routine Boston Heart communications). ROA.11474-75.

Likewise for Next Level. Agent Geren testified that the only three individuals associated with Next Level were Ruben Marioni, Jordan Perkins, and a Mr. Flores. ROA.11472. There was no evidence of any substantive communication between Hardaway and Perkins or Flores. Marioni rarely spoke with Hardaway and then only to discuss onboarding doctors to Boston Heart testing – part of his job

responsibilities at Boston Heart. ROA.8513-15 (Marioni confirming that he "did not regularly communicate with Hardaway", that there would be very few email communications between the two, and that when they would communicate it would be to discuss onboarding doctors).

Notably, Parnell, the Government's witness who, like Hardaway, was a Boston Heart sales representative, testified that when conducting Boston Heart sales presentations for doctors he did not participate in the MSO portion of that presentation. ROA.9413-14. Although Parnell testified at trial as a cooperator, he did *not plead guilty to violating the AKS* or participating in any conspiracy. ROA.9433-34. Parnell stated that the MSO presenters "didn't want [him] in the room" because they did not want him to "know their business." ROA.9414. *See also* ROA.9417 ("David, obviously, Boston doesn't do anything with the MSOs, so we will not be part of that presentation.") (citing Hardaway Ex. 125 (ROA.6787)); ROA.9417 ("Q. Okay. So does this email reflect what you were just talking about, the fact that you would do the Boston Heart training and talk about the Boston Heart test clinically –A. Yes.").

The record is simply bare of evidence that Hardaway knew anything about the workings of the Criminal MSOs—including how Little River calculated its payments to the MSOs or how distributions were made to each MSO's physician investor. *See* ROA.9419 (Parnell) (explaining that as a Boston Heart representative,

he had no "transparency into other MSOs" and couldn't have known what they were doing because the other MSOs "didn't tell us.").[5]

Likewise, there is no evidence that Hardaway had any knowledge that doctors accepted remuneration in exchange for federal referrals. Three doctors testified at trial: DeMattia, Salinas, and Sheinberg. Neither DeMattia nor Salinas even knew of Hardaway, (ROA.8135, 9566), and Sheinberg testified that he was not part of an MSO and never received payment in exchange for any of his referrals. ROA.12716-18.[6]

### F. Hardaway Operates a Lawful and Compliant MSO

Hardaway, together with a partner, Stan Jones, operated his own MSO, named Rise Health Solutions ("Rise"), which, for a short time, had a marketing contract with Little River. ROA.8731.

---

[5] To the extent Hardaway knew anything about Little River's arrangements with the Criminal MSOs, Little River made it very clear to any marketing company it worked with that it would not pay for federal referrals. *See* ROA.8495-96, 11483-84; Gov. Ex. 5 (ROA.2272-91 at ROA.2280); Gov. Ex. 7 (ROA.2294-95); Gov. Ex. 8 (ROA.2296-309 at ROA.2301).

[6] A total of six doctors were indicted in this case, all of whom were associated with Ascend, with which Hardaway was not involved. All six live in North Texas and none had any connection or relation to Hardaway. ROA.11474-75.

Neither Rise nor any of its physician investors were ever alleged to have engaged in criminal conduct. Indeed, the evidence established that Rise acted entirely lawfully. ROA.9356, 9418-19, 9420, 9424-25, 9433-34.

Agent Geren testified that he investigated Rise as part of this investigation and concluded that—consistent with a lawfully operated MSO—Rise had numerous other employees (other than its owners) and confirmed that Rise "had obtained legal counsel." ROA.11481-82. Parnell also testified that Rise sought advice of counsel and operated legally. ROA.9356, 9418-20, 9424-25, 9433-34. *See also* ROA.13118-19 (Downton) ("I had an opinion letter from Rise's attorney who laid out that their setup was completely legal and appropriate, and there -- no one was getting paid on federal specimens."). Rahman, the Government's own expert, testified that consulting legal counsel was an "extremely important" factor to MSO compliance and that he himself worked with attorneys to set up his own MSO. ROA.8004.

Apart from Rise's own consultation with counsel, Rise's physician investors separately consulted with—and obtained approval from—legal counsel before investing. ROA.9420 (Parnell) ("Q. Okay. Did the fact that they had consulted with lawyers give you some comfort that -- give you further comfort that this MSO was legal? A. It was just that they were doing their due diligence, yes."); ROA.10476 (Howard) ("Q. Did Dr. Worrell obtain two independent legal opinions that the Rise Health Solutions' offering was legal? A. That's what Dr. Worrell stated.").

The only similarity to the Criminal MSOs at issue is that Rise was also not paid a penny for any referred samples paid through federal health care programs. ROA.9423-24, 9433.[7]

## G. Hardaway Leaves Boston Heart Before It Begins Working with Stamford Hospital

Hardaway resigned from Boston Heart effective July 8, 2016, and had no further involvement with the company after that date. ROA.10032, 11310-11, 11476; Gov. Ex. 507 (ROA.4768). Rise had already ceased working with Little River in December 2015 and had no subsequent involvement with the hospital. ROA.9088-89.

Nor was Hardaway involved with Stamford Memorial Hospital, another hospital with which Boston Heart entered a contract in August 2016 after Hardaway left Boston Heart. ROA.11476.

## H. The Federal Criminal Investigation and Indictment

On January 13, 2022, a one-count indictment was returned against 18 defendants alleging a violation of 18 U.S.C. § 371 for a conspiracy to commit illegal remunerations. ROA.53. The 72-page indictment barely mentioned Hardaway and

---

[7] The Government, aware that Hardaway's ownership of Rise was not evidence of his guilt, presented virtually no evidence pertaining to Rise at trial. Rather, the Government chose to suggest that involvement with any MSO was illegal but never connected Rise or Hardaway to the illegal conduct presented to the jury.

failed to allege any specific active conduct by Hardaway as part of the conspiracy. The indictment also was filed well over five years after Hardaway resigned from Boston Heart in July 2016.

## I. Trial and the District Court's Denial of Hardaway's Request for a "Good Faith" Instruction

Five of the indicted defendants proceeded to trial, which lasted approximately six weeks. The Government called 23 witnesses in its case-in-chief, including eight cooperating witnesses, of which five did not even know Hardaway and the other three had such minimal substantive contact with him that even two of those could not identify him in court. *See* ROA.8156 (Marioni testifying that he could not identify Hardaway in the courtroom); ROA.8613-14 (Todd Cook testifying that he did not see Hardaway in the courtroom).

At the close of the Government's case-in-chief, Hardaway moved orally for a judgment of acquittal. ROA.12592. The district court reserved judgment at that time. ROA.12612. After the defense case and the Government's rebuttal case, Hardaway renewed his oral motion for a judgment of acquittal. ROA.13332. The district court again reserved judgment. ROA.13332.

Both orally and in writing, Hardaway requested that the district court instruct the jury that Hardaway's good faith belief his conduct was lawful was a complete

defense to the charged offense. ROA.1941-42, 13260-64.[8] During the November 21, 2023 charge conference, Hardaway's counsel argued that, because one of the defendants (not Hardaway) was asserting a "good faith reliance on advice of counsel" defense, failure to include an instruction on good faith simpliciter would confuse the jury into believing, incorrectly, that good faith is not a defense unless it is based upon the advice of counsel, including all the prerequisites for that defense. ROA.13262-63.

At closing, the Government barely mentioned Hardaway and, when it did, it cited either entirely innocent conduct—such as Hardaway's introduction of Little River to Boston Heart and his involvement with Rise—or made clearly false statements. On the latter point, the Government told the jury that Hardaway "[did] business with" O'Neal "for years." ROA.13385. But Agent Geren's uncontradicted testimony was directly to the contrary. ROA.11474-75.

The Government also misled the jury as Hardaway's counsel had feared, suggesting that good faith—a belief in the lawfulness of one's conduct—somehow requires all the elements of an advice-of-counsel defense, which Hardaway had never argued:

> Let's talk about good-faith reliance on advice of counsel . . . [Counsel for Hardaway] tried to argue some version of this on behalf of Hardaway, but the record is devoid of any

[8] *See* ROA.1941-42 (full text of Hardaway's requested good faith instruction).

> attorney's name, or identity, what information that attorney was supposedly given, what advice they rendered, or whether it was strictly followed by Hardaway. There's just no evidence of that in the record. [Counsel for Hardaway] simply relies on a duct tape series of hearsay statements about the supposed involvement of an attorney, and then he haphazardly calls it good faith. It simply just is not.

ROA.13651, 13655.

At the close of trial, the jury convicted all defendants, including Hardaway, of a conspiracy to violate the AKS.

### J. The District Court Discloses, for the First Time Following the Verdict that It Had Received a Jury Note Stating that a Juror's "Moral Compass" Precluded Him from Being "Open Minded" and that the Juror Stated that He Would "Hang This Jury"

The jury began deliberating on the morning of November 28, 2023. The jury sent two notes that day, the first identifying the jury foreperson and the second stating that a juror (Juror #1) wished to "talk with" the judge the following morning. ROA.14983.[9] The following day, November 29, the jury sent two notes to the district court which stated, with increasing force and urgency, that the jury was deadlocked due to a single holdout juror, Juror No. 12 (the "Jury Deadlock Notes"). *See* ROA.14984, 14986.

---

[9] The parties were not informed of either note at the time they were received. The court informed the parties about Note # 1 the following day and about Note # 2 only following the verdict. ROA.15001. According to the courtroom deputy, nothing was sent to the jury in response to Note # 2. ROA.15001-03.

The first of these notes—Note # 3—was time-stamped 10:55 a.m. and the following note—Note # 4—was time-stamped 11:30 a.m. *Id*. Although both Jury Deadlock Notes explained that the jury was at an impasse, they are patently different in tone and substance. Note # 3 stated: "Juror #12 is unwilling to change his mind based on the evidence provided and the instructions you provided." ROA.14984. Note # 4 was materially more direct and in need of a direct response: "Juror #12 informed the jurors that his 'moral compass' would not allow him to be open minded. He also stated he would 'hang this jury.'" ROA.14986.

After receiving Note # 3 at 10:55 a.m., the district court notified the parties that a jury note had been received and directed the parties to appear for a conference at 11:30 a.m. ROA.14999. At that time, the district court informed counsel of the note's contents, the court's proposed response, and invited objections from the parties. ROA.13668-69. The district court proposed the following response:

> "I refer you to the instructions already provided. I further instruct you to continue deliberating until you have reached a unanimous decision. . . . You may be as leisurely in your deliberations as the occasion may require, and you should take all the time which you feel is necessary."

ROA.13668.

Based on the facts then known to Hardaway, he raised no objection to the proposed response. ROA.13668-69. At some point after the court adjourned at 11:35 a.m., the court received Note # 4—but decided not to inform Hardaway or the

other Defendants—and sent the proposed response to Note # 3 (the "Response"). ROA.13669, 14985 (adding the words "in good faith" following the directive to continue deliberating).

Hardaway did not know that the district court received Note # 4 either during the conference regarding Note # 3, or prior to the court sending its Response. *Compare* ROA.14996 (Note # 4 time-stamped 11:30 a.m.) with ROA.14995 (Response time-stamped 11:35 a.m.). The parties were not informed of the existence of Note # 4 until the following day, November 30, at 11:00 a.m., when immediately before taking the verdict, the district court informed the parties of the existence (but not the contents) of Note # 4:

> I did want to note for the record, we did receive a second note from the jury in the process of our responding to the first note. It was very similar to the first note, regarding Juror No. 12. I did not directly respond to it. That will be filed with the other jury notes after the verdict.

ROA.13674.

Contrary to the district court's *post hoc* remark and rationale that the notes were "very similar," (ROA.13674), Note # 4 was materially different and warranted a substantial independent response. Hardaway and his counsel did not learn of the contents of Note # 4 until the Deputy Courtroom Clerk attached the jury notes to an email on December 1, 2023, the day after the verdict was entered. ROA.14991-97.

### K. Post-Trial Motions and Sentencing

Hardaway filed a written motion for a judgment of acquittal, ROA.22552-87, that the district court denied by written order. ROA.7088-143. The district court's opinion upholding the verdict as to Hardaway referenced evidence not remotely supporting an inference of guilt or the court's conclusions. For example, the district court cited four exhibits for the proposition that Hardaway "knew that the MSOs did not actually provide any management or administrative services for the physicians who joined them." ROA.7120. Two of those exhibits make no mention whatsoever of Hardaway or MSOs, (*see* Gov. Ex. 289 (ROA.4392); Gov Ex. 978 at 7 (ROA.6186)), one mentions Hardaway but has no mention of and is unrelated to MSOs (Gov. Ex. 492 (ROA.4755)), and the fourth mentions MSOs but neither references nor copies Hardaway. *See* Gov. Ex. 277 (ROA.4351). The district court then concluded that "based on other evidence, the jury could infer" that Hardaway had this knowledge, but cites only exhibits that either had nothing to do with Hardaway, nothing to do with MSOs, or both. *See* ROA.7120 (order citing Gov. Ex. 277 (ROA.4351); Gov. Ex. 277A (ROA.4347); Gov. Ex. 289 at 4 (ROA.4395)).

The district court also cited evidence that Hardaway knew and communicated about MSOs and was copied on a "summary," prepared by Kraus, "which explained that Little River remunerated physicians who referred their patients to the hospital for testing services" and was similarly copied on a response email from Parnell

telling Kraus to delete this statement. ROA.7120 (citing Gov. Ex. 287 (ROA.4389); Gov. Ex. 320 (ROA.4418)). Putting aside that Hardaway did not send these emails or otherwise participate in this exchange, the evidence at trial was that physicians could be lawfully remunerated through MSOs and that nothing in the summary suggested the MSO's working with Little River were not compliant. The district court finally stated that Hardaway "often" forwarded e-mails to his personal e-mail account and that this was evidence of "willfulness." ROA.7120. In support of this last point, the court cited two instances to demonstrate how "often" Hardaway did this, but only one of those showed Hardaway forwarding an e-mail to himself. *See* Gov. Ex. 568 (ROA.4838-41).

On May 20, 2025, the district court held a sentencing hearing for Hardaway. At his allocution, Hardaway reiterated—consistent with the evidence at trial—that he did not know of his co-defendants' misconduct. ROA.22790.

The district court determined that "Hardaway's involvement and culpability is less, in my view, than many in the case," (ROA.22782), and noted Hardaway's "otherwise law-abiding life despite a difficult upbringing." ROA.22783.

The district court verbally sentenced Hardaway principally to 12-months and one day imprisonment and ordered him to pay a fine of $25,000 to the United States. ROA.22794-95.

The district court entered final judgment on May 21, 2025, (ROA.22714), and Hardaway timely filed his notice of appeal on May 25, 2025. ROA.22722.

## STANDARD OF REVIEW

This Court reviews the denial of a motion for judgment of acquittal *de novo*. *United States v. Guevara*, 408 F.3d 252, 256 (5th Cir. 2005). The Court "considers countervailing evidence as well as the evidence that supports the verdict." *United States v. Brown*, 186 F.3d 661, 664 (5th Cir. 1999) (internal quotation marks omitted). Where a withdrawal defense is at issue, the Court must vacate the conviction "if no reasonable trier of fact could have failed to find that [the defendant's] withdrawal from the conspiracy . . . was established by a preponderance of the evidence." *United States v. Heard*, 709 F.3d 413, 428 (5th Cir. 2013).

This Court reviews alleged violations of Rule 43 and the Sixth Amendment *de novo* where, as here, defendant was denied an opportunity to object. *See*, *e.g.*, *United States v. Hillsman*, 480 F.3d 333, 335 (5th Cir. 2007) (reviewing denial of motion for new trial *de novo* predicated on court's failure to disclose its response to a jury note).

The denial of a defendant's right to be present requires reversal absent waiver or a finding the error is harmless, meaning that the court must "find beyond a reasonable doubt that the defendant's absence did not prejudice his substantial rights." *See United States v. Alikpo*, 944 F.2d 206, 209 (5th Cir. 1991). The district

court's determination of whether to give an Allen charge is reviewed for abuse of discretion. *United States v. Eghobor*, 812 F.3d 352, 358 (5th Cir. 2015).

The Court reviews a district court's refusal to give a defense-tendered jury instruction for abuse of discretion. *United States v. John*, 309 F.3d 298, 304 (5th Cir. 2002).

## SUMMARY OF THE ARGUMENT

Hardaway's conviction must be reversed because the evidence failed to show that he knowingly joined the conspiracy to violate the AKS. The evidence as to knowledge was deficient in two respects. *First*, the evidence failed to show that Hardaway knew that the MSO payments to doctors were designed or intended to "induce" referrals as required by the AKS. The evidence was clear that MSO payments to doctors can be, and often are, legal. The Government failed to prove anything more than Hardaway's knowledge of the *existence* of MSOs—but not how *the specific* MSOs at issue were operating and therefore failed to show Hardaway's knowledge of the "key relationship" with the "relevant decisionmakers." *See United States v. Marchetti*, 96 F.4th 818, 827 (5th Cir. 2024).

*Second*, the Government critically failed to show that Hardaway knew the payments were intended specifically to induce *federal* referrals, a critical element of the AKS. *See United States v. Shah*, 95 F.4th 328, 351-52 (5th Cir. 2024). For these reasons, Hardaway did not knowingly join the conspiracy.

The district court committed two additional fatal errors requiring, at a minimum, that his conviction be vacated. *First*, the district court inexplicably failed to advise the parties of a critical deadlock note, thereby depriving the parties of an opportunity to revise, object, and/or be heard on an appropriate response. Failure to disclose the final deadlock note was prejudicial error, requiring a new trial. *See United States v. Bass*, 490 F.2d 846, 855 (5th Cir. 1974), *overruled on other grounds by United States v. Lyons*, 731 F.2d 243, 246 (5th Cir. 1984); *United States v. Mejia*, 356 F.3d 470, 477 (2d Cir. 2004).

*Second*, the district court erroneously denied Hardaway's request for a good faith jury instruction. That denial constitutes an abuse of discretion because a different jury instruction regarding "good faith reliance on advice of counsel" likely led the jury to believe—erroneously—that good faith *requires* a formal "advice of counsel" defense. *Marchetti*, 96 F.4th at 832-33 (examining good faith instruction given in AKS case).

The prosecution in summation exploited this confusion, asserting that Hardaway's core good faith defense fails because he did not point to "any attorney's name, or identity, what information that attorney was supposedly given, what advice they rendered, or whether it was strictly followed by Hardaway." ROA.13655. But the law is clear that good faith—even without "reliance on counsel"—is a complete defense.

# <u>ARGUMENT</u>

## I. The Evidence Was Insufficient to Show That Hardaway Knowingly and Willfully Joined the Conspiracy.

Hardaway's conviction must be reversed because the evidence was, for two reasons, insufficient to establish his knowing and willful participation in the charged conspiracy.

*First*, there was no evidence that Hardaway knew that the payments to physicians being made by the MSOs were intended to "induce" referrals as required to violate the AKS. 42 U.S.C. § 1320a-7b(b)(2). The Government's case, and the district court's upholding of Hardaway's conviction, essentially presumed that MSOs are *per se* illegal. But that presumption is contrary to the facts adduced at trial. Every witness who testified on the matter—from Agent Geren to government expert Rahman—testified that MSOs can be legal.

To prove that Hardaway violated the AKS required something *more* than just his knowledge that Little River was working with MSOs. This the Government failed to prove. Hardaway had zero involvement with, or insight into, the Criminal MSOs or their operations. He did not set them up, operate them, or have any awareness of how they were operated. By the Government's own evidence, Hardaway *never even communicated* with many of the conspirators who operated those MSOs, most of whom could not even identify Hardaway in court. While the

evidence established that some of the MSOs did pay doctors to induce referrals—there was simply no evidence to show that Hardaway *knew* that to be so, let alone that he agreed to willfully pay illegal remunerations. The Government's "MSO equals guilt" syllogism fails as a matter of law and fact.

*Second*, the Government failed to show that the referrals at issue were for "service[s] for which payment may be made in whole or in part under a *Federal health care program*." 42 U.S.C. §§ 1320a-7b(b)(l), (2); 1320a-7b(b)(2) (emphasis added). The evidence showed precisely the opposite, that no payments were made for federal samples. More importantly, Hardaway was given every reason to believe that no such payments on federal samples were to be made. Knowledge that referred samples were payable by a *federal* health care program was a required element of the offense, and one which the evidence failed to satisfy.

For both reasons, Hardaway's conviction must be reversed.

### A. The Evidence Failed to Show that Hardaway Knew the MSO Payments Were Intended to Induce Physicians to Refer Laboratory Tests Payable by Federal Health Care Programs to Little River.

The record is bare of any evidence that Hardaway knew that the Criminal MSOs were operating in a way designed or intended to induce doctors to refer federal patient samples to Little River. To convict a defendant of conspiracy to commit illegal remunerations, the government must prove:

> (1) an agreement between two or more persons to pursue [the] unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy.

*Marchetti*, 96 F.4th at 824 (quoting *United States v. Barnes*, 979 F.3d 283, 295 (5th Cir. 2020)) (alteration in original).

Here, the alleged unlawful objective was a violation of the AKS, which requires the government to show that Hardaway "(1) knowingly and willfully made a payment or offer of payment, (2) as an inducement to the payee, (3) to refer an individual, (4) to another for the furnishing of an item or service that could be paid for by a federal health care program." *United States v. Miles*, 360 F.3d 472, 479–80 (5th Cir. 2004) (citing 18 U.S.C. § 1320a–7b(b)(2)(A)).

The intent to induce a referral must be knowing and willful. *See Shah*, 95 F.4th at 351–52 ("The [Supreme] Court concluded that 'knowingly' 'modifies not only the words directly following it, but also those other statutory terms that separate wrongful from innocent acts.'") (discussing *Ruan v. United States*, 597 U.S. 450 (2022)).

To prove that a defendant acted with intent to induce referrals, the government must show that he "intended 'improperly [to] influence[ ]' those who make healthcare decisions on behalf of patients." *Marchetti*, 96 F.4th at 827 (alteration in

original) (quoting *Miles*, 360 F.3d at 480). *See also United States v. Sorensen*, 134 F.4th 493, 500 (7th Cir. 2025) ("For a payment to fall within the prohibitions of 42 U.S.C. § 1320a-7b(b)(2)(A), a payor must act with the intent to induce referrals from the payee.").

### 1. **There Is No Evidence that Hardaway Knew the Criminal MSOs Were Paying Doctors to Induce Federal Referrals.**

There was no evidence in this case that Hardaway knew or understood that payments by the Criminal MSOs to the physicians were for the purpose of inducing federal referrals. Although MSOs were making payments to doctors, and Hardaway was aware of that fact, the Government's witnesses testified unequivocally that, in and of itself, there is nothing illegal about MSOs or payments to doctors so long as the payments are distributions based on legitimate investments and not based upon the volume or value of referrals. ROA.11481-82 (Agent Geren testifying that "MSOs aren't illegal" and providing examples of "legitimate MSO[s] that [he has] seen in the course of [his] work."); ROA.8027 (Rahman explaining that "when an MSO comes up in this context, it isn't a red flag to anyone" and "the term 'MSO,' that's a common thing in the practice of medicine"); ROA.12929-30 (Ryan Downton testifying that there is nothing inherently wrong with MSOs); ROA.9085 (Cook noting that "there are legal ways to operate an MSO"); ROA.12122-23 (Aseron stating same).

Hardaway's conceded knowledge that Little River was paying MSOs to advertise its services—including Boston Heart tests—was not sufficient to establish his knowledge that the payments were made to induce referrals. The evidence was that Hardaway understood, based on the legal information reviewed and how Rise operated, that MSOs could lawfully issue distributions to invested doctors if those distributions were calculated based on the number of shares owned and were independent of the number of referrals a doctor submitted. *See* ROA.9433-34 (Parnell) (Rise did not kick doctors out of the MSO or move them to a group of lower ordering providers if they did not order a lot of tests; doctors would still be paid on their Rise investment even if they did not order any tests.); ROA.8026 (Government expert Rahman testifying that a compliant MSO distributes profits to investors based on their ownership interests). To the contrary, both Marioni and O'Neal, the cooperators who operated the Criminal MSOs, plainly testified they would adjust distributions paid based upon physicians' ordering volume, but neither indicated or testified Hardaway knew that, nor could they. ROA.8518, 12525.

The evidence at trial centered around the Criminal MSOs—Ascend and Next Level. Of course, the conspirators who owned, operated, or worked on behalf of these MSOs knew that they were paying doctors in a manner designed to induce referrals. But by the Government's own evidence, Hardaway had little or no communication with any of the individuals involved with either of them. Agent

Geren testified that there were *zero communications* between Hardaway and any of those operating Ascend. ROA.11474-75. Likewise, Hardaway barely had any communications with the three individuals associated with Next Level, , and when he did it was only to discuss onboarding doctors to Boston Heart testing—part of his legitimate Boston Heart job responsibilities. ROA.8513, 11472.[10] There was simply no proof that Hardaway knew the workings of these MSOs.

The lack of evidence here parallels the insufficiency of evidence this Court found in *Marchetti* as to much of the alleged conduct. Marchetti operated a sales and marketing company to "attract Medicare referrals to a medical laboratory named Vantari." *Marchetti*, 96 F.4th at 821. Although the evidence showed that Marchetti was compensated based on the "value of each referral," this Court held that—as to these activities—the government failed to prove that Vantari and Marchetti intended "improperly [to] influence[ ]" those who make healthcare decisions on behalf of patients. *Marchetti*, 96 F.4th at 827 (quoting *Miles*, 360 F.3d at 481). That is because there was no evidence about how Marchetti interacted with any referrer:

---

[10] Marioni erroneously claimed that Hardaway had knowledge that Next Level was paying doctors to induce federal samples, however, Marioni also noted that he rarely, if ever, spoke to Hardaway and when he did it was solely about onboarding doctors. Moreover, the record was clear that it was Seth Morris (a Boston Heart sales representative who was not charged in this case) who was working with Next Level and visited physicians with Next Level representatives—not Hardaway. ROA.11471.

> And that is where the government dropped the ball. Its case connects Marchetti to Vantari and KNM Global. *But it does nothing to connect Marchetti to any referrer*. It recounts undoubtedly questionable dealings to backstab co-workers and cover up the structure of payments, but nary a word about how Marchetti interacted with relevant decisionmakers.
>
> The closest the government comes to providing the missing link is its assertion that Marchetti had "relationships with, access to, and influence over" doctors. The first two prongs of this triptych broaden the scope of the AKS beyond what it can bear. . . .
>
> The final prong identifies the relevant inquiry. If Marchetti "improperly influenced" doctors, this case is open and shut. *But the government does not provide a drop of color as to what Marchetti's influence looked like. Plainly, not every sort of influence is improper. (What are advertisers hired to do anyway?) Ultimately, the government fell short in providing any detail on the key relationship: the relationship between Marchetti and relevant decisionmakers*.

*Marchetti*, 96 F.4th at 826-27 (emphasis added).

Likewise, here, the Government failed to show that Hardaway knew how the Criminal MSOs were interacting with their physician investors, as to their operations and how payments to doctors were calculated. It is not enough that the Criminal MSOs intended payments to doctors to induce referrals; the Government needed to show that Hardaway *knew* that to be the case and, like in *Marchetti*, the Government here "dropped the ball." *Marchetti*, 96 F.4th at 827. The facts here are even more compelling. Given the geographies of these Criminal MSOs, and as confirmed by

trial testimony, Hardaway was not privy to how the Criminal MSOs conducted their operations. *See, e.g.,* ROA.10474, 11471-75.

*Marchetti* moreover highlights the critical point that not every interaction with a potential referrer is unlawful and that the government must provide sufficient "color" as to the alleged influence on a referrer—and what an alleged co-conspirator like Hardaway knew about that relationship—to support a conviction. *Compare Miles*, 360 F.3d at 480 (reversing AKS convictions because the marketers "simply engaged in advertising activities" and "[t]here was no evidence that [the marketer] had any authority to act on behalf of a physician in selecting the particular home health care provider"), with *United States v. Shoemaker*, 746 F.3d 614, 629 (5th Cir. 2014) (affirming AKS conviction where the evidence showed that the owner of a nurse staffing company "wanted [the hospital board's chairman] to exploit his personal access to [hospital] executives" to ensure that the hospital favored his company when it chose nursing services).

Not only does the record fail to show that Hardaway knew how the Criminal MSOs were operating, but it also affirmatively demonstrates the opposite. Hardaway simply did not operate in the markets where Ascend and Next Level were recruiting physicians to invest, and accordingly, he had no communications with their invested doctors. Parnell who, like Hardaway, was a Boston Heart sales representative testified on behalf of the Government that he was *not* part of the

conspiracy—also testified that he had no knowledge of how the Criminal MSOs were operating. ROA.9413-14, 9417. *See also* ROA.9419 (Parnell had no "transparency into other MSOs" and did not know what they were doing because the other MSOs "didn't tell us.").

Hardaway's knowledge that Little River was working with MSOs was not enough to prove he knew they were acting unlawfully to influence doctors, and the Government introduced no evidence to suggest that he had some additional knowledge about the workings of the Criminal MSOs.

### 2. **The Evidence as to Hardaway Was Limited to Lawful Conduct.**

The evidence as to Hardaway was limited to entirely lawful conduct directly within the scope of his responsibilities as a Boston heart sales representative. For example, when Dr. Sheinberg complained to Hardaway that the Boston Heart tests he believed were highly efficacious and "the best tool that we have to prevent heart disease" (ROA.12676) were not covered for his patients because they were out of network, Hardaway appropriately introduced Little River to Boston Heart to enable the tests to be performed in network. ROA.11479-80. There was nothing remotely illegal about this introduction or Hardaway receiving commissions for doing so as Agent Geren agreed. ROA.11478-80.

The Government also made much about the December 2015 e-mail exchange in which Kraus sent Parnell an "executive summary," which included a statement that "practitioners become investors by purchasing shares in the MSO. Little River will remunerate the Marketers/MSO, which in turn disperse their profits among the investors." ROA.4391. Parnell responded by telling Kraus to delete this statement. ROA.9301-02. Aside from the fact that Hardaway was merely copied on these emails and never responded or participated in this exchange, the evidence at trial established that MSO payments to doctors are not inherently illegal or even a "red flag." ROA.8026-27.

Parnell, the Government's own cooperating witness, testified about this exchange that no one was trying to conceal anything: "MSOs were so prevalent in the market that everyone seemed to have a grasp that physicians were investing, and it seemed like common knowledge to me. *There was no reason to try to conceal anything*." ROA.9303 (emphasis added).

MSOs, by definition, distribute their profits to doctors. Certainly, those payments may be illegal if intended to induce referrals, but they may likewise be entirely legal if they represent a distribution of legitimate profits. It was the Government's burden to prove that Hardaway knew that the payments by the MSOs at issue were the former, not the latter. The Government utterly failed to do so.

Moreover, the Government's reliance on an email where Sheinberg proclaimed Hardaway was "beside himself" at the volume of tests being generated for Boston Heart through its relationship with Little River is misplaced. *See*, *e.g.*, ROA.4434. First, even if Hardaway were "beside himself" with glee at success of this new relationship, this email communication it entirely unrelated to the alleged illegal activity. Sheinberg never invested in or had knowledge about MSO marketing for Little River; in fact, he testified at trial that Hardaway never discussed an MSO with him. ROA.12717-18.

Second, Sheinberg, not Hardaway, drafted the email and he testified at trial that Hardaway *did not tell* him that he was "beside himself," and that what Sheinberg meant in his e-mail, based on his own opinion, was that Hardaway "was very happy that we were able to continue to perform these lab tests." ROA.12719.

Third, it was Hardaway's job as a sales representative to increase sales, just as it was the job of Sheinberg—who was equally ecstatic about the number of tests—to facilitate the best diagnostic tests for his patients. *See* ROA.12716 (Sheinberg explaining that he and Hardaway are "excited everything is working. I [] no longer fear . . . losing this ability – my ability to do this testing."). Again, Sheinberg never invested in an MSO. ROA.12718. Sheinberg expressing his own excitement about the Little River-Boston Heart laboratory services agreement supports the assertion that doctors were searching for a way to provide Boston Heart tests to remain in-

network, and that doctors unaffiliated with MSOs were excited that they now had the opportunity to continue to order the tests and have them be treated as in-network by commercial insurance companies.[11]

The record is replete with evidence of the value of Boston Heart tests and the difficulty in ordering those tests so long as they were out of network. *See, e.g.*, ROA.8522-23, 9087, 9407-09, 12673-75. It would be pure conjecture to conclude that Hardaway must have known about the illegal payments merely because he was doing a good job as a sales representative. While the jury is permitted to draw reasonable inferences from the evidence, there is nothing but pure speculation to conclude that Hardaway was aware of the inner workings of MSOs he had nothing to do with. *See United States v. Moreland*, 665 F.3d 137, 149 (5th Cir. 2011) ("[A] verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference.") (citation omitted).

#### 3. **Hardaway's Only Knowledge About MSOs Came from His Operation of Rise Which Was Fully Compliant.**

The dearth of any evidence that Hardaway knew the Criminal MSOs were operating unlawfully is by itself enough to require reversal. But the evidence at trial regarding Hardaway's involvement with Rise shows that he had an *affirmative* basis

---

[11] A distinction the district court acknowledged when reducing the loss amount to account for the fact that almost half of the tests sent to Little River were from physicians who never even invested in an MSO. ROA.22742.

to believe the MSOs working with Little River, including Ascend and Next Level, were lawful.

At the relevant time, Hardaway owned Rise together with Jones. There were no allegations of misconduct at trial concerning Rise or any of its physician investors.

The evidence at trial showed that Rise had multiple employees, obtained legal counsel, "had an opinion letter from Rise's attorney who laid out that their setup was completely legal and appropriate," and that Rise's physician investors also separately consulted with—and obtained approval from—legal counsel before investing. ROA.11481-82, 9418-20, 9424-25, 9433-34. Parnell, the Government's witness, "thought that Rise was -- had a compliant MSO." ROA.9356. Hardaway's understanding of how MSOs were operating was drawn from his own experience with Rise.

Given the utter absence of evidence that Hardaway knew how those other MSOs were operating and his experience that Rise operated in a fully compliant manner, no rational jury could find that he knew the other MSO payments were being made unlawfully to induce referrals.

Because "taking all inferences in favor of the verdict, 'no rational juror could have found guilt beyond a reasonable doubt,'" Hardaway's conviction must be

reversed. *United States v. Sila*, 978 F.3d 264, 270 (5th Cir. 2020) (citing *United States v. Hoffman*, 901 F.3d 523, 541 (5th Cir. 2018)).

### B. The Evidence Failed to Establish Hardaway's Knowledge that Payments for the Referred Lab Samples "May be Made" Under a *Federal* Healthcare Program.

The evidence was also insufficient to establish Hardaway's knowledge that any of the unlawfully referred samples "could be paid for by a federal health care program." *Shah*, 95 F.4th at 552 (quoting *Miles*, 360 F.3d at 480). Under *Shah*, the Government was required to prove not only Hardaway's knowledge that payments were made for the purpose of inducing doctors to send samples to Little River—a critical element for which there was insufficient evidence, but moreover that the samples unlawfully induced—not just any samples—could be paid by a federal health care program. But the record uniformly demonstrates a contrary conclusion, that the induced referrals were strictly commercial samples and that, while doctors did refer federally insured patient samples, Hardaway did not have the intent to induce those referrals.

Start with the contracts themselves. Each of the contracts between Little River and the MSOs expressly stated that no marketer would encourage referrals payable by a federal health care program and that *no payments* would be made in exchange for any referrals payable by a federal healthcare program. ROA.8495-96, 11483-84. And every Government witness—doctors, marketers, and Little River employees—

testified that payments were not, in fact, made on federal samples. ROA.8118-19, 8484, 8495-96. Some doctors did refer federal samples, but the record reflects that this was a matter of convenience rather than the result of inducement. ROA.8495-97, 9000-02.

Even if there was sufficient evidence that the MSO operators intended to induce the referral of federal samples, there is zero evidence that Hardaway *understood that to be the case*, let alone that he acted willfully to obtain federal referrals. The legal guidance Hardaway received for Rise was directly contrary to this.

"Willfulness in the Medicare kickback statute 'means that the act was committed voluntarily and purposely with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law.'" *United States v. Ricard*, 922 F.3d 639, 648 (5th Cir. 2019) (quoting *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998)).

There is nothing in the record that would allow a rational juror to conclude that Hardaway acted *willfully* to induce the referral of federal samples when every effort was made—at least to Hardaway's knowledge—to avoid payment on federal samples. Hardaway was multiple levels removed from any knowledge of the intentions of the MSO operators or the physicians they were dealing with.

Hardaway was a Boston Heart sales representative in the San Antonio and Austin Areas. ROA.8706. Ascend operated primarily in Dallas and the surrounding areas, with Parnell and Howard serving as the designated Boston Heart sales representatives in its territory. ROA.8706, 10103. Next Level operated primarily in the Houston area, with Morris serving as the designated Boston Heart sales representative in its territory. ROA.8306, 8706, 11471. By virtue of his geographical location Hardaway had no knowledge of, familiarity with, or way to interact with the doctors getting the alleged kickback payments, and the evidence clearly established that he was not communicating with individuals at the Criminal MSOs in a manner to understand how those MSOs were operating. ROA.11472, 11474-75.

As explained above, Hardaway did not even know how the MSOs were operating or paying physicians such that he could reasonably have known that payments were being made as an inducement, let alone willfully to induce federal referrals. Indeed, Hardaway's own MSO, Rise, was never paid for federal samples and made no payments to doctors for federal referrals, consistent with the legal guidance it received and Hardaway understood. *See* ROA.9081, 9423-24, 9433, 12973-74, 12990 (testimony from several witnesses that Rise was never paid for federal referrals and did not pay doctors for federal referrals).

It would stretch every inference to the breaking point to conclude that Hardaway willfully sought to induce federal samples. *Moreland*, 665 F.3d at 149 ("[A] verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference.") (citation omitted).

That Hardaway, who had no dealings with the Criminal MSO operators, and no insight into the Criminal MSO workings, would somehow know that payments to doctors were structured specifically to induce *federal* referrals, is a conclusion nowhere near supported by the evidence. *See United States v. Nora*, 988 F.3d 823, 830–31 (5th Cir. 2021) (reversing health care fraud conviction because "the evidence did not prove that Nora understood Abide's various practices and schemes to be fraudulent or unlawful, and thus there was insufficient evidence to conclude that Nora acted with "bad purpose" in carrying out his responsibilities at Abide").

Hardaway's conviction should therefore be reversed.

## II. There was Sufficient Evidence that Hardaway Withdrew from the Conspiracy.

There was insufficient evidence to conclude beyond a reasonable doubt that Hardaway agreed to join the conspiracy. But even if there had been, Hardaway's affirmative resignation from Boston Heart in July 2016— more than five years prior to the January 12, 2022, indictment—constituted a withdrawal from the conspiracy

such that the Government's charge against him was time-barred. *See* 18 U.S.C. § 3282(a).

Withdrawal requires a showing that the defendant "committed affirmative acts inconsistent with the object of the conspiracy that are communicated in a manner reasonably calculated to reach conspirators." *United States v. Vargas*, 6 F.4th 616, 624 (5th Cir. 2021); *United States v. Hoffman*, 901 F.3d 523, 545 (5th Cir. 2018) ("disassociat[ion]" sufficient to show withdrawal). After a defendant withdraws, he is, by definition, no longer a member of the conspiracy and "cannot be held liable for acts . . . committed in the five years preceding the indictment by other conspirators because his withdrawal ended his membership in the conspiracy." *United States v. Read*, 658 F.2d 1225, 1233 (7th Cir. 1981).

Hardaway publicly resigned from Boston Heart in July 2016, thereby disassociating himself entirely from the conspiracy, and from that time forward had nothing to do with the alleged unlawful conduct. No reasonable jury could, by a preponderance of the evidence, conclude otherwise. *Heard*, 709 F.3d at 428.

Hardaway's conviction, for this reason too, should therefore be reversed.

## III. The District Court's Failure to Disclose a Critical Jury Note Was Prejudicial Error and Requires that the Verdict Be Vacated.

The district court violated Rule 43 by failing to notify Hardaway about Note # 4 and thereby denying him the opportunity to seek a proper Allen charge. Given

the tone of Note # 4, this Court cannot conclude beyond a reasonable doubt that sending the jury back for further deliberations without providing a proper Allen charge—including the necessary language instructing the jurors on their duty not to yield a "conscientious opinion"—did not result in a coerced verdict. Hardaway's conviction must be vacated and the case remanded for a new trial.

### A. The District Court's Failure to Notify the Parties of the Existence and Contents of Note # 4 Was Error.

A criminal defendant is entitled to be notified of every communication between the jury and the district court. *See* Fed. R. Crim. P. 43(a)(2); *United States v. Sylvester*, 143 F.3d 923, 928 (5th Cir. 1998) ("Upon receiving the note from the jury, the court should have notified counsel of the message, shared its contents, and granted each side the opportunity to be heard."); *Gomila v. United States*, 146 F.2d 372, 373 (5th Cir. 1944) ("Defendants were entitled to be apprised of the nature of these [jury] questions and were entitled to an opportunity to be heard in connection therewith.") (brackets added); *Mejia*, 356 F.3d at 474.

This procedure is "well established" and designed "to enable counsel to make informed decisions concerning whether to object or propose additional instructions." *Sylvester*, 143 F.3d at 928. A trial court errs if it responds to juror communications without providing the defendant an opportunity to be heard. *See Rogers v. United States*, 422 U.S. 35, 39 (1975) ("Cases interpreting the Rule make it clear, if our

decisions prior to the promulgation of the Rule left any doubt, that the jury's message should have been answered in open court and that petitioner's counsel should have been given an opportunity to be heard before the trial judge responded."); *United States v. Davis*, 609 F.3d 663, 676 (5th Cir. 2010) ("It is well-settled in this circuit that when a communication is received from the jury, counsel should be informed of its substance and afforded an opportunity to be heard before a supplemental charge is given."); *United States v. McDuffie*, 542 F.2d 236, 240-41 (5th Cir. 1976) ("We can perceive no justification for not following this procedure in this case.").

The district court's lack of an express response to Note # 4 does not mitigate the error. For one thing, it is at least likely—given the timing—that the jury understood the district court's response to Note #3 (which response was sent shortly after 11:35 a.m.) as a response to Note #4 (which had been sent minutes earlier, at approximately 11:30 a.m.). So, from the jury's perspective, the district court *did* respond to Note # 4 and its response was one that the parties were never given the opportunity to consider and which communicated to the jury—and Juror # 12 in particular—that only a unanimous verdict would be acceptable. *See Bass*, 490 F.2d at 853-55 (vacating a verdict where the district court responded to a deadlock by directing the jury to "continue your deliberations" without providing appropriate cautionary language). The other alternative is no better—i.e., that the jury never received a response to Note #4—the nonresponse conveying the same coercive

message. *Mejia*, 356 F.3d at 474 (vacating conviction where the district court provided no substantive response to a deadlock note).

Allowing a district court to keep jury communications from the parties so long as it provides no response to the jury would result in the very harms Rule 43 was designed to prevent. This Court has recognized that a principal purpose of the requirement to notify a defendant of jury communications is to provide the parties with an opportunity to "propose additional instructions" as necessary to avoid prejudice. *Sylvester*, 143 F.3d at 928. Those circumstances include a deadlock note, as in this case, where no response—or a deficient Allen charge—could well have been understood by the jury as "in effect [a] direct[ive] the jury to continue deliberations, which may have 'induced unanimity,'" *Mejia*, 356 F.3d at 477 (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)). Either way, failure to advise the parties about the jury communication can result in the same harm as an objectionable response. *Cf. Mejia*, 356 F.3d at 477 (district court's failure to respond to a report of deadlock in a jury note "deprived" the jury of "necessary guidance" and "deprived" counsel "of the opportunity to insist on an Allen charge at that point in the deliberations").

Indeed, at least one court has deemed a court's failure to notify the parties of a jury note as error even though the district court did not respond to the note. *See, e.g.*, *United States v. Wilson*, 203 Fed. Appx. 140, 141-142 (9th Cir. 2006) ("Had he

been informed of the note, Wilson's counsel might have 'tr[ied] [to] persuade the judge *to* respond.' Therefore, the district court's failure to inform Wilson or her attorney of the jury note was constitutional error.") (emphasis in original) (internal citations and parentheticals omitted).

The district court here committed error by not timely informing Hardaway of the existence and contents of Note # 4.

### B. The District Court's Failure to Inform the Parties of Note # 4 Was Prejudicial Error and Requires that Hardaway's Conviction be Vacated.

The district court's error was not harmless beyond a reasonable doubt and therefore requires Hardaway's conviction to be vacated. Had Hardaway been informed of Note # 4 stating that Juror No. 12 was resolved to "hang this jury" because his "moral compass" prevented him from yielding to the majority's position, Hardaway would have requested—and been entitled to—a proper Allen charge to ensure the juror was not unduly coerced to reach a unanimous decision by the court's prior instruction.

Here, the Response served the same function as an Allen charge—encouraging a jury to continue deliberations to overcome a deadlock—but did not include any of the language required by this Court to protect against a coerced verdict. *Bass*, 490 F.2d at 854 (directive to "return to the jury room and continue your deliberations" on any charges "as to which you are not yet in unanimous

agreement" "is to be judged by the standards which we have demanded of Allen charges.").

The jury in *Bass* sent a note asking if it was acceptable to render a verdict of "guilty" as to two counts and "hung" as to the others. *Bass*, 490 F.2d at 853-54. The district court responded that the jury should return the verdict as to the counts on which it agreed but that "[o]n any count as to which you are not yet in unanimous agreement, I will ask you to return to the jury room and continue your deliberations." *Id.* at 854. This Court vacated the conviction in part because it found the directive to "continue your deliberations" "violated the defendant's right to an uncoerced jury." *Id.* at 855. The Court found that this directive was essentially an improper Allen charge as it "serv[ed] the same purpose, was given in an Allen situation, and is fraught with the same—indeed greater—potential for coercion of the jury." *Id.* at 854. *Bass* held that the district court was required to "make[] plain to the jury that each member of the jury has a duty conscientiously to adhere to his own honest opinion and . . . avoid[] creating the impression that there is anything improper, questionable, or contrary to good conscience for a juror to cause a mistrial." *See Bass*, 490 F.2d at 855. Moreover, by instructing the jury to continue its deliberations as to any counts where unanimity had not been reached, the response "indicates that only unanimous agreement is acceptable." *Id.*

This case is worse than *Bass*. The district court's directive here that the jury must continue deliberating "*until you reach* a unanimous decision" (ROA.24-40779.14995 (emphasis added)), was *far more prejudicial* as it conveyed to Hardaway's jury *that only unanimity* was acceptable, whereas in *Bass* the court's directive to "continue your deliberations," *Bass*, 490 F.2d at 854, at least did not demand "a unanimous decision."

While the district court's response may have been sufficient as to Note # 3—which was the first deadlock note and indicated only that Juror No. 12 was "unwilling to change his mind"—the response (or no response) was inadequate as to Note # 4, which was now the second deadlock note and indicated "moral objection" and intent to "hang the jury."

Had Hardaway been notified of the contents of Note # 4, he would have requested and been entitled to a full Allen charge to ensure that each juror fully understood that a hung jury is acceptable if it is the result of each juror's honest convictions. Had Note # 4 been the only deadlock note, and had the Court informed Hardaway of its content and existence, he would have asked for a mistrial, or, at least, a proper and complete Allen charge.

These facts are also analogous to the situation presented in *Mejia*. In that case, as here, the jury sent an initial note stating it was deadlocked. *Mejia*, 356 F.3d at 472. The district court disclosed the note to the parties and, after consulting them as

to the appropriate response, advised the jury to continue its deliberations but did not provide a full Allen charge. *Id*. The next day, the jury issued a second note regarding deadlock, stating more emphatically it could not come to an agreement and indicating the jury was divided 11-1. *Id.* at 473. The court did not disclose this note to the parties, but rather responded *ex parte* by instructing the jury only to not disclose how the vote stands in its communications. *Id.* The district court provided no substantive response to the message regarding deadlock. *Id.* The Second Circuit vacated the conviction, finding that "by its failure to respond to the report of deadlock, the court in effect directed the jury to continue deliberations which may have induced unanimity for a guilty verdict." *Id.* at 477 (cleaned up).

Here, as in *Mejia*, the district court did not directly respond to Note # 4. But, as the Second Circuit recognized, a failure to respond in this context effectively amounts to a direction to continue deliberations despite the jury's deadlock. Without a proper Allen charge to "assure[] that those who have conscientious opinions for either side need not yield them in order to assure unanimity," that direction warrants reversal. *Mejia*, 356 F.3d at 477.

Because it cannot be said beyond a reasonable doubt that the result would have been the same had Hardaway been notified of Note # 4, this Court must vacate Hardaway's conviction and order a new trial. *See Alikpo*, 944 F.2d at 209.

## IV. The District Court Abused Its Discretion by Denying Hardaway's Request for a Good Faith Jury Instruction.

The district court's denial of Hardaway's request for a good faith instruction was an abuse of discretion because it met each of the elements set forth by this Court in *United States v. Lucas*. 516 F.3d 316, 324 (5th Cir. 2008) ("A district court abuses its discretion in omitting a requested jury instruction only if the requested language '(1) is substantively correct; (2) is not substantially covered in the charge given to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impairs the defendant's ability to present effectively a particular defense.'").

### A. Hardaway's Proposed Good Faith Instruction Was Substantively Correct.

The Fifth Circuit has held that a defendant's good faith is a complete defense to a charge that requires a defendant act willfully. *United States v. Simkanin,* 420 F.3d 397, 410 (5th Cir. 2005) ("[A] defendant's good-faith belief that he is acting within the law negates the willfulness element."). The proposed good faith instruction presented by Hardaway's counsel in this case is nearly identical to the instruction provided in a recent case in the Northern District of Texas. *See United States v. Hagen*, 3:19-cr-00146-B, ECF 281 pp. 22-23 (N.D. Tex. filed July 8, 2021). Notably, neither the district court, nor the Government, identified anything incorrect in Hardaway's proposed instruction. ROA.13273, 13275.

### B. The Good Faith Instruction was not Substantially Covered in the Charge Given to the Jury.

Although this Court has previously held that a general good faith instruction is unnecessary where the instruction as to "knowledge" makes plain that the jury must acquit if the defendant acted in good faith, *United States v. Frame*, 236 Fed. Appx. 15, 18 (5th Cir. 2007), this Court has also acknowledged that there are circumstances where this is inadequate. Here, as Hardaway's counsel argued, inclusion of an instruction on "good faith reliance on advice of counsel"—with all the strictures and requirements for that defense would—absent a plain and concise instruction on general "good faith"—misled the jury into an erroneous belief that good faith is a defense only if all the elements for an advice-of-counsel defense are met. Given this confusion—which the prosecution exploited during its closing argument—the good faith instruction was not "substantially covered" by the general specific intent instructions.

Courts in this circuit have found a good faith instruction necessary in similar cases, where the absence of such an instruction would likely confuse the jury. *See, e.g.*, *United States v. Harris*, et al., Case No. 3:17-cr-0103-M, ECF 1086 pp. 12-13 (N.D. Tex. filed May 24, 2021) (including a good faith instruction where the defendants were charged with, *inter alia*, conspiracy to commit healthcare fraud and to defraud Medicare and Medicaid); *United States v. Marchetti, et al.*, 5:19-cr-00025,

ECF 595 pp. 23-24 (E.D. Tex. filed Dec. 16, 2021) (including a good faith instruction where the defendants were charged with conspiracy to commit illegal remuneration); *United States v. Hagen*, No. 3:19-cr-146, ECF 281 pp. 22-23 (N.D. Tex. filed July 8, 2021) (providing a good faith jury instruction where defendant made a "derivative advice of counsel" defense based upon legal advice received by others that was subsequently communicated to the defendant).

The proposed instruction was likewise not substantially covered by the general definitions of knowledge and willfulness because those definitions do not apprise the jury, as did Hardaway's instruction, that "[i]n determining whether a defendant acted in good faith, you may consider whether he or she had discussions with legal counsel or involved legal counsel in the relevant transactions" and that "[t]his is so even if the defendant does not rely on any specific advice of counsel as discussed below." ROA.1941-42; *compare with* ROA.2180-81 (the definitions of knowingly and willfully in the final jury instructions).

Courts have held that such a good faith instruction is appropriate when a defendant relies on legal advice that another individual received and transmitted to the defendant. *See United States v. Hagan*, 542 F. Supp. 3d 515, 519 (N.D. Tex. 2021); *United States v. Lamb*, 5:19-cr-00025 (E.D. Tex. filed Dec. 11, 2019) (including a good faith instruction in the situation where defendant was told by another defendant that the research grant in question was legal and vetted by counsel

and the evidence supported the argument that the defendant relied on that information).

Here, the jury heard only a "good faith reliance on advice of counsel" instruction, likely leading to an erroneous conclusion that good faith is only a defense when it is based upon advice of counsel. Indeed, the only reference to "good faith" in the jury charge related to the advice-of-counsel defense. *See* ROA.2182-83. The Government intentionally misled the jury by suggesting that Hardaway did not offer the identity of counsel or specific legal advice and, therefore, had not proved "good faith" defense. ROA.13655. This sleight of hand relied on the very confusion defense counsel warned of at the charge conference. *See, e.g.,* ROA.13267-68. For all of these reasons, a standard "good faith" instruction as proposed by Hardaway was necessary.

### C. The Good Faith Instruction Concerned an Important Point and the Failure to Give It Seriously Impaired Hardaway's Ability to Present Effectively His Defense.

Failure to give Hardaway's requested good faith instruction seriously impaired his defense in two ways. *First*, a critical part of Hardaway's defense was his good faith belief that the MSOs at issue were operating in compliance with the law. This belief was, in important part, based upon the operation of his *own* MSO—Rise—in a legally compliant manner as supported by legal counsel sought and

obtained by Rise concluding that Rise was operating lawfully. *See, e.g.*, ROA.8816, 9418, 9424-25, 9433, 11482.

As an owner of Rise, Hardaway, while not the client recipient of the legal advice, came to understand that Rise was operating lawfully. Based on this undisputed evidence, Hardaway asserted at trial that he was acting under the good faith belief that the other MSOs were operating lawfully.

Hardaway's reliance on Rise's compliance and legal opinions to form a good faith belief that the other MSOs were similarly compliant makes this case different from those where this Court has held "good faith" duplicative. Hardaway's defense was premised on more than merely not knowing or understanding certain actions were unlawful. Hardaway's defense was premised on an affirmative, direct, established understanding that his MSO, Rise, was complying with the applicable law. No witness contradicted that understanding and the Government chose not to attack it. Hardaway acted in good faith, and was entitled to an instruction that would have made clear that his understanding of Rise's legal guidance negated willfulness. Fearful that a jury would do exactly that, the Government intentionally exploited the good faith reliance on counsel instruction to confuse the jury. ROA.13654-54.

*Second*, as explained above, the absence of a specific good faith instruction resulted in confusion with the advice-of-counsel instruction. This allowed the Government, in its rebuttal summation, to intentionally obfuscate a basic "good

faith" defense—which Hardaway was relying upon—with the "good faith reliance on counsel defense," with all of its requirements. *See* ROA.13651-55.

For both reasons, the failure to give the good faith instruction "seriously impair[ed] [Hardaway's] ability to present effectively" his good faith defense, and the lower court's decision to omit it was an abuse of discretion. *Lucas*, 516 F.3d 316, 324 (5th Cir. 2008).[12]

## **CONCLUSION**

For the reasons discussed above, this Court should reverse the decision below and remand for a judgment of acquittal or, in the alternative, vacate the conviction and order a new trial.

[12] Pursuant to Federal Rule of Appellate Procedure 28(i), Hardaway adopts and joins in the arguments made by Co-Defendants Susan L. Hertzberg, Matthew J. Theiler, and David Weldon Kraus.

Dated: October 2, 2025

Respectfully submitted,

*s/ Gene R. Besen*

GENE R. BESEN
Texas Bar No. 24045491
GBesen@SheppardMullin.com
ELISHA J. KOBRE
Texas Bar No. 24127663
EKobre@SheppardMullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2200 Ross Avenue, 20th Floor
Dallas, Texas 75201
Telephone (469) 391-7400
Facsimile (469) 391-7401

ATTORNEYS FOR THOMAS GRAY HARDAWAY

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2025, an electronic copy of the foregoing brief was filed with the Clerk of the Court of the U.S. Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Participants in the case are registered CM/ECF users and services will be accomplished through the appellate CM/ECF system.

*s/ Gene R. Besen*
GENE R. BESEN
Texas Bar No. 24045491
GBesen@SheppardMullin.com
ELISHA J. KOBRE
Texas Bar No. 24127663
EKobre@SheppardMullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2200 Ross Avenue, 20th Floor
Dallas, Texas 75201
Telephone (469) 391-7400
Facsimile (469) 391-7401

ATTORNEYS FOR THOMAS GRAY HARDAWAY

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B)(i) because this brief contains 12,982 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f) and 5th Cir. R. 32.1.

2. This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this brief was prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

*s/ Gene R. Besen*
GENE R. BESEN
Texas Bar No. 24045491
GBesen@SheppardMullin.com
ELISHA J. KOBRE
Texas Bar No. 24127663
EKobre@SheppardMullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2200 Ross Avenue, 20th Floor
Dallas, Texas 75201
Telephone (469) 391-7400
Facsimile (469) 391-7401

ATTORNEYS FOR THOMAS GRAY HARDAWAY