No. 24-40779

# United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

MATTHEW JOHN THEILER; SUSAN L. HERTZBERG; DAVID WELDON KRAUS; THOMAS GRAY HARDAWAY,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Eastern District of Texas,
Tyler Division, No. 6:22-cr-3-JDK-JDL

BRIEF FOR APPELLEE UNITED STATES

JAY R. COMBS
United States Attorney
Eastern District of Texas

STEPHAN E. OESTREICHER, JR.
TRACI L. KENNER
Assistant United States Attorneys
101 E. Park Blvd., Suite 500
Plano, Texas 75074
(972) 415-6202

ATTORNEYS FOR THE UNITED STATES

## DISCLOSURE STATEMENT

There were no identifiable organizational victims of the defendants'
criminal activity. ROA.19713 (¶ 77); *see* Fed. R. App. P. 26.1(b).

**STATEMENT REGARDING ORAL ARGUMENT**

Given the length of the record and the number of issues the defendants raise, the government believes that oral argument would assist the Court. *See* Fed. R. App. P. 34(a)(2).

TABLE OF CONTENTS

DISCLOSURE STATEMENT ................................................................. i

STATEMENT REGARDING ORAL ARGUMENT ............................................ ii

TABLE OF CONTENTS ..................................................................... iii

TABLE OF AUTHORITIES ................................................................. vii

JURISDICTIONAL STATEMENT ............................................................ 1

STATEMENT OF THE ISSUES ............................................................. 1

STATEMENT OF THE CASE ............................................................... 2

  I.   Overview: "Marketers" Pay Physicians to Order Boston
      Heart Blood Tests Through Rural Texas Hospitals. ............ 4

 II.   The Defendants Further the Kickback Scheme. .................. 9

      A.  Hardaway brings Little River to Boston Heart,
           Hertzberg facilitates pricing, and revenue ramps
           up, including through Hardaway's MSO. ...................... 11

      B.  In the face of red flags, Hertzberg and Theiler press
           ahead with the Little River relationship, and they
           try to limit information about it within Boston
           Heart. .......................................................... 20

      C.  Theiler works with O'Neal and Howard to replace
           Little River, Hertzberg approves pricing with
           Stamford, and Michael Ivers blows the whistle
           on Boston Heart's hospital business. ...................... 32

      D.  Hertzberg resigns amid conflict with Eurofins,
           the Stamford deal moves forward, and Hardaway's
           MSO offers a physician a "sign-on bonus." .................. 43

SUMMARY OF ARGUMENT ..................................................... 47

ARGUMENT .......................................................................... 55

  I.  **A Rational Jury Could Find That Hertzberg, Theiler, and Hardaway Joined the Kickback Conspiracy.** .............. 55

    A.  **Background and standard of review** ............................. 55

    B.  **The jury rationally found that Hertzberg knew of and joined the conspiracy.** ............................... 60

      1.  **Little River** .................................................. 60

      2.  **Expansion to Integrity and Stamford** ....................... 71

      3.  **The Ivers email** .............................................. 74

    C.  **The jury rationally found that Theiler knew of and joined the conspiracy.** ............................... 78

      1.  **Little River** .................................................. 79

      2.  **Expansion to Integrity and Stamford** ....................... 86

      3.  **The Ivers email** .............................................. 92

    D.  **The jury rationally found that Hardaway knew of and joined the conspiracy.** ............................... 94

      1.  **Little River and Rise MSO** .......................... 94

      2.  **Expansion to Integrity and Stamford** ..................... 100

      3.  **The "sign-on bonus"** ................................... 102

II.   **A Rational Jury Could Find a Federal Nexus.** ................. 102

   A.   **Background and standard of review** .......................... 102

   B.   **The government only had to prove knowledge that the incentivized physicians ordered tests that *could* be reimbursed by federal payors.** .............. 103

   C.   **Hertzberg and Hardaway knew, at minimum, that the tests *could* be reimbursed by federal payors.** ....................................................... 106

III.  **A Rational Jury Could Find That Hertzberg and Hardaway Did Not Withdraw from the Conspiracy.** ....... 108

   A.   **Background and standard of review** .......................... 108

   B.   **Hertzberg and Hardaway did not prove withdrawal.** ...................................................... 109

IV.   **The District Court Did Not Plainly Err in Failing to Immediately Disclose Jury Note 4.** ..................................... 114

   A.   **Background and standard of review** .......................... 115

   B.   **Kraus and Hardaway do not show obvious error in the timing of disclosure.** ............................. 122

   C.   **Kraus and Hardaway do not show prejudice.** ........... 124

   D.   **Kraus and Hardaway do not show a serious effect on the fairness, integrity, or public reputation of judicial proceedings.** ............................. 129

**V.   The District Court Did Not Plainly Err in Its Response to Jury Note 3.** ....................................................... 130

   **A.   Background and standard of review** ............................ 130

   **B.   Kraus does not show obvious error.** ........................... 130

   **C.   Kraus does not show prejudice or a serious effect on the fairness, integrity, or public reputation of judicial proceedings.** ............................. 132

**VI.   The District Court Did Not Abuse Its Discretion in Refusing Hardaway's Good-Faith Instruction.** ............ 134

   **A.   Background and standard of review** ............................ 134

   **B.   The court was within its discretion.** ............................. 135

   **C.   Any error was harmless.** ................................................ 137

CONCLUSION ............................................................................................... 138

CERTIFICATE OF SERVICE ...................................................................... 139

CERTIFICATE OF COMPLIANCE ............................................................ 140

vi

## TABLE OF AUTHORITIES

CASES:

*Allen v. United States,*
  164 U.S. 492 (1896) ...... 53, 54, 117, 125, 126, 127, 129, 130, 131, 133

*Greer v. United States,*
  593 U.S. 503 (2021) ........................................................................ 121

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.,*
  198 F.3d 823 (11th Cir. 1999) ................................................. 111, 112

*Puckett v. United States,*
  556 U.S. 129 (2009) ................................................. 119, 121, 122, 129

*Smalls v. Batista,*
  191 F.3d 272 (2d Cir. 1999) ......................................................... 132

*Smalls v. Batista,*
  6 F. Supp. 2d 211 (S.D.N.Y. 1998) .............................................. 132

*Smith v. United States,*
  568 U.S. 106 (2013) ............................................................ 108, 109

*United States v. Andaverde-Tinoco,*
  741 F.3d 509 (5th Cir. 2013) ........................................................ 131

*United States v. Bass,*
  490 F.2d 846 (5th Cir. 1974) ........................................................ 128

*United States v. Beacham,*
  774 F.3d 267 (5th Cir. 2014) .......................................................... 57

*United States v. Benavides,*
  549 F.2d 392 (5th Cir. 1977) ........................................................ 123

*United States v. Berger,*
  224 F.3d 107 (2d Cir. 2000) ............................................................. 112

*United States v. Bergman,*
  852 F.3d 1046 (11th Cir. 2017) ...................................................... 112

*United States v. Bieganowski,*
  313 F.3d 264 (5th Cir. 2002) ........................................... 122, 123, 125

*United States v. Boyd,*
  773 F.3d 637 (5th Cir. 2014) ......................................................... 119

*United States v. Carr,*
  740 F.2d 339 (5th Cir. 1984) ........................................... 71, 135, 136

*United States v. Cisneros,*
  130 F.4th 472 (5th Cir. 2025) ........................................................ 124

*United States v. Comrie,*
  842 F.3d 348 (5th Cir. 2016) ......................................................... 129

*United States v. Daniel,*
  933 F.3d 370 (5th Cir. 2019) ......................................................... 119

*United States v. Davis,*
  609 F.3d 663 (5th Cir. 2010) .............................................. 123, 125

*United States v. Diaz,*
  90 F.4th 335 (5th Cir. 2024) ............................................................. 4

*United States v. Ebron,*
  683 F.3d 105 (5th Cir. 2012) .............................................. 133, 134

*United States v. Escalante-Reyes,*
  689 F.3d 415 (5th Cir. 2012) (en banc) .......................... 120, 124, 125

*United States v. Gibson,*
  875 F.3d 179 (5th Cir. 2017) ...................................... 58, 81, 95, 105

*United States v. Giraldi,*
    86 F.3d 1368 (5th Cir. 1996) ........................................................ 137

*United States v. Hale,*
    685 F.3d 522 (5th Cir. 2012) .............................................. 130, 131

*United States v. Harris,*
    960 F.3d 689 (5th Cir. 2020) .......................................................... 59

*United States v. Heard,*
    709 F.3d 413 (5th Cir. 2013) ......................... 108, 109, 110, 113, 114

*United States v. Hesson,*
    746 F. App'x 324 (5th Cir. 2018) .............................. 66, 68, 69, 72, 93

*United States v. Hillsman,*
    480 F.3d 333 (5th Cir. 2007) ........................................................ 121

*United States v. Hoffman,*
    901 F.3d 523 (5th Cir. 2018) ........................................................ 110

*United States v. Hoskins,*
    44 F.4th 140 (2d Cir. 2022) .................................................. 112, 113

*United States v. Jones,*
    664 F.3d 966 (5th Cir. 2011) ........................................................ 135

*United States v. Killian,*
    639 F.2d 206 (5th Cir. Unit A Mar. 1981) .............................. 110, 113

*United States v. Lyons,*
    731 F.2d 243 (5th Cir. 1984) (en banc) ........................................ 128

*United States v. Marchetti,*
    96 F.4th 818 (5th Cir. 2024) .............................................. 57, 58, 96

*United States v. Martinez-Rivera,*
No. 24-20031, 2025 WL 985711 (5th Cir. Apr. 2, 2025) ................ 130

*United States v. McClaren,*
13 F.4th 386 (5th Cir. 2021) ........................................................ 109

*United States v. McClatchy,*
249 F.3d 348 (5th Cir. 2001) ........................................................ 130

*United States v. McDuffie,*
542 F.2d 236 (5th Cir. 1976) ............................................... 122, 123

*United States v. Mejia,*
356 F.3d 470 (2d Cir. 2004) ................................................. 127, 128

*United States v. Meza,*
701 F.3d 411 (5th Cir. 2012) .......................................................... 58

*United States v. Miles,*
360 F.3d 472 (5th Cir. 2004) ........................................................ 133

*United States v. Miller,*
406 F.3d 323 (5th Cir. 2005) ................................. 119, 120, 124, 132

*United States v. Moreno-Gonzalez,*
662 F.3d 369 (5th Cir. 2011) .......................................................... 57

*United States v. Nerlinger,*
862 F.2d 967 (2d Cir. 1988) ................................................. 111, 112

*United States v. Page,*
__ F.4th __, 2025 WL 3534588 (5th Cir. Dec. 10, 2025) ................ 137

*United States v. Pierre,*
88 F.4th 574 (5th Cir. 2023) ........................................................ 121

*United States v. Ryan,*
156 F.4th 583 (5th Cir. 2025) ........................................................ 59

*United States v. Sanders,*
952 F.3d 263 (5th Cir. 2020) ...................................... 57, 58, 59, 78, 90

*United States v. Scroggins,*
599 F.3d 433 (5th Cir. 2010) ........................................................ 116

*United States v. Shah,*
95 F.4th 328 (5th Cir. 2024) .......... 55, 56, 64, 103, 104, 107, 135, 137

*United States v. Straach,*
987 F.2d 232 (5th Cir. 1993) ........................................................ 133

*United States v. Sylvester,*
143 F.3d 923 (5th Cir. 1998) ........................................................ 125

*United States v. Thomas,*
724 F.3d 632 (5th Cir. 2013) ........................................................ 119

*United States v. Tolliver,*
730 F.3d 1216 (10th Cir. 2013) ...................................................... 64

*United States v. Tooker,*
957 F.2d 1209 (5th Cir. 1992) ................................................... 67, 92

*United States v. Torres,*
114 F.3d 520 (5th Cir. 1997) ........................................................ 109

*United States v. Vargas-Ocampo,*
747 F.3d 299 (5th Cir. 2014) (en banc) ........................................... 58

*United States v. Vasquez,*
766 F.3d 373 (5th Cir. 2014) .......................................................... 59

*United States v. Vergara,*
687 F.2d 57 (5th Cir. 1982) ........................................................... 61

*United States v. Wentland,*
   582 F.2d 1022 (5th Cir. 1978) ........................................................ 112

*United States v. Willett,*
   751 F.3d 335 (5th Cir. 2014) .............................. 63, 66, 72, 73, 92, 93

*United States v. Wilson,*
   203 F. App'x 140 (9th Cir. 2006) .................................................. 124

*United States v. Yusuf,*
   57 F.4th 440 (5th Cir. 2023) .................................................... 58, 59

**STATUTES AND RULES:**

18 U.S.C. § 371 ..................................................................... 1, 108

18 U.S.C. § 3231 ......................................................................... 1

18 U.S.C. § 3282(a) ................................................................... 108

28 U.S.C. § 1291 ......................................................................... 1

42 U.S.C. § 1320a-7b(b) .............................................................. 1

42 U.S.C. § 1320a-7b(b)(2) ......................................................... 56

42 U.S.C. § 1320a-7b(b)(2)(B) ............................................... 2, 103

42 U.S.C. § 1320a-7b(f) ............................................................... 2

42 U.S.C. § 1320a-7b(h) .................................................. 56, 103, 104

Fed. R. Crim. P. 43 ............................................................. 114, 122

Fed. R. Crim. P. 51(b) .......................................................... 119, 121

Fed. R. Crim. P. 52(b) ............................................................... 119

**MISCELLANEOUS AUTHORITIES:**

BLACK'S LAW DICTIONARY (12th ed. 2024) ............................................. 113

FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS
    (CRIMINAL CASES) § 1.26 (2024) ...................................................... 115

JURISDICTIONAL STATEMENT

Following a six-week trial, a jury found Susan Hertzberg, Matthew Theiler, David Kraus, and Thomas "Gray" Hardaway guilty of conspiring to commit illegal remunerations under the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b), in violation of 18 U.S.C. § 371. ROA.2188-2189; *see* ROA.67-119. The district court (Kernodle, J.) sentenced Hertzberg to five years of probation; Theiler to 18 months in prison; Kraus to 22 months in prison; and Hardaway to 12 months and one day in prison. ROA.7157, 16182, 19395, 22715. The defendants timely appealed. ROA.7164, 16189, 19401, 22722. The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291.

STATEMENT OF THE ISSUES

I.    Whether a rational jury could find that Hertzberg, Theiler, and Hardaway knowingly joined the kickback conspiracy. (Hertzberg Br. 35-58; Theiler Br. 12-28; Hardaway Br. 29-41.)

II.    Whether a rational jury could find a federal nexus under the AKS. (Hertzberg Br. 58-59; Hardaway Br. 41-44.)

III.   Whether a rational jury could find that Hertzberg and Hardaway did not withdraw from the conspiracy. (Hertzberg Br. 60-63; Hardaway Br. 44-45.)

IV.   Whether the district court plainly erred in failing to immediately disclose to the parties a jury note similar to one to which the court was already responding. (Kraus Br. 10-18; Hardaway Br. 45-52.)

V.   Whether the district plainly erred in its response to that earlier note. (Kraus Br. 19-23.)

VI.   Whether the district court abused its discretion in refusing Hardaway's proposed good-faith instruction. (Hardaway Br. 53-58.)

### STATEMENT OF THE CASE

As relevant here, the AKS makes it a crime to knowingly and willfully pay a kickback "to any person to induce such person" to order any item "for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(B). Medicare is a "Federal health care program" under the AKS. 42 U.S.C. § 1320a-7b(f); *see* ROA.2180.

A grand jury charged Hertzberg, Theiler, Kraus, Hardaway, and 14 codefendants with conspiring to pay and receive illegal remunerations

under the AKS. ROA.67-119. The indictment alleged that two rural Texas hospitals—one in Rockdale run by Little River Healthcare (Little River), and one in Stamford run by Jones County Regional Healthcare (Stamford)—used management services organizations, or "MSOs," that purported to offer "investment opportunities" to physicians throughout the state, including in the Eastern District of Texas. ROA.64, 69; *see* ROA.94. The indictment further alleged that, in reality, the MSOs paid the physicians to order laboratory blood tests performed by Boston Heart Diagnostics (Boston Heart). ROA.69. According to the indictment, the physicians ordered Boston Heart tests through the hospitals or Boston Heart itself; the hospitals and Boston Heart received reimbursement from commercial insurers and Medicare; the hospitals paid a portion of their profits to the MSO "recruiters" who paid the referring physicians; and Boston Heart executives and sales personnel, including the defendants here, joined the scheme to enhance their own revenues, bonuses, and commissions. ROA.69; *see* ROA.68-94.

Boston Heart was headquartered in Massachusetts. ROA.10967. Hertzberg was its CEO. ROA.10967. Theiler was its vice president of sales, and he reported to Hertzberg. ROA.9307, 10967. Kraus was

regional sales director for the southwest region, including Texas, and he reported to Theiler. ROA.9168, 9298, 10968, 10125. Hardaway was area sales manager for Austin and San Antonio, and he reported to Kraus. ROA.9085, 10125. The four were tried together with Jeffrey Madison, CEO of Little River.[1] ROA.7404. The government called 23 witnesses and introduced emails, text messages, contracts, and other documents. ROA.2226-6530, 7761-12551. The defendants called three witnesses and introduced additional documents. ROA.6556-6809, 12636-13209. Taken in the light most favorable to the government, *United States v. Diaz*, 90 F.4th 335, 342 (5th Cir. 2024), the evidence showed the following:

## I.    Overview: "Marketers" Pay Physicians to Order Boston Heart Blood Tests Through Rural Texas Hospitals.

Little River's hospital in Rockdale, a town of about 5,000 people, had at most 25 beds, and it operated partly out of trailers. ROA.4390, 8244-8249, 11587-11588, 12724. It was a "critical access hospital" for a rural area, so federal and commercial insurance payors reimbursed the hospital at much higher rates than they paid providers in other areas. ROA.4328, 4668, 8189-8190, 9760-9761, 10540, 11170-11171. By early

---

[1] Madison was convicted and sentenced to 36 months in prison. *United States v. Madison*, 6:22-cr-3-JDK-JDL-7, Dkt. No. 1398 (E.D. Tex.). He does not appeal.

2015, Little River CEO Madison was looking for more patients and a way to leverage Little River's "great contracts." ROA.8189. In 2015 and 2016, the hospital paid "[m]arketers" to "recruit" and remunerate physicians throughout Texas and thereby induce the physicians to order Boston Heart's advanced lipid blood tests through Little River, which in turn billed insurers. ROA.4391, 4572, 10188; *see* ROA.8076, 8107, 8241, 8259-8260, 8308, 9640, 11556, 12276-12277. The so-called marketers included (1) Ruben Marioni and affiliated entities such as "Next Level" MSO; and (2) Robert O'Neal, Laura Howard, Christopher Gonzales, and affiliated entities such as "Ascend" MSO. ROA.8241, 9601-9602, 9640, 9684, 10121, 10975-10977, 12276-12277.

As the name "management services organization" suggests, a typical MSO provides physicians with administrative services such as billing, payroll, and IT support. ROA.8006, 10974. For those services, the physician pays the MSO, not the other way around. ROA.8004, 8009; *see* ROA.9611-9612 (Q: "Would it be odd if I mowed your lawn, and then I paid you?" A: "That would be odd."). But under the kickback scheme in this case, the MSOs performed no services for the physicians, and the payments flowed the wrong way. ROA.8284, 9524-9525, 9610-9612,

5

10974-10975, 11095-11096. On the pretense that physicians were "investing" in "shares" of an MSO, a marketer would accept a physician's nominal investment (e.g., $500 per share for two shares) and would pay the physician for referrals based on volume and under the guise of a return on the investment. ROA.4391, 8161-8162, 8283-8284, 8515-8516, 9295-9296, 9521-9528, 9603-9605, 9610-9612, 9643, 9684, 11094-11096. The "return" was as much as 10,000%. ROA.11096.

Such payouts were not the only way in which participating physicians were remunerated. For some physicians, Little River paid a member of the physician's staff or family to serve as a phlebotomist, i.e., the person who drew blood samples from patients. ROA.8093-8094, 8258-8259, 9176-9177, 9528-9529, 9605-9610, 12282. The staff or family member became an employee of the hospital but served in the physician's office, often performing tasks besides collecting the samples. ROA.8093-8094, 8258-8259, 9529, 9605-9610. The result was a reduction in the physician's overhead expenses. ROA.8094, 8259, 9529, 9609-9610, 10133.

During the relevant time in 2015 and 2016, Little River had no lab or only a small one, and it did not perform the blood tests for which insurers reimbursed it. ROA.2325, 8260, 11588. Instead, it entered a

"Client Bill Agreement" with Boston Heart, which performed the tests. ROA.2325-2329 (typeface altered). Under this "buy and bill" model, Boston Heart averaged revenue of more than $900 per "req," meaning requisition or blood-test order. ROA.2991, 4329, 4622, 4640, 9231, 11186. That per-test average was more than twice Boston Heart's average of $400 for, say, the Dallas–Fort Worth metroplex. ROA.9168, 9231. The difference was easily explained: payors reimbursed Little River at higher rates than they paid Boston Heart. ROA.4622, 4835, 10813. All told, Little River paid Boston Heart about $30 million for tests. ROA.11023.

The Little River deal was lucrative enough that, as it frayed, Boston Heart worked with marketer Robert O'Neal to start a new arrangement in 2016 with an "alternative" rural hospital: Stamford. ROA.10242; *see* ROA.4561, 8386-8387. Stamford paid the same marketers—Marioni, O'Neal, Howard, and Gonzales—to pay physicians to order Boston Heart tests. ROA.5721, 5729-5730, 8386-8394, 12361-12362. Indeed, the marketers brought over many of the same physicians who had ordered Boston Heart tests through Little River, and the schemers again pretended that the physicians were "investing" in MSOs. ROA.9539-9540, 9685-9692, 10274, 11095-11096, 12361; *see* ROA.5699-5730. The

MSOs now had names like "Regal" and "BenefitPro," but they were still affiliated with Marioni and O'Neal, and they still served the same purpose: to remunerate physicians for ordering Boston Heart blood tests. ROA.8161-8162, 9539-9540; *see* ROA.12388 (O'Neal testified that the MSOs were "just a piece of paper" and that "the names were secondary," because "[i]t was all for the purpose of procuring referrals").

Much like Little River, Stamford entered a "Laboratory Services Agreement" with Boston Heart. ROA.6593-6599 (typeface altered). But the Stamford deal differed somewhat from the Little River deal. ROA.5740, 5743 (demonstratives). Little River accepted *all* Boston Heart blood-test orders from the "investing" physicians, not only for patients covered by commercial insurance but also for patients covered by federal insurance (e.g., Medicare). ROA.8107, 8322-8323, 8520-8521, 8564-8567, 9142, 9501-9502, 10139, 11016-11017, 11556-11557, 12265, 12277-12278, 12539. In fact, Little River actively sought both types of orders, and it would not permit physicians to exclude tests covered by Medicare. ROA.8197, 9523, 9612, 9759-9760. By contrast, under the Stamford arrangement, Stamford billed for tests covered by commercial insurance,

8

and Boston Heart billed for tests covered by Medicare. ROA.6594, 9696, 11008-11010, 11019-11020, 12322-12323.

## II.    The Defendants Further the Kickback Scheme.

As noted (pp. 3-4), Susan Hertzberg was Boston Heart's CEO, Matthew Theiler was VP of sales, David Kraus was a regional sales director,[2] and Gray Hardaway was an area sales manager in Texas. ROA.9085, 10125, 10967-10968.

Hertzberg was a "force of nature": she was "brilliant," "energetic," "motivated," and "charismatic." ROA.10599, 12809-12810. She could also be "very direct," and she "wasn't bashful" about expressing objections. ROA.9993. Before Hertzberg worked at Boston Heart, she was CEO of another healthcare company, where she "knew everything and everybody." ROA.12809. By 2011, she had left that company to become Boston Heart's CEO. ROA.11873-11874, 12811.

At Boston Heart, Hertzberg had a team of 12 "direct reports." ROA.12823. In 2015, that executive team included Theiler; general counsel Luke Albrecht; CFO Kim Bracuti; and Jeff Craven, VP of "Payor

---

[2] Kraus does not claim that the evidence did not sufficiently prove his guilt, so the government recounts his conduct only as necessary to provide context for that of the other defendants.

Innovation & Strategy," i.e., "a business development guy." ROA.6609, 11585; *see* ROA.12823-12825. The team had "tremendous experience" in navigating the "complex factors" of running a diagnostics company. ROA.12825-12826. Their experience extended to compliance, and they received compliance training. ROA.12826-12827, 12850.

Hertzberg was familiar with the AKS specifically. ROA.11883. In 2011, she and others asked the Department of Justice to investigate possible AKS violations by a competitor lab experiencing "explosive growth." ROA.11873-11875; *see* ROA.11883. During an interview with a DOJ investigator, Hertzberg and others reported that the competitor lab was using a "marketing" company to pay "processing" and "handling" fees to physicians to induce the physicians to order the lab's tests for $1200 to $1400 each. ROA.11875-11876. Hertzberg noted that, in comparison, Boston Heart's tests cost only $370. ROA.11876-11877.

Like Hertzberg, Theiler was "very smart" and "experienced." ROA.9305, 10967-10968. He had worked with Hertzberg at a different company, and he was "loyal" to her. ROA.9305-9307; *see* ROA.11644 (at Boston Heart, Hertzberg and Theiler were part of a "close group" that included Bracuti and Craven). As VP of sales, Theiler sometimes had

calls with all Texas sales representatives. ROA.9187, 10126, 10162. Likewise, Hertzberg occasionally participated in Texas sales calls, including one in which "there was in-depth conversation about the MSOs and the influence that they provided." ROA.10161-10162; *see* ROA.10126.

**A.    Hardaway brings Little River to Boston Heart, Hertzberg facilitates pricing, and revenue ramps up, including through Hardaway's MSO.**

Like Hertzberg and Theiler, Hardaway was knowledgeable and experienced. ROA.10968, 12717. And "he was the one that brought the Little River opportunity to Boston Heart." ROA.11478. By early 2015, Little River CEO Madison contacted Hardaway about the "buy and bill" model under which Boston Heart would perform blood tests and Little River would obtain reimbursements. ROA.4322. Hardaway answered Madison's questions and worked on pricing, but Madison said that Boston Heart's competitors were "offering better pricing." ROA.4322.

In February 2015, Jonathan Sheinberg, a cardiologist affiliated with Little River, emailed Hertzberg directly about the buy and bill model. ROA.4846-4847; *see* ROA.12637. He said: "I have a problem that Gray Hardaway and I are having a difficult time solving." ROA.4847. Sheinberg told Hertzberg that because Little River had "great contracts,"

11

the executives there wanted to "bill for labs themselves," and they were considering various lab companies to see if they could get "a possible lucrative deal." ROA.4847. Sheinberg added that he was using Boston Heart's tests and wanted to "keep the business with your company," but "I just need some competitive pricing and I need it soon." ROA.4847. Within a few minutes, Hertzberg responded: "I'm on it! Stay tuned!" ROA.4846. Later that night, she got Madison's contact details from Sheinberg to "get the ball rolling." ROA.4846. Hertzberg also forwarded Sheinberg's email to Bracuti and Craven, and she "ask[ed] them to get a better price proposal" for Little River. ROA.4627.

The day after Sheinberg initiated contact, Hardaway and Bracuti exchanged emails about pricing. ROA.4437-4440. Hardaway told Bracuti that Little River "owns 100+ physicians" and "want[s] to get all providers on board with ordering." ROA.4439. Bracuti responded: "Woohoo! Ok — let's get this going!" ROA.4439. Several weeks later, with an effective date of April 1, 2015, Boston Heart entered the "Client Bill Agreement" under which it performed blood tests for Little River. ROA.2325-2329. Bracuti signed the agreement for Boston Heart. ROA.2327.

12

Hardaway and other sales personnel helped with the "onboarding" of physicians interested in ordering Boston Heart's tests through Little River. ROA.8295. During "onboarding," an MSO "marketer" and a Boston Heart representative would visit a physician's office together. ROA.8262-8263, 8295. The marketer's role was to explain "our business and how we are getting paid," and the role of the Boston Heart representative was to answer questions about the tests. ROA.8263. Based on conversations with Hardaway, Marioni testified that Hardaway knew that Marioni's MSO "made payments to physicians," and knew that "those payments were intended to induce referrals." ROA.8264.

In early April 2015, Hardaway emailed Craven a Boston Heart requisition form listing two blood panels, "C" and "M." ROA.4406-4407. Hardaway titled the email "Little [R]iver," and he told Craven: "They plan to use the c panel for commercial and m panel for Medicare." ROA.4406. About a week later, Hardaway sent Madison a text message saying that he wanted to discuss "[h]ow we properly coordinate blood samples and paperwork and copies of insurance for you guys to bill, etc." ROA.3164. Madison replied: "Okay. Let's discuss tonight." ROA.3164.

13

In May 2015, Hardaway sent Madison another text saying: "We didn't receive contract from you so wanted to make sure everything was good on your end. We are ready to start crushing this!" ROA.3163. Judging by the timing, the contract in question was not the "Client Bill Agreement" between Little River and Boston Heart but a contract between Little River and a company called "LGRB." ROA.9087-9089, 11131-11132. Hardaway and a man named Stan Jones were principals of LGRB, and they were partners in an affiliated MSO called "Rise." ROA.8731, 8795, 8816, 8835, 13088, 13114-13118. Starting in May 2015, Little River had a "marketing contract" with LGRB and, by extension, Rise MSO. ROA.8731; *see* ROA.8613, 8694, 8795, 9087-9089, 13088.

Boston Heart sales representative Jeffrey Parnell testified that, when he got a lead on a physician who wanted to "invest" in an MSO, he sent the physician to Stan Jones at Rise. ROA.9206, 9242-9243, 9353-9354, 9387, 9418-9419. Parnell understood that Hardaway did the same thing, ROA.9419-9420; that many physicians bought "shares" in Rise and received "profits," ROA.9420-9422; and that Little River paid Rise for the physicians' "commercial samples." ROA.9422-9423. Parnell disclaimed any understanding that Rise paid physicians to send "federal samples" to

14

Little River. ROA.9423. But he admitted that physicians "could just send whatever they wanted," and he was "sure" that some of the "Rise-invested doctors actually did send federal samples to Little River." ROA.9424.

In June 2015, Kraus told Hardaway, Parnell, and other sales personnel by email that Hertzberg and Theiler had "asked what you would need to kick 2015 samples through the roof!" ROA.4634. Kraus said he would meet with Hertzberg and Theiler in two weeks. ROA.4634. By the time of that meeting, revenue from Little River was "taking off nicely." ROA.4409; *see* ROA.4646. Little River's Sheinberg told Hertzberg in a June email: "We've been smoking it! Hundreds and hundreds of labs. Gray is beside himself!" ROA.4434. And Craven told Theiler, Kraus, and Hardaway in a June email: "Little River growth continues to be very strong." ROA.4640. About a week later, Craven forwarded the email to Hertzberg. ROA.4640. He told her that, if he were to "annualize" the Little River numbers, "we are up a net of $4.4M." ROA.4640.

JoAnna Shore was on Craven's initial email. ROA.4640. She had just been hired as Boston Heart's vice president of hospital strategy. ROA.9098, 11584-11586, 11702. Theiler was Shore's supervisor, but Shore also worked directly with Hertzberg. ROA.11583, 11593, 11796.

15

Shore's "vision"—the one she had been hired to implement—was to work with hospitals that would administer Boston Heart's tests when discharging patients at risk of heart disease and diabetes. ROA.11576-11578. Broadly speaking, Little River "didn't fit into the vision at all." ROA.11581. Also, Theiler's sales team had the Little River line of hospital business, but Shore had little or no contact with them. ROA.9247, 11581-11582, 11586, 11604-11605, 11740. And when she saw revenue numbers in emails like Craven's, she was "curious" and "confused," not "excited." ROA.11710-11711. Little River was generating "a lot of revenue" "for a rural hospital." ROA.11710, 11713. Over time, then, Shore "grew to have some questions about the Little River business model." ROA.11712.

Unlike Shore, some Boston Heart personnel *were* excited about the Little River numbers. ROA.10749. In mid-July 2015, Boston Heart financial analyst Andy Flynn updated Craven on the latest numbers, saying by email: "This just keeps getting better and better." ROA.4329-4330; *see* ROA.10735. Craven forwarded the update to Hertzberg, Theiler, Kraus, Hardaway, and others, noting that "we are now looking at a net revenue increase of approx. $8.6M/year." ROA.4329. In the same thread, Kraus said to Hardaway, Parnell, and other sales personnel:

16

"Some serious coin for you boys[.]" ROA.4329. At trial, Parnell said that Kraus was alluding to increased commissions. ROA.9234. Hardaway especially stood to benefit from the increased volume: he got an additional "percentage of commissions" on the Little River deal, evidently because he had helped to "set it up." ROA.9202-9203.

By the end of July 2015, Boston Heart's revenue from Little River had ramped up even more. ROA.4415, 4648. In a July 30 email, Craven told Theiler and others that "we are up $12.9M/yr." ROA.4415. In the same thread, Flynn commented to Craven: "Still cant believe how this took off. If we can get all 100 ordering the revenue will be staggering[.]" ROA.4415.

About a week later, in early August 2015, Hertzberg emailed Boston Heart board members about an upcoming board meeting. ROA.4642, 10499-10502. The board members included chairman Jonathan Lapin of Eurofins, a lab conglomerate that had recently acquired Boston Heart as a subsidiary. ROA.4653, 10492-10497, 11410. When Eurofins bought Boston Heart, an "earnout" provision of the merger agreement made the purchase price contingent on Boston Heart's performance during the first two years after the merger. ROA.10609-

17

10610. As shareholders, Hertzberg and Theiler had "earnout potential": they stood to make as much as $4.7 million and $750,000, respectively. ROA.11460; *see* ROA.10609-10610, 11286-11287, 11447-11448. And even apart from the earnout, Boston Heart personnel—again including Hertzberg and Theiler—stood to receive performance bonuses. ROA.2937, 5796, 10554-10555, 10566-10568, 11314.

Against that backdrop, Hertzberg's August 2015 email to board members attached PowerPoint slides touting Boston Heart's relationship with Little River. ROA.4642-4646, 10502-10504. One slide reported "$10M+" in "net annualized revenue" from the relationship. ROA.4645. Another slide depicted Little River's growth from March to July 2015. ROA.4646. The growth was rapid enough that, as Lapin later put it, the graph was "hockey-stick-shaped." ROA.10503.

In the meantime, by August 2015, Hardaway was benefitting from the Little River deal not only through Boston Heart commissions but also through his role at LGRB and Rise MSO. ROA.4329, 4399, 5308, 8795-8796, 9202-9203, 11173-11174. In mid-August, in an email thread that included Hardaway, LGRB's Stan Jones "highlighted" for Little River executives the "accounts" that LGRB had "brought" to Little River.

18

ROA.5308. Jones said that, for "BH," "LGRB did 109 in June and 492 in July." ROA.5308. CEO Madison replied: "That's awesome guys!" ROA.5308. A few weeks later, Hardaway emailed Jones "a rough estimate of what we should get paid for may and june from lrhc." ROA.4399. Hardaway added: "I estimated 60% of reqs being commercial." ROA.4399. The implication was that the other 40% were covered by federal programs like Medicare. ROA.11174.

In early September 2015, financial analyst Flynn emailed a "Little River Update" to Hertzberg, Theiler, and others. ROA.4647-4648. Flynn reported that, based on the prior four weeks, Boston Heart's annualized revenue from Little River was now more than $20.8 million. ROA.4647. Within an hour of the update, Hertzberg replied: "WOWIE!!!!! HOW DO WE GET SOME MORE OF THAT???!!!!!!!" ROA.4647. Hertzberg also told Theiler and others that she wanted to "fly out and meet with" Madison and Sheinberg. ROA.5340-5341.

In late September 2015, Flynn sent another "Little River Update" to Hertzberg, Theiler, Hardaway, and others. ROA.4826. Flynn reported that, based on the prior four weeks, Boston Heart's annualized revenue from Little River was now more than $26.7 million. ROA.4826.

19

Separately, a September 2015 financial review showed that Boston Heart set a new volume record, and that Hardaway was the company's third-most productive sales representative. ROA.3014, 3020, 10589-10591.

**B.   In the face of red flags, Hertzberg and Theiler press ahead with the Little River relationship, and they try to limit information about it within Boston Heart.**

Robert O'Neal, Laura Howard, and Christopher Gonzales were MSO "marketers" affiliated with Ascend MSO, one of the entities that paid physicians to order Boston Heart's tests. ROA.10140-10141, 10344-10350; *see supra* pp. 5-7. After Howard began working with O'Neal and Gonzales, Boston Heart hired her as a sales representative in Texas. ROA.3207, 9167, 10106-10109. Howard started at Boston Heart in early October 2015. ROA.3207, 10146. About a week later, she "prep[ped]" Hertzberg for a call with a "high-volume" Texas physician, Robert Megna. ROA.3206, 10114; *see* ROA.9315-9318, 10115-10116. After the call, Hertzberg told Howard that Megna was "happy" with the call. ROA.3206.

Also in early October 2015, Hertzberg had a call with Madison. ROA.4548. Afterward, in an email to Theiler, JoAnna Shore, and others, Hertzberg noted that Madison "seems concerned that we are throwing the Little River name around in the market." ROA.4548. Later in the

20

same thread, Theiler suggested that even people *within* Boston Heart were speaking "way too openly" about Little River. ROA.4548. Theiler said:

> I know that some reps were asking questions about Grey's numbers, and they were told (I don't know by whom) about the Little River deal. That was part of the reason I have been saying that information about this account is being shared way too openly within our company. Now it seems it's also being shared outside our company, which is not good.

ROA.4548. A few hours after Theiler's email, Flynn circulated the latest "Little River Update." ROA.5357. He reported that, based on the prior four weeks, Boston Heart's annualized revenue from Little River was now more than $28.1 million.[3] ROA.5357. A few days later, Hertzberg asked Flynn to "stop sending these updates to the distribution" and to "limit" circulation to Hertzberg, Bracuti, and Craven. ROA.4308. Flynn followed that instruction. ROA.4308, 5360, 10742.

In or around mid-October 2015, Boston Heart held a national sales conference in Nashville. ROA.9243-9246, 9500. Parnell testified that, at the conference, he discussed MSOs with Theiler and Kraus, and "everyone seemed to know the model," i.e., "that physicians had the

---

[3] Boston Heart's *total* revenue in 2015 was roughly $100 million. ROA.10773.

opportunity to invest in" the MSOs. ROA.9245; *see* ROA.9305 (based on interactions with Theiler, Parnell "would think" that Theiler "knew how the MSOs worked"). Parnell also testified that, during a hallway conversation at the conference, Theiler instructed Parnell and possibly Kraus: "You guys don't send me emails about MSOs." ROA.9246. To Parnell, "it sounded like [Theiler] didn't want a paper trail." ROA.9246.

Around that same time in mid-October 2015, in an email thread that included Hardaway, LGRB's Stan Jones again "highlight[ed]" for Little River executives the "accounts" that LGRB and Rise MSO were bringing to Little River. ROA.4831. Jones said: "Week of 10/4 Rise did 283 tests," i.e., "41.4% of the total 684 done by LR. Just saying LOL[.]" ROA.4831. Madison replied: "Nice job guys!!!!" ROA.4831.

In the latter half of October 2015, with assistance from Theiler and Boston Heart director of business intelligence Theo McCormick, Kraus drafted a presentation about Little River. ROA.4341-4370, 4400-4401, 10799, 10803-10813. At the outset, Kraus asked Theiler for "input" on an "outline." ROA.4849. Kraus proposed to discuss, *inter alia,* "MSO's and how they work with LRHC"; how "practitioners" were "partnering" with MSOs and sharing in "profits"; and why this arrangement benefitted

22

Boston Heart. ROA.4849. Theiler told Kraus that "the framework looks good" but to "steer clear of pricing and profitability." ROA.4849. About a week later, before the draft was complete, Kraus told Theiler and McCormick (ROA.4347):

> I did find out the MSO's working with Little River are not providing any management/administrative services for the office. The MSO's offer the access to testing[.] … Little River has 3 "Marketers" working for them, Next Level and a couple more. Heard their lawyer (Little River's) advised them to acquire practices in the areas where they are ordering testing (Houston, Dallas) for compliance reasons/passing the sniff test.

The final version of Kraus's presentation was called: "Selling to a 'Healthcare System.'" ROA.4618; *see* ROA.4616-4633. Among other things, it said that Little River worked with MSOs to "recruit providers"; the MSOs gave "leads" to Boston Heart sales personnel on physicians who showed an interest in "joining" an MSO; Little River phlebotomists drew the samples; Little River obtained "favorable reimbursement" through its "favorable contracts with Payors"; Boston Heart invoiced Little River and received payment for every test; and this model was a "Win/Win for everyone." ROA.4620-4622, 4627.

In late October 2015, Kraus gave—or, rather, started to give—his presentation to 40 members of Boston Heart's leadership team, including

23

Hertzberg and McCormick. ROA.10814. "At some point," Hertzberg "stood up and stopped the presentation." ROA.10814. She said: "This isn't who we are, and this isn't clinically focused. This is not medically related." ROA.10814.

Emails suggest that Kraus's presentation was on Tuesday, October 27 or Wednesday, October 28. ROA.4355, 4375. On Thursday, October 29, Kraus emailed a meeting invitation to Theiler and members of the Texas sales team, including Hardaway, Parnell, and Howard. ROA.4837. Kraus said that "Matt would like to discuss the signing of LRHC accounts" the following Monday, November 2. ROA.4837. JoAnna Shore was not invited. ROA.4837, 9323-9326. On Sunday, November 1, Theiler emailed Kraus a master list of Little River providers. ROA.4375. Theiler instructed Kraus (ROA.4375):

> Please work with the team to fill in the info regarding in-servicing, and how the account rolled under LR, whether it was owned, a lead from an MSO, our decision to roll under due to payors, etc. we need to get this completed ASAP. …

The morning of the scheduled meeting, Monday, November 2, Kraus sent the master list to the Texas sales team, including Hardaway, Parnell, and Howard. ROA.4374. Kraus told them to be "completely transparent" on how and why each account was "set up under the LRHC

24

model." ROA.4374; *see* ROA.9287-9291. Kraus also replied directly to Theiler's email. ROA.4375. He apologized to Theiler "for what transpired" the previous week, saying that "it cast a big shadow over my region." ROA.4375. He added: "I'm not sure if it hit you, but if it did[,] I am so very sorry to have disappointed you and to have caused you any grief." ROA.4375.

That same day, November 2, 2015, Kraus forwarded Theiler a spreadsheet of physician information supplied by the sales team. ROA.4377-4381. For each physician, the spreadsheet included a column for "Source of Referral to Boston Heart." ROA.4379-4381. In that document and in a revised version, the most common source of referral was "MSO" or variants like "MSO referral." ROA.4379-4381, 4553-4557, 11259-11261. Theiler later forwarded the spreadsheet to Hertzberg, along with the sales team's "explanations" for signing up neurologists, psychiatrists, and other physicians with "specialties that looked questionable, meaning that they were not our typical clients" for advanced lipid testing. ROA.4551-4552; *see* ROA.8257 ("advanced lipid testing … is advanced labs for cardiovascular patients"); ROA.8826 (Boston Heart performed a "very specialized" "advanced test looking at

25

your cardiac factors"); ROA.8997 (it detected risks of heart attack or stroke).

On November 3, 2015, no more than a week after Kraus's aborted presentation, JoAnna Shore told Hertzberg, Theiler, and Craven by email: "Until we have the clarity on all of Little River, we should stand down on all hospitals, particularly in David's area." ROA.4420; *see* ROA.11604 ("David" meant Kraus). Shore explained her concerns in detail, saying among other things:

- "A critical access hospital exists **to provide access** and **does not typically have a marketing arm**."

- "I do not believe we fully understand the Little River business model or the targeted MSA for their marketing arm (MSO?). They are way outside of the Little River access area for patients."

- "*My strong recommendation and request, is that we reel this in and ask the field to stand down on any further client bill engagement with hospitals, Critical Access or otherwise, until we have an opportunity to train*."

ROA.4420 (emphases in original); *see* ROA.11708-11709, 11714 ("MSA" meant geographical marketing area).

Despite the above developments, Boston Heart continued to work with Little River under the same arrangement as before. ROA.6669, 10890, 10901, 11253-11255. About a week after Shore recommended

standing down, Hertzberg emailed Madison and Sheinberg at Little River. ROA.4420, 4848. Among other things, she told them that she was looking forward to talking with them the next day; she wanted a "Little River overview" from Madison; she was "particularly interested" in Little River's "business model" and "MSO relationships"; and she was "not sure" that she "fully" understood "how things work." ROA.4848.

On November 10, 2015, Hertzberg, Shore, and others participated in the planned call with Madison and Sheinberg. ROA.4421, 4615. Afterward, Shore emailed Hertzberg, Theiler, and others. ROA.4421. Shore said the call was "great!" but she had "Questions" about "MSOs" and how Little River was "targeting" physicians with its "'marketers.'" ROA.4421. Shore asked if Boston Heart and Little River should "consider a JV," meaning a joint venture. ROA.4421; *see* ROA.11608. At trial, Shore explained that she "did not feel comfortable" with the existing model, so she proposed a "joint venture" to "create a different approach." ROA.11608-11609; *see* ROA.11608 (Shore had "experience of working with joint ventures between Quest Diagnostics and many hospitals," so she "brought forward the idea" of "a framework like that").

27

On unspecified dates, Hertzberg, Shore, and others had a "couple" "discovery meetings" about the idea of a joint venture. ROA.11610-11611. But it was not Shore's role to decide the "legality" of such a venture. ROA.11610. Nor was it Shore's "place" to suspend the existing model. ROA.11716. So, instead, Shore asked Hertzberg to bring aboard someone who could "make [the] interpretation" of whether Boston Heart was acting lawfully. ROA.11694. At the time, general counsel Luke Albrecht was "acting" as Boston Heart's "chief compliance officer." ROA.9947, 9952. Evidently, though, that title had little practical significance, because Albrecht was not on the compliance committee. ROA.10569-10570. Indeed, Hertzberg later told chairman Lapin that "95%" of Albrecht's job was "general counsel work," not compliance work, and that Boston Heart had a compliance committee of one member: Hertzberg. ROA.4779; *see* ROA.10551, 10569-10570, 10577, 10706; *but see* ROA.10635-10636, 12828 (there were in fact other members).

In November 2015, on Shore's recommendation, Hertzberg hired Rob Rossi as "vice president of compliance." ROA.9894, 9952, 11634, 11694. But that title, too, had little practical significance: Rossi was largely "isolated" and "kind of walled off" during his time at Boston

28

Heart. ROA.9929, 9948. He shared an office with a paralegal. ROA.9948. He "wasn't part of the senior leadership team," so he "couldn't get that bigger picture" to "become a better compliance person." ROA.9896, 9899. At trial, he could not "specifically recall" any occasion in which Hertzberg ever asked him for information about MSOs. ROA.9945. Nor could he "remember any specific meetings" with Little River representatives. ROA.9901. Instead, he remembered Shore asking him why he had not been included in such a meeting. ROA.9901, 9976. He "didn't have an answer" to that question. ROA.9901. And absent complete information on how MSOs were operating with Boston Heart, Rossi could "[n]ot really" offer compliance advice about them. ROA.9944-9945.

In early December 2015, Hertzberg sent Lapin an "overview" of the "Joint Venture Opportunity" with Little River. ROA.4665, 4667. The overview reflected that Little River owned two rural hospitals; the hospitals were "paid a premium (**3x standard rate**) by government and private payors"; Little River had an "alliance model" with physicians who ordered Boston Heart's tests; and Boston Heart in turn billed Little River "instead of third party payors." ROA.4668 (boldface in original); *see* ROA.4673. The overview said nothing about MSOs. ROA.10546-10547.

Lapin had "questions" about the proposed joint venture, and he told Hertzberg that he wanted to understand its "structure," including from a "legal" standpoint. ROA.10543, 10548-10549.

On December 8, 2015, a few days after Hertzberg's email to Lapin, Kraus emailed Hardaway and Parnell. ROA.4389. He told them that Hertzberg was "preparing to present LRHC to Eurofins," and that she had "asked us to prepare an Executive Summary for her." ROA.4389. Kraus attached a first draft, asked Hardaway and Parnell to review it, and said he would talk to them the next morning. ROA.4389-4391. The draft said in part that a "driver for growth for Little River and other hospitals is the Management Services Organization model." ROA.4391. The draft explained the MSO model as follows:

> Little River will employ Marketers. These Marketers represent Management Service Organizations (MSO"s), which allow the practitioners to become investors in these MSO's. The practitioners become investors by purchasing shares in the MSO. Little River will remunerate the Marketers/MSO, which in turn disperse their profits among the investors.

ROA.4391 (punctuation and "disperse" as in original).

At trial, Parnell affirmed that Kraus's first draft accurately described the MSO model. ROA.9295-9296. But the morning after Kraus

30

sent the draft, Parnell replied with an email that proposed to delete and rephrase some of the information about MSOs. ROA.4418, 9298-9302. Parnell testified that his edits were not intended "to conceal the nature of these MSOs" from Hertzberg, Theiler, or anyone else at Boston Heart, because "MSOs were so prevalent in the market that everyone seemed to have a grasp that physicians were investing, and it seemed like common knowledge to me." ROA.9302-9303.

On December 9, 2015, Kraus sent Theiler a revised draft of the executive summary. ROA.4392-4395. As to MSOs, the draft now said:

- Management Services Organization (MSO).
  - o Marketers/MSO's represent LRHC.
  - o Marketers recruit providers into the MSO, allowing the provider [to] access a variety of medical and management services, some of which are offered through Little River.

ROA.4395. The draft noted, too, that Little River's "Critical Access" status allowed it "to receive cost-based reimbursement from Medicare, instead of standard fixed reimbursement rates." ROA.4394-4395.

On December 11, 2015, Theiler sent Hertzberg the final executive summary. ROA.4570-4572. It contained a few more revisions, but as to MSOs, it retained the language that Kraus had sent to Theiler. ROA.4395, 4572. It also retained the language about Little River's

31

eligibility "to receive cost-based reimbursement from Medicare." ROA.4571-4572.

On December 15, 2015, Lapin sent Hertzberg an email reiterating that, for the joint venture with Little River, he wanted to understand the "structure" from a "legal" standpoint. ROA.4773; *see* ROA.10548-10549. But neither Hertzberg nor anyone else ever supplied him with an opinion on the structure's legality, so he never approved the idea of a joint venture.[4] ROA.10545-10547, 10705-10706, 11276-11277.

**C. Theiler works with O'Neal and Howard to replace Little River, Hertzberg approves pricing with Stamford, and Michael Ivers blows the whistle on Boston Heart's hospital business.**

By late 2015, all four defendants had learned that Little River was working with a competitor lab, True Health. ROA.4339-4340, 4387, 10134-10137. Some high-volume physicians who had ordered Boston Heart tests through Little River were now ordering, or were at "risk" of ordering, from True Health. ROA.10177-10178; *see* ROA.3911-3913,

---

[4] In January 2016, Shore visited Little River to see if it "could support their half or a portion of a joint venture." ROA.11616-11617; *see* ROA.6180. Afterward, Shore told Hertzberg, Theiler, and others that Little River had "a sound business model for bringing integrated care to rural areas." ROA.6180. At trial, she explained that that was a comment about the hospital as a "healthcare delivery critical access hospital," not about "the current Little River business model." ROA.11617.

32

3924, 4521, 11035. Thus, while Boston Heart kept working with Little River in late 2015 and early 2016, ROA.4925, 8885-8886, 10177, Theiler and other Boston Heart personnel began to "focus" on "where Boston would be able to work next," ROA.10188; *see* ROA.4525-4526, 4561, 9248-9269, 11299-11309.

Also by late 2015, Boston Heart began working with Integrity hospital in Denton, Texas, just north of Dallas. ROA.4387. As Kraus explained in a December email to Hertzberg, Theiler, and others, the Integrity relationship "was derived from a group of marketers called Benchmark"; "Benchmark was originally with Little River"; and "Little River cut ties with them."[5] ROA.4387. Kraus added that now—through Benchmark, Hardaway, and Parnell—Boston Heart had "about 25 accounts with Integrity." ROA.4387. At trial, Parnell testified that Boston Heart had become Integrity's "reference lab" for blood tests, and that some physicians were "referring through ITH the way that they had also been referring through Little River." ROA.9258-9259.

---

[5] Earlier, Kraus had told Hertzberg that "Little River booted this MSO called Benchmark because they were misleading and dirty." ROA.4339.

By this time in late 2015, Boston Heart sales representative Laura Howard had given Kraus (who then gave Hertzberg and Theiler) "intel" from Robert O'Neal about True Health's negotiations with Little River. ROA.4340, 10136. Howard was still working as a so-called marketer with O'Neal and Christopher Gonzales. ROA.3911-4214, 10343-10345, 12319. In a late December email to Theiler, Howard said that she had asked O'Neal to meet with Theiler "to discuss how Boston Heart can be involved in [O'Neal's] pursuit of hospital growth." ROA.4561. Theiler said that he would be traveling to Dallas in mid-January 2016, and he suggested a "business dinner" with O'Neal. ROA.4561. Kraus later sent Theiler an itinerary for Theiler's three-day trip to Dallas. ROA.4525. The itinerary showed that Theiler would have meetings with O'Neal; Howard; an "LR marketer," meaning Gonzales; two different "LR client" physicians, one of them a neurologist; Integrity executives; and "ITH marketers," meaning an MSO that worked with Integrity. ROA.4525-4526; *see* ROA.9248-9258, 9859-9860, 10185-10188, 10229-10230.

Parnell testified that Theiler's meeting with Integrity executives was "PR work" meant to "solidify the relationship." ROA.9258. As for the "ITH marketers," ROA.4525, Theiler had asked Parnell to set up a

34

meeting with them so that Theiler "could just see how an MSO worked and what they did functionally," ROA.9255. In that MSO meeting, there were no "discussions about whether or not physicians were involved." ROA.9256. But after the meeting, in the parking lot, Theiler reminded Parnell not to send him "any emails about MSOs." ROA.9256.

On February 11, 2016, Theiler and JoAnna Shore had a call with O'Neal. ROA.4562-4563, 4573. According to notes that Theiler emailed to Shore after the call, O'Neal would soon "have" five hospitals in Texas and elsewhere; Boston Heart would "[n]eed to get him a fee schedule"; and O'Neal would have "phlebs or processors in each of the offices to triage the work to the right facilities." ROA.4562-4564; *see* ROA.11640-11643.

On or about February 15, 2016, Theiler asked Rob Rossi "questions about MSOs." ROA.10010. On February 17, Rossi emailed Theiler, Shore, and Luke Albrecht "[s]ome info on MSO's that I pulled from American Health Lawyers Association website." ROA.4581. Rossi attached a writeup that addressed legal issues with MSOs. ROA.4582. The writeup said (*inter alia*) that an MSO "must service physicians," should not be a "sham," and should not be "improperly used as a vehicle to pay physicians for patient referrals." ROA.4584, 4587, 4589. After Rossi sent the

35

writeup, he did not recall Theiler or anyone else requesting any further information about MSOs. ROA.9942.

By March 2016, O'Neal and Stamford hospital executives were "discussing" a possible "business relationship." ROA.6234; *see* ROA.4920. That month, Theiler and Shore traveled to Texas to meet with O'Neal in person.[6] ROA.11301, 11461, 11803, 12319-12320, 12332. At one point, Shore left the room, so Theiler and O'Neal had a chance to speak alone. ROA.12332-12335, 12347-12348. It was then that Theiler and O'Neal discussed "the terms of the Stamford and Boston Heart arrangement," along with the possibility of "more hospitals being brought into the fold." ROA.12334, 12348. According to O'Neal, Theiler also said that "he appreciated working with the relationship"; "their stock had gone sky high"; and "he needed a story line." ROA.12334.

In mid-March 2016, Howard told Gonzales by text that O'Neal "was telling me he is 2 wks from new hospital and Boston not on board yet." ROA.4007. Gonzales replied: "Shit!" ROA.4007. Referring to Shore, Howard said that "the head of hospitals at Boston is the issue." ROA.4007; *see* ROA.10236. Referring to Theiler, Howard added: "I am

---

[6] The record does not disclose the date of the meeting.

going to call Matt and tell him reps are starting to work with [O'Neal] and I need to know if Boston will be offered." ROA.4007; *see* ROA.10236. The next day, Theiler told Shore by email: "I agree that we should be very cautious" with O'Neal; "I'm not suggesting he's the answer," but "he knows what's happening in the market"; and Shore should "[p]roceed with caution." ROA.4852.

In April 2016, O'Neal told Theiler that, more than two weeks earlier, he had sent Shore a non-disclosure agreement so that their "relationship" could "proceed." ROA.4579-4580. O'Neal added that there had been "radio silence" on Shore's end. ROA.4580. The next day, Theiler replied that the NDA was now finalized, and that Theiler "[w]ould like to catch up" with O'Neal by phone "to ensure things are moving well from your perspective." ROA.4579.

By this time in 2016, marketer Ruben Marioni had set up Regal MSO to "do the same thing we did with Little River, except it would be attached to Stamford." ROA.8389; *see* ROA.2360-2361, 8386-8390. Marioni testified that Boston Heart sales personnel, including Hardaway, told Marioni that: Boston Heart was "trying to do business with Stamford"; Stamford was "replicating" the Little River model; and

37

if Marioni wanted a "home," he should "move [his] MSO physicians" to Stamford. ROA.8386-8387. Ultimately, MSOs had to "go through" O'Neal to work with Stamford, so Marioni's MSO worked with O'Neal, not with Stamford directly. ROA.12361; *see* ROA.8387-8393.

By May 2016, there was "significant concern" at Boston Heart that the company was about to lose its remaining "access" to Little River. ROA.10239-10240. Early that month, Shore told Hertzberg and Theiler by email that she got an "interesting call" from a Little River executive who had heard "from MSOs and others" that Boston Heart was "redirecting" its business to other hospitals. ROA.4764. The same day, Hertzberg replied: "Did you tell him what we have been hearing in the market about them and True Health?" ROA.4764.

Meanwhile, Andy Flynn was still tracking Boston Heart's revenue from Little River—and now its revenue from Integrity—and he sent Hertzberg regular updates from January through May 2016.[7] ROA.5762-5795, 11214-11225. By early May 2016, the graph that once resembled a hockey stick had leveled off and turned downward. ROA.5790-5791. In

---

[7] Starting in mid-February, the Integrity updates included the following "Note": "Annualized revenue is based on both ITH Client bill reqs and ITH reqs in which BHD is billing Government Payors directly." ROA.5772-5792.

38

mid-May, CFO Bracuti asked Theiler for "information" about Integrity accounts that "had significant decline." ROA.4765. She told Theiler on a Friday that Hertzberg wanted the information by Monday. ROA.4765.

The following week, on May 18, 2016, Jeff Craven sent Hertzberg, Theiler, Shore, and others an email attaching "the proposed fee schedule for Stamford Hospital in TX." ROA.5345. Craven explained that, with one exception, the pricing for Stamford tracked the pricing for Little River. ROA.5345. He added: "Please send me your approval." ROA.5345. A few minutes later, in an email solely to Hertzberg, Craven said: "I know you are busy, but can you please shoot back a reply on the below. This is one of our safety nets for the TX market from what we discussed at the last Payor meeting. Matt is looking to close this down." ROA.5345. Hertzberg replied: "Good to go." ROA.5345.

On May 31, 2016, Theiler emailed Stamford CEO Rick DeFoore a proposed "Laboratory Services Agreement" between Stamford and Boston Heart.[8] ROA.6592. The agreement was dated that day.

---

[8] Rob Rossi reviewed and edited the agreement beforehand. ROA.6592, 9978-9980. But the agreement did not purport to authorize "paying physicians in exchange for referrals." ROA.10071. Rossi would have "struck" any such provision, because it "would have been a major red flag." ROA.10071.

ROA.6593, 9988, 10073. Theiler copied O'Neal on the email. ROA.6592. The same day, DeFoore responded by attaching "the agreement signed by Stamford." ROA.6591-6592. Theiler forwarded DeFoore's email to Bracuti, Shore, Rossi, and others at Boston Heart, saying: "Not sure who signs on our side, please let me know." ROA.6591. The next morning, June 1, Rossi said that Bracuti could sign the agreement. ROA.6591. Bracuti apparently did so that day, attaching a version with a date of "060116" in the filename, and saying: "Here you go[.]" ROA.6591. Also on June 1, Theiler told DeFoore and O'Neal, but not Shore: "Signed and executed. We should set up a call to discuss next steps." ROA.4864.

On June 3, 2016, Michael Ivers—Boston Heart's hospital sales director for the southwest region—sent Hertzberg a detailed email expressing his "ongoing concern" about "business activity taking place" with Little River and Integrity. ROA.4577-4578; *see* ROA.11676, 11891-11893. Ivers lived in California and had started at Boston Heart about three months earlier, at the end of February. ROA.11892, 11952, 11987-11988. Ivers' territory included Texas, but Shore, who was Ivers' direct supervisor, had told him not to put any emphasis on that market. ROA.4783-4784, 11676, 11891-11892.

40

When Ivers sent his June 3 email to Hertzberg, he copied Theiler, Shore, Rossi, and other Boston Heart executives. ROA.4577. The email reported some of what Ivers had learned from Shore and others during his first few months with the company. ROA.4577-4578; *see* ROA.11987-11988. In summary, Ivers' email reported that:

- Boston Heart's business with Little River and Integrity was "nothing short of a Compliancy Disaster."

- People associated with Little River and Integrity had "broken the law as it relates to critical access hospitals, physician referral, billing through both LRH and ITH and much more with the association of the MSO's who are working on behalf of all parties."

- Physicians ordering Boston Heart's tests were "being incentivized through a model in which they can either partner with the MSO or others and have an ownership stake."

- The "average patient requisition" for Little River and Integrity was "$1200 vs BHD's national average of roughly $400."

- Little River and Integrity "have accounted for close to 30% of all of BHD's total gross yearly revenue."

- Boston Heart sales representatives who were "tied to both LRH and ITH" were "doing an extremely high volume of business."

- Ivers had been "told to ignore LRH and ITH and never put anything in email regarding them."

- The "VP of Sales" was "concealing customer data specific to the Texas market and LRH and ITH."

41

ROA.4577-4578; *see* ROA.11898-11899 (Ivers testified that Theiler was VP of sales, and that Hardaway, Parnell, and Howard were among the sales representatives to whom he had alluded).

From June 13 to June 15, 2016, Boston Heart held a leadership conference. ROA.11906-11907. Ivers attended, and Hertzberg and the vice president of human resources approached him. ROA.11907, 11954-11955. Hertzberg told Ivers that he was "not being terminated," but she "asked why so many people were copied on the email." ROA.11907; *see* ROA.11955. Hertzberg said that "she felt like she had been punched in the gut by Mike Tyson, and she was still catching her breath." ROA.11907. Either Hertzberg or the VP then told Ivers that, "going forward," he would be focusing on "cardiology business development" and reporting to a supervisor who until then was lateral to him. ROA.11907-11908; *see* ROA.11988-11989. Ivers found that to be "a little strange," because his new supervisor was "not a fan or a supporter" of him or of "the hospital business itself," and their relationship was "extremely adversarial." ROA.11988. Because of the changes, Ivers was "taken away from the hospital area"—a field in which he was "confident and knowledgeable"—and he no longer reported to Shore. ROA.11958-11959.

42

**D.    Hertzberg resigns amid conflict with Eurofins, the Stamford deal moves forward, and Hardaway's MSO offers a physician a "sign-on bonus."**

Well before Ivers sent his June 3 email, Hertzberg was "butting heads" "on a regular basis" with Jonathan Lapin and other Eurofins executives. ROA.9992. Hertzberg and Boston Heart's board of directors were in "open" "conflict" over Eurofins' efforts "to take more control." ROA.9945-9946, 9992-9993; *see* ROA.4653, 10497, 10507-10508. For instance, in May 2016, Lapin ordered Hertzberg to fire general counsel Luke Albrecht based on concerns that he had withheld information from the board. ROA.10570-10572, 10629. Hertzberg objected to Albrecht's removal. ROA.4780, 10629. She also objected when Lapin installed interim general counsel Elizabeth Kozlowski. ROA.4781, 9996, 10573-10574, 10629-10630. And on May 31, Hertzberg sent Lapin a notice, through counsel, that she had "Good Reason to terminate her employment" at Boston Heart. ROA.6602; *see* ROA.6601-6605.

On June 9, 2016—after Ivers' email but before he was removed from hospital sales—Lapin emailed Hertzberg a letter to reiterate matters they had discussed verbally, including that Elizabeth Kozlowski was to

43

be "intimately involved in Boston Heart's legal life." ROA.10579; *see* ROA.2938-2939. Among other things, Lapin's letter said that:

- Despite a "direct instruction" to Hertzberg, Kozlowski was "being excluded from regular matters within the purview of her General Counsel duties." Hertzberg was to "ensure" that Kozlowski had "unfettered access to all necessary information."

- Given Hertzberg's "impending departure," she was "not authorized to take any actions of consequence with respect to the Company without my or (as I deem appropriate) the Board's approval."

ROA.2938. Lapin testified that, per his June 9 letter, Hertzberg was not authorized to enter contracts on Boston Heart's behalf absent Lapin's approval. ROA.10582-10583.

In early July 2016, Hardaway left Boston Heart. ROA.10031-10032. But he apparently gave no direct notice to Hertzberg or Theiler. Instead, a fellow executive alerted Theiler by email that Hardaway's "numbers were going down and looked like he was leaving to go somewhere else for employment." ROA.11476 (case agent's testimony); *see* ROA.4768 (email itself). Theiler asked the executive to contact HR and ensure that Hardaway's "access" was "turned off." ROA.4768.

On July 19, 2016, Hertzberg and Lapin signed Hertzberg's separation agreement. ROA.2927-2928, 10604-10605. Hertzberg was to resign from her CEO position by August 15, but she would remain "an

44

employee Advisor of the Company on Garden Leave" until September 15, and she would continue to receive her salary. ROA.2917-2918; *see* ROA.10605-10606. On July 26, Hertzberg announced her resignation in a company-wide call. ROA.4073, 10270, 11786. She discussed her "choice to leave Boston Heart," but she "gave the impression that the board had wanted her to be gone." ROA.10270.

In mid-July and early August 2016, Boston Heart's filing personnel contacted Rossi to ask the status of the Laboratory Services Agreement with Stamford. ROA.9984-9986. As it turned out, the agreement had not been formally executed, because the anticipated revenue from the agreement was such that only the CEO, not CFO Bracuti, had signatory authority. ROA.9981-9984. Still, the lack of an authorized signature had not halted progress: by August 3, Boston Heart was already setting up accounts with Stamford. ROA.10072. On August 9, Hertzberg started her "Garden Leave." ROA.6600, 10638. On August 10, Rossi told filing personnel that "the contract was now fine to sign." ROA.9986. On August 11, acting CEO Tom Burnell signed the agreement, and "all Stamford accounts were turned on." ROA.10388; *see* ROA.6597, 6599, 10584, 10648-10651. A few days later, Robert O'Neal asked Theiler to "resend"

45

paperwork "from the hospital." ROA.4579. Within an hour, Theiler replied that he was "not clear" on what O'Neal was seeking, but he added: "Will help in any way I can." ROA.4579.

Thereafter, in late 2016 and into 2017, Stamford paid Marioni, O'Neal, Howard, and Gonzales to pay physicians to order Boston Heart tests. ROA.5721, 5729-5730, 8386-8394, 9867-9868, 12361-12362; *see supra* pp. 7-9. In Marioni's case, Stamford paid O'Neal; O'Neal paid Marioni's MSO; and Marioni's MSO paid physicians to order Boston Heart tests from Stamford and Boston Heart itself. ROA.8390-8393, 12361-12362; *see* ROA.5743 (demonstrative).

Theiler stayed at Boston Heart until January 2017. ROA.2937. As for Hardaway, even after he left Boston Heart, he was still "involved" with Rise MSO, which now worked with True Health rather than Boston Heart. ROA.10247, 10886-10887; *see* ROA.10823-10824. Rise competed with Marioni's MSO for physicians and offered one of Marioni's "high-volume" physicians a $10,000 "sign-on bonus."[9] ROA.8292, 8394-8396.

---

[9] The record does not specify when the bonus was offered, but context suggests that it was in 2017. At trial, the government asked Marioni about payments that his then-MSO, Regal, received "from early 2017 to late 2017." ROA.8394. During the same exchange, the government asked Marioni if, "at this time," there was "a fair amount of competition" for physicians. ROA.8394-8395. Marioni said yes and then testified to the $10,000 bonus offer. ROA.8395-8396.

In January 2022, a grand jury in the Eastern District of Texas charged Hertzberg, Theiler, Kraus, Hardaway, and 14 codefendants with AKS conspiracy. ROA.67-119. The codefendants included Marioni, Parnell, Gonzales, and Howard, and they testified at trial.[10] ROA.53, 8151-8569, 9151-9511, 9593-9891, 10078-10488. The codefendants also included physicians who practiced in the Eastern District of Texas and accepted MSO payments in exchange for referrals. ROA.53, 5699-5730, 9618-9619, 9659, 9817-9818.

## SUMMARY OF ARGUMENT

**I.**    A rational jury could find that Hertzberg, Theiler, and Hardaway knowingly joined the kickback conspiracy.

**A.**    The defendants isolate individual pieces of evidence and say that each has an innocent explanation. But the evidence is to be taken as a whole. And its collective force is far greater than the sum of its parts.

**B.**    The jury could reject Hertzberg's claim that she did not know that physicians were being paid to order Boston Heart tests. She witnessed, and cheered, exponential growth from the Little River deal.

---

[10] O'Neal was charged separately, ROA.12160, and he likewise testified at trial, ROA.12158-12551.

47

She knew that Boston Heart was collecting more than twice the usual amount for the tests. She knew that MSOs provided "influence," ROA.10161, and that Little River used the MSOs to "recruit" physicians, ROA.4620. She was an intelligent and experienced healthcare CEO who could recognize the parallels between this case and a previous one in which she had sought investigation into a competitor's possible AKS violations. Yet Hertzberg undertook no corrective measures. Instead, she removed JoAnna Shore from Little River updates; she cut off Kraus's presentation on Little River; she disregarded Shore's recommendation to suspend hospital business in Kraus's region; she stonewalled Jonathan Lapin's effort to understand Little River from a legal standpoint; and she hired Rob Rossi, who was "walled off." ROA.9948.

As the scheme expanded to Integrity, Hertzberg stood idle. As the scheme expanded to Stamford, Hertzberg approved the pricing. When Michael Ivers reported illegality relating to physician referrals, Hertzberg asked why he had told so many people. She then moved Ivers to a position where he would no longer report to Shore, who was the source for much of his report.

48

Taking all that evidence together, the jury did not *have* to acquit Hertzberg.

**C.**    Theiler witnessed the same exponential growth that Hertzberg did. He complained that people within Boston Heart were speaking "way too openly" about Little River. ROA.4548. He told Jeffrey Parnell, twice, not to send him emails about MSOs. He knew that MSOs were "partnering" with physicians and sharing "profits" with them. ROA.4849. He knew that the physicians included neurologists, psychiatrists, and others who would not typically order advanced lipid tests. He knew that the MSOs—management services organizations— were not providing management services. And he knew that Kraus's presentation had "cast a big shadow" over Kraus's region. ROA.4375.

After Shore recommended suspending hospital business in Kraus's region, Theiler took no corrective action. Instead, he went to Texas to solidify the relationship with Integrity and to meet with Robert O'Neal, Laura Howard, and Christopher Gonzales, all of whom were key participants in the kickback scheme. Theiler then worked with O'Neal— and cut out Shore—as the scheme expanded to Stamford. During an in-person meeting, when Shore left the room, Theiler and O'Neal discussed

49

the Stamford deal. When O'Neal later got "radio silence" from Shore on a non-disclosure agreement, Theiler followed up "to ensure that things [were] moving well" for O'Neal. ROA.4579-4580. When Kim Bracuti signed the Stamford agreement, Theiler looked to discuss "next steps" with O'Neal but not Shore. ROA.4864. And even after receiving Ivers' report of illegality in Texas, Theiler told O'Neal: "Will help in any way I can." ROA.4579.

On that combined evidence, the jury did not have to believe that Theiler was unwittingly involved in *three* corrupt hospital deals.

**D.** Hardaway brought Little River to Boston Heart, and he worked with MSO representatives in onboarding physicians who agreed to order Boston Heart tests through Little River. Based on conversations with Hardaway, Ruben Marioni testified that Hardaway knew that Marioni's MSO paid physicians for referrals. The jury could credit that testimony, especially because (1) Hardaway worked with Little River through his own MSO; (2) he received a draft executive summary saying that Little River remunerated MSOs that in turn disbursed "profits" to physicians, ROA.4391; (3) he was on at least one Boston Heart sales call in which the participants discussed the MSOs' "influence," ROA.10161-

10162; (4) he knew that the so-called "investor" physicians were ordering a heavy volume of tests and generating an unusually high per-test fee for Boston Heart; and (5) he personally profited, twice over, from the scheme.

Hardaway suggests he innocently believed that the payments to physicians were a genuine return on investment. But his own MSO offered a high-volume physician a sign-on bonus. That offer could not have been a return on any investment, because its very purpose was to get the physician to switch from Marioni's MSO to Hardaway's.

Taking together that evidence and more, the jury could find that Hardaway knew of and joined the kickback scheme.

**II.**   Though Hertzberg and Hardaway claim otherwise, a rational jury could find a federal nexus. The government only had to prove knowledge that the incentivized physicians ordered tests that *could* be reimbursed by federal payors. The evidence satisfied that requirement, proving at minimum that Hertzberg and Hardaway recognized the simple possibility of federal reimbursement.

Hertzberg sent Lapin an overview reporting that Little River was paid a premium by private *and* government payors. And Theiler sent Hertzberg an executive summary reporting that Little River received

51

cost-based reimbursement from Medicare. There would have been no need for the summaries to mention government rates if there were no possibility that Little River might collect on them.

Similarly, Hardaway knew that Little River planned to use an "m panel for Medicare." ROA.4406. He proposed to discuss insurance with Little River CEO Jeffrey Madison. Kraus asked to speak to Hardaway about how Little River worked with Medicare patients. And Hardaway's own MSO sent commercial *and* federal samples to Little River.

**III.**    A rational jury could find that Hertzberg and Hardaway did not withdraw from the conspiracy. They both resigned from Boston Heart, but they did not prove that they did so to disavow or defeat the conspiracy. Nor did they establish any other affirmative act of withdrawal. Hertzberg says that she "refused" to sign the Stamford agreement, Br. 60-61, but that is incorrect. No evidence suggests that the agreement was ever presented for Hertzberg's signature, let alone that she affirmatively refused to sign it despite having approved the Stamford pricing. As for Hardaway, he does not even show that he communicated his resignation to fellow conspirators like Hertzberg and Theiler.

52

**IV.** Citing the right to be present throughout the trial, Kraus and Hardaway fault the district court for failing to immediately disclose Jury Note 4 upon receipt. But they forfeited that claim by failing to object, and they do not show that the court plainly erred in disclosing the note just before the verdict. They rely on cases finding error in a court's failure to notify parties before *responding* to a jury note. But the court here did not respond to Note 4, because it was similar to Note 3, to which the court was already responding (with the parties' agreement).

Even assuming obvious error, Kraus and Hardaway do not show prejudice or a serious effect on the fairness, integrity, or reputation of the proceedings. They say that, if immediately advised of Note 4, they would have moved for a mistrial or an *Allen* charge. But the record does not establish that they would have done so, and the district court made clear that it would have denied such relief even if it were requested. Moreover, the defendants and their attorneys were present when the court disclosed Note 4. That disclosure effectively negated any earlier exclusion from the trial, because the defendants could have made themselves heard at that point, i.e., before the jury returned the verdict.

53

**V.** Contrary to Kraus's other forfeited claim, the district court did not plainly err in its response to Jury Note 3. Note 3 indicated that Juror 12 was "unwilling to change his mind" based on the "evidence" and "instructions." ROA.14984. Kraus argues that the court's response—to which no one objected—was an erroneous *Allen* charge. But the court well explained why the response was not an *Allen* charge at all. Kraus belatedly faults the response for not telling the jurors that they had a duty to adhere to their own honest opinions. But the response covered that concept by directing the jurors to earlier instructions that said (*inter alia*) not to "give up your honest beliefs" "for the mere purpose of returning a verdict." ROA.2185, 14985. And even if Kraus could show obvious error, he could not show prejudice or unfairness: the response was effective without being coercive.

**VI.** Finally, the district court did not abuse its discretion in refusing Hardaway's good-faith instruction. The rejected instruction was confusing at best, and the court's instructions on knowledge and willfulness already enabled Hardaway to present his good-faith defense. In any event, any error was harmless because the jury would have convicted Hardaway even if the court had given the proposed instruction.

54

**ARGUMENT**

Hertzberg, Theiler, and Hardaway claim **(I)** that there was insufficient evidence that they joined the kickback conspiracy. Hertzberg and Hardaway claim **(II)** that there was insufficient evidence of a federal nexus and **(III)** that the jury irrationally rejected their assertions of withdrawal. Kraus and Hardaway claim **(IV)** that the district court erred in failing to immediately disclose Jury Note 4. Kraus claims **(V)** that, in view of Note 4, the court erred in its response to Note 3. And Hardaway claims **(VI)** that the court erred in refusing his good-faith instruction. Each claim fails.

## I. A Rational Jury Could Find That Hertzberg, Theiler, and Hardaway Joined the Kickback Conspiracy.

### A. Background and standard of review

In an AKS conspiracy case, the government must show (1) "an agreement between two or more persons to pursue an unlawful objective"; (2) "that the defendant knew of the unlawful objective and voluntarily joined the conspiracy"; and (3) "an overt act." *United States v. Shah*, 95 F.4th 328, 350 (5th Cir. 2024). Because the degree of criminal intent necessary for an AKS conspiracy is the same as for the underlying offense, the government must also show that the defendant acted

55

"willfully," meaning "with the specific intent to do something the law forbids or with bad purpose either to disobey or disregard the law." *Id.* (simplified); *see* 42 U.S.C. § 1320a-7b(b)(2). But the government need not show that the defendant knew of or intended to violate the AKS specifically. 42 U.S.C. § 1320a-7b(h).

This case largely turns on the second element: knowledge of the unlawful objective. At trial, when the government rested and again at the close of all evidence, Hertzberg, Theiler, and Hardaway moved for acquittal. ROA.12554-12583, 12592-12601, 13332. In each instance, the district court reserved ruling. ROA.12612, 13332. The jury found the defendants guilty. ROA.2188-2189, 13674-13676. Thereafter, Hertzberg, Theiler, and Hardaway again moved for acquittal. ROA.6919-6961, 18939-18990, 22552-22587. Among other things, they claimed that there was insufficient evidence that they knew of and joined the AKS conspiracy. ROA.6920-6939, 18953-18965, 22562-22583. In a 56-page opinion and order, the district court denied the motions. ROA.7088-7143. At the threshold, the court noted that no defendant meaningfully challenged the evidence that there *was* an AKS conspiracy, so it treated that issue as waived. ROA.7093 n.1. The court then concluded that a

rational jury could find that Hertzberg, Theiler, and Hardaway knew of and joined the conspiracy. ROA.7106-7116, 7119-7120.

On appeal, Hertzberg, Theiler, and Hardaway again claim that there was insufficient evidence that they knew of and joined the AKS conspiracy. Hertzberg Br. 35-58; Theiler Br. 12-28; Hardaway Br. 29-41. That claim "swims upstream," *United States v. Sanders*, 952 F.3d 263, 273 (5th Cir. 2020) (quotation omitted), because the "bar for sufficiency is low," *United States v. Marchetti*, 96 F.4th 818, 827 (5th Cir. 2024). The district court's ruling is reviewed de novo, but this Court is "highly deferential" to the jury's verdict. *Id.* at 823-824 (quotation omitted). The Court draws "all reasonable inferences in favor" of the verdict, which it will affirm "unless no rational jury, viewing the evidence in the light most favorable to the prosecution," could have found the defendants guilty beyond a reasonable doubt. *United States v. Beacham*, 774 F.3d 267, 272 (5th Cir. 2014) (quotation omitted).

The Court does not ask whether the verdict was "correct." *Sanders*, 952 F.3d at 273. And the *defendants* have the burden to demonstrate that the verdict was *irrational*. *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372-373 (5th Cir. 2011). They must show that twelve of their peers—

57

with a first-hand vantage on six weeks of evidence—unanimously reached a verdict that this Court, on a "cold appellate record," *Marchetti*, 96 F.4th at 824 (quotation omitted), can say was "absurd, preposterous, foolish, or fanciful," *Sanders*, 952 F.3d at 273 (quoting definition of "rational" for antonyms). In reviewing for irrationality, the Court does not second-guess the jurors' credibility determinations, interfere with their authority to weigh conflicting evidence, or reject their use of common sense. *United States v. Gibson*, 875 F.3d 179, 185 (5th Cir. 2017); *United States v. Meza*, 701 F.3d 411, 423 (5th Cir. 2012).

Three additional principles have special bearing on this document-intensive conspiracy case. First, the evidence "need not exclude every reasonable hypothesis of innocence." *Sanders*, 952 F.3d at 276 (quotation omitted). Second, even if discrete aspects of a defendant's conduct may have a "benign explanation" when "separately considered," they may be incriminating by virtue of their "number and joint operation." *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en banc) (quotation omitted). Third, because a conspiracy "doesn't need to be formal or even spoken," *Sanders*, 952 F.3d at 274, "[k]nowledge may be—and often must be—shown by circumstantial evidence," *United States v.*

58

*Yusuf*, 57 F.4th 440, 445 (5th Cir. 2023) (quotation omitted). Thus, knowing participation may be inferred from a "concert of action," *United States v. Vasquez*, 766 F.3d 373, 380 (5th Cir. 2014) (quotation omitted), or from a "collection of circumstances," *United States v. Ryan*, 156 F.4th 583, 592 (5th Cir. 2025) (quotation omitted). And the Court will not upend the verdict just because no single witness directly implicated a particular defendant. *Sanders*, 952 F.3d at 275.

The defendants take turns ignoring these principles. They isolate single pieces of evidence. Hertzberg Br. 44; Theiler Br. 2, 4, 8, 13. They insist on individually benign explanations when guilty ones are available for the whole. Hertzberg Br. 53-58; Theiler Br. 4-5, 8, 13, 16, 21; Hardaway Br. 31-32, 37-39. They denigrate inferences. Theiler Br. v, 6, 12, 16, 27. They favor direct over circumstantial evidence even though the latter receives "equal weight." *United States v. Harris*, 960 F.3d 689, 693 (5th Cir. 2020) (quotation omitted); *see* Hertzberg Br. 36, 41; Theiler Br. v, 2, 4-5, 12-13, 26-27. And they effectively complain that no witness said in as many words: "The defendants conspired with me to pay kickbacks." *See* Theiler Br. 4, 13-14; Hardaway Br. 4, 10, 14, 28. When the evidence is taken as it must be—together, with all reasonable

59

inferences in the verdict's favor—it proved that the defendants knowingly participated in an AKS conspiracy whose existence is now undisputed.

## B. The jury rationally found that Hertzberg knew of and joined the conspiracy.

The crux of Hertzberg's state-of-mind claim is that she did not know that physicians were being paid to order Boston Heart blood tests, and she believed that the MSOs were "legitimate marketing entities operating within legal bounds." Br. 19. The jury could rationally reject her claim, especially when considering the full timeline.

### 1. Little River

At or near the outset of the kickback scheme, Hertzberg helped "get the ball rolling" with Little River. ROA.4846. In February 2015, within minutes of being told that Little River needed "competitive pricing" or might take its business elsewhere, Hertzberg replied that she was "on it!" ROA.4846-4847. She asked Boston Heart CFO Kim Bracuti "to get a better price proposal," ROA.4627, and Bracuti worked on pricing with Hardaway, ROA.4437-4440. About a month later, the Client Bill Agreement was in place with Little River. ROA.2325-2329.

To convict Hertzberg, the jury did not need to find that she knowingly joined the conspiracy at its "inception" or even in the first few months. *United States v. Vergara*, 687 F.2d 57, 61 (5th Cir. 1982). But what she learned in those months, and how she reacted, was telling. In June 2015—as Hertzberg and Theiler sought to "kick 2015 samples through the roof," ROA.4634—Hertzberg learned that Little River was "smoking it" and generating so many orders that Hardaway was "beside himself!" ROA.4434. Then, from July to October, Hertzberg received reports of exponential growth attributable to Little River: from $4.4 million of annualized revenue in early July, to $8.6 million in mid-July, to $20.8 million in early September, to $26.7 million in late September, to $28.1 million in early October. ROA.4329, 4640, 4647, 4826, 5357.

Hertzberg denies that the revenue was "unusually high." Br. 48. But the $28 million forecast in October 2015 represented some 28% of *all* Boston Heart revenue in 2015. ROA.10773. Also, Hertzberg understates the amount that Little River ultimately generated for Boston Heart. She uses a figure of $20.5 million, but she cites a document showing that, as of May 2016, Little River still owed Boston Heart $7.1 million, for a total of $27.6 million. Br. 16 (citing ROA.5794); *see* ROA.10740-10741, 11222-

11223. So the $28 million forecast in October 2015 proved a sound prediction, as other evidence showed. ROA.11023 (case agent testified that Boston Heart received about $30 million from Little River).

The growth was "rapid" enough to raise "questions about the Little River business model." ROA.10800, 11712-11713. As Boston Heart executive Theo McCormick affirmed at trial, people "notice" when a rural hospital is "outperforming every other client." ROA.10896. For instance, "pretty quickly" after JoAnna Shore joined Boston Heart, she was "curious" and "confused" about how a rural hospital could generate so much revenue. ROA.11710-11711, 11713.

Hertzberg notes that the numbers did not lead *Andy Flynn* to suspect illegality. Br. 48 (citing ROA.10782). But Flynn was a mid-level financial analyst, not a CEO with years of experience running a diagnostics company. ROA.10734-10735, 10967-10968, 12809-12811. Nothing suggests that Flynn participated in calls with Little River CEO Jeffrey Madison, as Hertzberg did, or with the full Texas sales team, as Hertzberg did, or with a high-volume Texas physician, as Hertzberg did. ROA.3206, 4421, 4548, 4615, 4848, 10113-10116, 10126, 10161-10162. And the list goes on.

62

Moreover, the comparison to Flynn would be inapt even if he were a high-level executive like Shore. Unlike Flynn and Shore, Hertzberg previously asked the government to investigate a competitor lab that produced "explosive" and "unusual" growth by using a "marketing" company to pay physicians to order the lab's tests at an inflated cost. ROA.11874-11877; *see* ROA.11882-11883. The jury could find that Hertzberg recognized the similarities between that case and this one, especially given how valuable Little River was to Boston Heart's bottom line. In 2015, as Hertzberg witnessed "hockey-stick-shaped" growth from the Little River deal, ROA.10503, she also learned that Boston Heart was averaging more than $900 per test billed through Little River, ROA.4329, 4640. That was more than twice the usual amount. ROA.9231.

Judging by Shore's early reaction to the revenue numbers, an innocent CEO would have questioned the rapid growth and the unusual per-test amount. ROA.11710-11713; *see United States v. Willett*, 751 F.3d 335, 340-342 (5th Cir. 2014) (defendant's "position of authority" and awareness of "high profit margins" helped prove knowledge of healthcare fraud). But Hertzberg's reaction was nothing like Shore's. In September 2015, instead of asking how the numbers were possible, or if the Little

63

River model was compliant, Hertzberg asked: "HOW DO WE GET SOME MORE OF THAT???!!!!!!!" ROA.4647. And she said she wanted to "fly out and meet with" Little River's CEO. ROA.5341.

Hertzberg says that she had no personal financial stake in the conspiracy. Br. 40-41. To start, that is not an essential element. *Shah*, 95 F.4th at 350 (elements of AKS conspiracy); *see United States v. Tolliver*, 730 F.3d 1216, 1223 (10th Cir. 2013) (in general, "motive, unlike *mens rea*, is not an essential element of a criminal offense," so lack of evidence of "financial motive" will not support motion for acquittal (simplified)). In any event, Hertzberg *did* have a stake in the conspiracy's success, and in its concealment. She was CEO of a company that had recently been acquired by Eurofins, which was examining "every little blemish." ROA.9946. She had $4.7 million of earnout potential, contingent on Boston Heart's performance in 2015 and 2016. ROA.10609-10610, 10701, 11286, 11447-11448. And like other executives, she stood to receive performance bonuses. ROA.5796, 10700. To a rational jury, those facts could explain why Hertzberg was "excited" by the Little River numbers, ROA.10783; *see* ROA.4647, 5340-5341, and why she touted the numbers to board members, ROA.4642-4646.

Even assuming Hertzberg did not initially know what was driving the numbers, she did not have to wait long to find out. At some point after Laura Howard joined Boston Heart in October 2015, Hertzberg participated in a Texas sales call during which "there was in-depth conversation about the MSOs and the influence that they provided." ROA.10161-10162; *see* ROA.10146. Relatedly, in late October, Hertzberg cut off David Kraus's presentation about how: Little River worked with MSOs to "recruit providers"; the MSOs gave "leads" to Boston Heart on physicians interested in "joining" the MSOs; Little River collected "favorable reimbursement"; and Boston Heart collected payment from Little River at higher reimbursement rates than it could collect itself. ROA.4620, 4622; *see* ROA.10814.

The sales call and Kraus's presentation were bright red flags, especially in combination with one another, the rapid revenue growth, the inflated per-test fees, and common sense. As the presentation itself reflected, "MSO" denotes a *management* services organization, not a *marketing* services organization. ROA.4620; *see* ROA.10974. It follows that an intelligent and experienced healthcare CEO would see a stark warning sign in MSOs that were "recruit[ing]" and "influenc[ing]"

65

physicians rather than providing management services. ROA.4620, 4622, 10161-10162; *see* ROA.10599, 10968, 11875.

The jury could find that, when faced with the foregoing developments, an innocent CEO would have taken corrective measures such as suspending the Little River relationship or seeking counsel. Hertzberg had a different reaction: she cut Kraus short, declared that "[t]his isn't who we are," ROA.10814, and permitted a return to business *without* corrective measures, ROA.10890, 10901, 11253-11255. That was evidence of knowing participation. As this Court has explained:

> [W]hen an individual holds a position of authority within a company and remains within "proximity to the fraudulent activities," it is evidence that the defendant was aware of malfeasance within that company. A similar inference is permissible when the individual fails to take remedial action in response to an employee's concerns about company practices.

*United States v. Hesson*, 746 F. App'x 324, 334 (5th Cir. 2018) (quoting *Willett*, 751 F.3d at 340).

Hertzberg resists such inferences here. Br. 47-58. For interrupting Kraus, she echoes the excuse that she gave at the time: his presentation was not "medically related" or "clinically focused." Br. 51 (quoting ROA.10814). The jury did not have to credit her explanation. Again,

66

Hertzberg also said: "This isn't who we are[.]" ROA.10814. That statement reads more like a false denial of responsibility than an assertion that a for-profit healthcare company should never focus on sales. It would have been especially odd for Hertzberg to interrupt *Kraus* for his focus on sales. Kraus was a salesman. ROA.10968. In consultation with Theiler, the vice president of sales, Kraus had been preparing a presentation about sales. ROA.4618, 4849, 10967. It is unclear whether Kraus's audience of Boston Heart executives included physicians, but Theo McCormick was there, and his job was "market analysis," not clinical analysis. ROA.10799, 10814. So it could not have surprised Hertzberg that the presentation focused on sales, and the jury could take her explanation as inculpatory pretense. *See United States v. Tooker*, 957 F.2d 1209, 1217 (5th Cir. 1992) (concealment suggests guilty knowledge).

Other facts bolster the inference of concealment. Tellingly, Hertzberg sent Jonathan Lapin a Little River summary that did not mention MSOs or "investor" physicians. ROA.4665-4683, 10546-10547, 11277. And she directed Andy Flynn to limit circulation of his Little River updates. ROA.4308. Hertzberg thereby removed Shore, the one who was "curious" about the Little River numbers. ROA.11710-11711. The jury did

not have to dismiss Shore's marginalization as coincidence, especially because she "did not feel comfortable" with the Little River model as then structured, ROA.11608-11609, and she told Hertzberg that she "didn't think that this type of model was sustainable," ROA.11587-11588.

Hertzberg suggests that Shore "reassured" her "that the Little River relationship was not problematic." Br. 26. Shore did no such thing, at least for the relationship as then structured. To the contrary, within a week after Kraus's ill-fated presentation, Shore advised Hertzberg and Theiler: "Until we have the clarity on all of Little River, we should stand down on all hospitals, particularly in David's area." ROA.4420. That "***strong recommendation***" was based on an array of concerns, including that Shore did not understand why a critical access hospital would use a "marketing arm (MSO?)" to target physicians who were "way outside of the Little River access area for patients." ROA.4420.

Knowing everything that Hertzberg knew, an innocent CEO faced with Shore's recommendation—to suspend hospital business in an entire region based on concerns that included Little River's use of MSOs—would set out to learn every detail about Little River's use of MSOs or would suspend the relationship pending "clarity." ROA.4420; *see Hesson*, 746 F.

68

App'x at 334. And if the innocent CEO did not initiate those measures the moment she received Shore's email, surely she would do so the next day, when she received (1) a spreadsheet showing that MSOs were the most common "Source of Referral" through Little River to Boston Heart; and (2) "explanations" for why the MSO referrals included orders from neurologists, psychiatrists, and other physicians with "specialties that looked questionable" because they were not typically associated with advanced lipid blood tests focused on the cardiovascular system. ROA.4551-4557; *see* ROA.8257, 8826, 8997.

But Hertzberg did not suspend the relationship with Little River. ROA.10901, 11254. Instead, she and Shore had a call with Jeffrey Madison in mid-November 2015, after Hertzberg told Madison that she wanted an overview of Little River's "business model" and "MSO relationships." ROA.4848. If Hertzberg were innocent and *still* had no idea what the MSOs were doing to drive blood-test orders to Little River and Boston Heart, nothing would have stopped her from asking Madison during the call. *See* ROA.9993 (Hertzberg is "very direct," not "bashful").

Hertzberg cites Shore's post-call email, ROA.4421, to suggest that Madison "assured" Hertzberg and Shore that the MSOs were engaged in

69

"legitimate" marketing, Br. 12. But Shore mentioned no such statement from Madison. Nor did Shore herself say that Little River's MSO model was "legitimate."[11] She said that the call was "great," but she still had "Questions" about "MSOs" and how Little River was "targeting" physicians with its "'marketers.'" ROA.4421. After the call, *Shore* was anything but reassured about Little River's MSO model. Her continued discomfort was the very reason she proposed a "joint venture" to "create a different approach." ROA.11608-11609; *see* ROA.11693-11694 (Shore testified that the existing model "was obviously a problem to me").[12] And even in the context of the proposed joint venture, Hertzberg stonewalled Lapin's effort to understand the structure from a "legal" standpoint. ROA.4773, 10543-10549, 10705-10706, 11276-11277.

It was not Shore's "place" to "tear up" the existing contract, ROA.11716, but she recommended that Hertzberg hire Rob Rossi to "make [the] interpretation" of whether Boston Heart was acting lawfully,

---

[11] Nor do other cited documents (Hertzberg Br. 9-11) purport to say that Little River's MSO model was "legitimate." *See* ROA.4570, 4590, 4620, 4640.

[12] Those facts were context for the January 2016 email in which Shore told Hertzberg that Little River had "a sound business model for bringing integrated care to rural areas." ROA.6180. As Shore explained at trial, her comment was about Little River as a "healthcare delivery critical access hospital" for a joint venture, ROA.11617, not an about-face on the existing Little River model, *contra* Br. 54.

ROA.11634, 11694. Hertzberg hired Rossi, ROA.11634, but he was "isolated" and "walled off," ROA.9929, 9948. Rossi did not remember Hertzberg ever asking him about MSOs, ROA.9945, and he did not remember any meetings with Little River, ROA.9901. All things considered, then, the jury could find that Hertzberg hired Rossi not as a "proactive step[ ] to elevate compliance oversight," Br. 13, but to provide cover for known illegality, *see United States v. Carr*, 740 F.2d 339, 347 (5th Cir. 1984) (defendant cannot claim reliance on counsel when he retains attorney in furtherance of scheme, not for legal advice).

### 2.    Expansion to Integrity and Stamford

Hertzberg's involvement did not end with Little River. By December 2015, Hertzberg knew that Benchmark MSO was "misleading and dirty." ROA.4339. At best, she then stood idle when Kraus told her that Hardaway and Jeffrey Parnell were working with this dirty MSO on "25 accounts with Integrity." ROA.4387. In other words, far from "heed[ing]" Shore's recommendation to stand down on all hospitals in Kraus's region, Hertzberg allowed the scheme to "expand[ ] to new hospitals," *contra* Br. 54.

Integrity was not the only such hospital. By early May 2016, Hertzberg knew that Boston Heart was at risk of losing its business with Little River *and* Integrity. ROA.4764-4765, 5791. That was the setting in which, on May 18, Hertzberg approved the pricing for Boston Heart's "safety net[ ]" deal with a third hospital, Stamford. ROA.5345. Like Little River and Integrity, Stamford used MSOs to pay physicians to order Boston Heart tests. *See supra* pp. 7-9, 46. The jury did not have to write off as coincidence that, over 15 months, Hertzberg played a role in all three hospital relationships. She was essential to all three, *contra* Br. 36, 38-39, not least because she was in a position to suspend them in the face of red flags. *See Willett*, 751 F.3d at 342 (evidence was sufficient where, *inter alia*, "the fraud could not have occurred" without defendant's participation); *Hesson*, 746 F. App'x at 334-335 (same where, *inter alia*, CEO defendant was privy to signs of healthcare fraud).

Hertzberg uses her CEO position as a shield, noting that she managed 400 people nationwide and was "separated" from the Texas sales team "by several levels of corporate hierarchy." Br. 45-46. If she means to argue that the Texas hospital deals were beneath her attention, she is mistaken. As discussed, Little River alone accounted for more than

72

a *quarter* of Boston Heart's business; Hertzberg received frequent revenue updates for both Little River and Integrity; and she participated in a host of Little River-related calls, meetings, and email exchanges with Theiler, Shore, Madison, Kraus, Hardaway, Laura Howard, and others.[13]

Given all that Hertzberg knew by May 18, 2016, her approval of the Stamford pricing (ROA.5345) was an especially incriminating act in furtherance of the kickback scheme. *Cf. Willett*, 751 F.3d at 341 (evidence sufficient where, *inter alia*, defendant negotiated prices of "upcoded" items). Hertzberg ignores the pricing approval and says that she made a "decision" "not to sign"—i.e., she "declined" to sign—the Stamford agreement itself. Br. 17, 31. That is wrong. No evidence suggests that the agreement was presented for Hertzberg's signature, let alone that she consciously *refused* to sign it despite having approved the pricing. Instead, because Rossi mistakenly believed that Bracuti had authority to sign the Stamford agreement, Bracuti did so. ROA.4864-4865, 6591,

---

[13] Hertzberg points out that Hardaway, Howard, and Parnell concealed from her their "involvement with MSOs." Br. 38; *see* Br. 19-20. But as Howard and Parnell explained at trial, they did not want to be fired for performing "side jobs" on behalf of the MSOs. ROA.10331-10332, 10404-10405; *see* ROA.9355-9356, 9382-9383. Parnell further testified that he saw "no reason to try to conceal anything" from Hertzberg when it came to "the nature of these MSOs," because "everyone seemed to have a grasp that physicians were investing." ROA.9302-9303.

9981-9982. The error was only discovered later, after Lapin stripped Hertzberg of authority to sign any contract on Boston Heart's behalf. ROA.2938-2939, 9982-9986, 10582-10583.

### 3. The Ivers email

Cinching matters, Michael Ivers told Hertzberg in the plainest terms that Boston Heart's business with Little River and Integrity was a "Compliancy Disaster"; people associated with Little River and Integrity had "broken the law as it relates to … physician referral"; and physicians ordering Boston Heart's tests were "being incentivized" through MSOs. ROA.4577. Ivers' email, and Hertzberg's reaction, reinforced every inculpatory inference that the jury could draw from all the evidence that came earlier in the timeline.

Ivers sent his email on June 3, 2016, roughly three months into his tenure at Boston Heart. ROA.4577, 11892, 11987-11988. He lived in California and was told not to focus on Texas. ROA.4783, 11676, 11952. He did not have access to the same information that Hertzberg had, so what he learned was secondhand. ROA.11945-11946. Yet within a few months at the company, Ivers had already pieced together the kickback scheme that Hertzberg says she knew nothing about.

74

Hertzberg's reaction to Ivers' email was revealing. Again, Ivers sent the email on June 3, but Hertzberg did not speak with him until June 13 at the earliest. ROA.4577-4578, 11906-11907, 11954-11955. Even then, as far as the record shows, Hertzberg did not bring compliance personnel; did not thank Ivers for reporting facts that had been hidden from her; and did not ask for additional details that might aid investigation or a change of course. Instead, Hertzberg brought the vice president of human resources; she assured Ivers that he was not being fired, as if firing were an expected outcome for reporting malfeasance; she questioned "the basis for copying so many other individuals"; she removed Ivers from hospital sales; and she thereby ensured that Ivers no longer reported to Shore but instead to a colleague who until then was lateral to Ivers. ROA.11907-11908; *see* ROA.11955, 11958-11959, 11988-11989.

Hertzberg offers a series of excuses for her reaction to Ivers' email. Br. 20-22, 55-57. None is persuasive.

*First*, Hertzberg says that Ivers' "allegations" came as a "surprise." Br. 21, 55. True, Ivers testified that Hertzberg was "taken aback" and surprised. ROA.11956-11957. But that testimony was just as consistent with guilt as with innocence, and the jury could reasonably choose the

former interpretation. In a whistleblowing email to six Boston Heart executives—one of them a compliance officer—Ivers all but implicated Hertzberg and others who had overseen Boston Heart's business with Little River and Integrity. No wonder, then, that Ivers made Hertzberg feel "like she had been punched in the gut." ROA.11907.

*Second*, Hertzberg suggests that Ivers' "allegations" were not later "substantiated" in her presence, so she had no cause to act on them. Br. 55. But no innocent CEO would sit back for *further* corroboration after all the red flags that Hertzberg had seen. And Ivers' report matched what Hertzberg already knew: MSOs were recruiting and influencing physicians to order Boston Heart's tests, ROA.4572, 4577, 4620, 10161-10162; Boston Heart received unusually high per-test fees from Little River, ROA.4329, 4577, 4640; Little River and Integrity "accounted for close to 30% of all of BHD's total gross yearly revenue," ROA.4577; *see* ROA.5357, 5762-5795, 10773; and the Texas sales team was "doing an extremely high volume of business" through Little River and Integrity, ROA.4577; *see* ROA.3014, 3020, 10589-10591.

*Third*, Hertzberg argues that she was powerless to act on Ivers' email because, a few days before she received it, she had submitted notice

76

of her resignation. Br. 22, 55-56; *see* ROA.6601-6605. But Hertzberg was not stripped of any authority until June 9, 2016, when chairman Lapin told her that she now needed his or the board of directors' approval "to take any actions of consequence" for Boston Heart. ROA.2938. Thus, when Hertzberg received Ivers' email on June 3, she could have suspended the relationship between Boston Heart and Stamford, regardless of whether the deal was formally consummated, *contra* Br. 25.

In any event, whether before June 9 or after, an innocent CEO surprised by Ivers' email would have reported the revelations to Lapin or Elizabeth Kozlowski;[14] disclosed that the innocent CEO had already approved Stamford pricing that tracked Little River pricing; and put fellow executives in the best possible position to investigate whether Stamford was *another* "Compliancy Disaster" involving physicians "incentivized" by MSOs. ROA.4577; *see* ROA.5345. Finally, Hertzberg proved that, even after her notice of resignation, she had real-world power to act on Ivers' email: she arguably demoted him and thereby ensured that he no longer reported to Shore, the source for many of his

---

[14] Even after June 9, Hertzberg was to "ensure" "unfettered access" to all information necessary for Kozlowski to perform as general counsel. ROA.2938.

statements. ROA.4577-4578, 11907-11908, 11958-11959, 11988-11989. That act speaks volumes about everything that came before.

Hertzberg wanted the jury to believe that, although she knew of and participated in central aspects of Boston Heart's business with Little River, Integrity, and Stamford, she had somehow missed the key fact that made the relationships illegal. ROA.13397. The jury rejected her argument. There was nothing "absurd, preposterous, foolish, or fanciful" about the result. *Sanders*, 952 F.3d at 273 (quotation omitted).

### C.    The jury rationally found that Theiler knew of and joined the conspiracy.

Like Hertzberg, Theiler claims that the only rational result was for the jury to find that he "had no idea of any kickbacks," Br. 16-17, and that he did not join the conspiracy, Br. 12-28. But he ignores much of the evidence,[15] and he takes the remainder piece by piece without regard to chronology, context, or combined effect. Considering together *all* the events in 2015 and 2016, the jury could readily find Theiler guilty.

---

[15] At the same time, Theiler relies heavily on the district court's sentencing findings. Br. 2, 6, 13, 17-19; *see* ROA.13680-13771. Those findings do not bear on sufficiency, and even if they did, they would not help Theiler. *See* ROA.13722 (court found that Theiler "joined the conspiracy in October of 2015"); ROA.13767 (court found that Theiler "knew about the scheme, not only did not stop it, but played a role in extending the scheme to Stamford").

### 1.    Little River

Like Hertzberg, Theiler sought to "kick 2015 samples through the roof." ROA.4634. Then, from July to October 2015, he received reports of exponential growth attributable to the Little River deal: from $8.6 million of annualized revenue in mid-July, to $12.9 million in late July, to $20.8 million in early September, to $26.7 million in late September, to $28.1 million in early October. ROA.4329, 4415, 4647, 4826, 5357.

Like Hertzberg, Theiler suggests that he had no stake in those numbers and no incentive to join the scheme that drove them. Br. 2, 8, 18-19 & n.5. The jury could find the opposite. Theiler knew that Hertzberg was excited by the numbers, and that she wanted to advance the Little River relationship. ROA.4647 (Hertzberg to Theiler and others: "HOW DO WE GET SOME MORE OF THAT???!!!!!!!"); ROA.5340-5341 (Hertzberg to Theiler and others: "I would like to fly out and meet with them. Dinner with [Sheinberg and Madison]. Who can help put this together???"). Theiler also had $750,000 in earnout potential, contingent on Boston Heart's performance, and he stood to receive performance bonuses. ROA.2937, 10609-10610, 10701, 11286-11287, 11314, 11460. The jury could infer, then, that Theiler had incentive to advance the

Little River relationship, including through the kickback scheme. It does not matter that he was later unable to collect the earnout, ROA.10694; *see* Br. 18, because the earnout and other rewards were possible at the time relevant to Theiler's state of mind, ROA.11558 (Q: "If a defendant commits a crime, is it still a crime if they make less money than they expected to make?" A: "Yes.").[16]

By October 2015, with Little River comprising more than a quarter of Boston Heart's expected revenue, ROA.4826, 5357, 10773, Theiler knew that "some reps were asking questions about [Hardaway's] numbers," ROA.4548. On October 9, Theiler told Hertzberg and Shore by email that people within Boston Heart were talking "way too openly" about Little River. ROA.4548. Theiler suggests that his email could only be innocent, because he mentioned Little River as an "account," not as part of a "conspiracy," and he included Shore. Br. 24-25. But as Theiler recognizes, Br. 25, conspirators tend not to announce their conspiracies, especially in the presence of non-conspirators, ROA.10030, 10077.

---

[16] Theiler says that, if he had any stake in the scheme, it was "wildly diluted." Br. 18 n.5. He adds that it would have been odd for him to join a criminal conspiracy so late in his career, with so little to gain. Br. v, 2, 5, 8, 18-19 & n.5, 28. Those are jury arguments, and not strong ones. Every criminal—especially every criminal who is caught—can say that it was a poor decision to commit the crime.

At minimum, Theiler's October 2015 email was an early effort to contain information about Little River. ROA.4548. Even if there were an innocent explanation for the email standing alone, it could not withstand other evidence. About a week after the email, during the mid-October conference in Nashville, Theiler told Jeffrey Parnell: "You guys don't send me emails about MSOs." ROA.9246; *see* ROA.9500. That comment, on the heels of Theiler's email to Hertzberg and Shore, helped explain *why* Theiler sought to contain information about the Little River deal — it involved MSOs.

Judging by Parnell's testimony, Theiler especially "didn't want a paper trail" linking *Theiler* to the MSOs. ROA.9246. Theiler dismisses Parnell's testimony as speculation, Br. 24, but the jury was entitled to believe it, *see Gibson*, 875 F.3d at 185.[17] Theiler insists that he "had no reason to avoid a 'paper trail'" because the "MSOs were discussed in countless other documents." Br. 24. But not every document connected *Theiler* to the MSOs. The jury could find that he sought to minimize the

---

[17] Theiler notes that Parnell was one of several cooperating witnesses. Br. 24; *see* Br. 1, 3, 7-9, 13-14 & n.2, 27-28. That does not bear on sufficiency. *Gibson*, 875 F.3d at 185 ("Even the uncorroborated testimony … of someone making a plea bargain with the government can support a conviction." (quotation omitted)).

number of documents that did, and that he would have had no reason to distance himself from the MSOs if he believed that they were providing legitimate services.

If Theiler were not already certain of the MSOs' illegal conduct when he made his comment to Parnell, all doubt would soon be removed. Over the next month, he was repeatedly updated on the scheme while Shore was siloed. On October 15, 2015, Kraus told Theiler that, as part of the Little River "opportunity," "practitioners" were "partnering" with the MSOs and sharing in the "profits." ROA.4849. On October 21, Kraus told Theiler that "the MSO's working with Little River are not providing any management/administrative services" for physicians' offices. ROA.4347. On October 27 or 28, Kraus gave his ill-fated presentation. ROA.4355, 4375, 10814. On November 2, Kraus apologized to Theiler "for what transpired," saying that "it cast a big shadow over my region." ROA.4375. That same day—evidently as part of the fallout from the presentation—Theiler, Kraus, Hardaway, Parnell, and Laura Howard had a call to discuss "accounts" (i.e., physicians) who had been signed up through Little River, including ones who were "a lead from an MSO." ROA.4374-4375, 4837; *see* ROA.9287-9291.

82

Shore was not invited for the call about MSO referrals. ROA.4837, 9323-9326. Nor was she copied on related emails from Kraus to Theiler or from Theiler to Hertzberg. ROA.4377-4384, 4551-4557. Again, those emails included (1) a spreadsheet showing that the MSOs were the most common "Source of Referral" through Little River to Boston Heart; and (2) "explanations" for why the MSO referrals included blood-test orders from neurologists, psychiatrists, and other physicians with "specialties that looked questionable" because they were not typically associated with advanced lipid tests focused on the cardiovascular system. ROA.4379-4381, 4551-4557, 11259-11261; *see* ROA.8257, 8826, 8997.

Theiler all but ignores the evidence in the two paragraphs above. The closest he comes to engaging it is a generic footnote arguing: "Any document referencing an MSO—without more—requires impermissible speculation to infer any wrongdoing as to Theiler." Br. 15 n.3. But the above documents *do* say more, and they require no speculation when taken with the rest of the evidence. Even a credulous neophyte would recognize a legal problem the moment he learned that Little River's so-called "management services organizations"—the largest "Source of Referral" to Boston Heart—were providing no management services but

83

instead were "partnering" with physicians who shared in the MSOs' "profits." ROA.4347, 4551-4557, 4849. And Theiler was no neophyte: he was the "sophisticated," Br. 23, "smart," ROA.9305, "experienced" sales VP who by now had sought to distance himself from the MSOs, ROA.9246, 10967-10968. So innocence was by no means the *only* rational inference, especially because this experienced VP knew that the profit-sharing physicians included ones who would not typically order advanced lipid blood tests. ROA.4551-4552; *see* ROA.8257, 8826, 8997.

Surely all those then-recent developments were at the front of Theiler's mind when, in November 2015, Shore gave her "***strong recommendation***" to "stand down on all hospitals" in Kraus's region, at least "[u]ntil we have the clarity on all of Little River." ROA.4420. Theiler notes, correctly, that Shore wanted to ensure proper training. Br. 20; *see* ROA.4420, 11716-11718. But Shore was not worried *only* about training. She sent her email in the wake of Kraus's presentation, one that Theiler knew "cast a big shadow over [Kraus's] region." ROA.4375. Shore expressed concern that Little River had an atypical "marketing arm (MSO?)" that was targeting physicians "way outside" Little River's geographic area. ROA.4420. And Shore's concern was based on a fraction

84

of what Theiler knew. *See, e.g.*, ROA.4347, 4374-4384, 4551-4557, 4837, 4849, 9323-9326. Beyond the facts already mentioned, Theiler had learned just two weeks before Shore's email that Little River was considering the acquisition of practices in Houston and Dallas "for compliance reasons/passing the sniff test." ROA.4347. Nothing suggests that Theiler shared that notable fact with Shore when she highlighted that the MSOs were operating "way outside" Little River's area. ROA.4420. His failure to share it points toward guilt, not innocence.

The jury could find that an innocent sales VP, knowing everything that Theiler knew by November 2015, would have acted on Shore's recommendation, not carried on as before. Theiler insists that, after Hertzberg and Shore had a follow-up call with Little River in mid-November, Shore "proposed to retain the relationship." Br. 20; *see* ROA.4421, 4615, 4848. That description is incomplete. As discussed above (pp. 69-70), Shore told Hertzberg and Theiler that the call was "great," but she still had "Questions" about "MSOs" and how Little River was "targeting" physicians with its "'marketers.'" ROA.4421. And because Shore "did not feel comfortable" with the existing model, she proposed a "joint venture" to "create a different approach." ROA.11608-

85

11609; *see* ROA.11693-11694 (Shore testified that the existing model "was obviously a problem to me"). Suffice it to say, then, that Shore did not propose to retain Little River's *MSO model*.

### 2. Expansion to Integrity and Stamford

Theiler argues that he "played no obvious role" in the kickback conspiracy, Br. 26, and that his participation was neither "necessary" nor "useful," Br. 12. The Integrity and Stamford deals proved otherwise.

By January 2016, Theiler and Laura Howard began to "focus" on "where Boston would be able to work" after Little River. ROA.10187-10188; *see* ROA.4525-4526, 4561, 9248-9269. Howard still worked as a so-called marketer with Robert O'Neal and Christopher Gonzales. ROA.3911-4214, 10343-10345, 12319. Kraus, Howard, and Parnell arranged for Theiler to have three days of meetings with, *inter alia*, O'Neal, Howard, Gonzales, Integrity executives, Integrity doctors, and an Integrity MSO. ROA.4525-4526, 9248-9258, 10185-10188, 10229-10230.

Theiler barely mentions O'Neal and Howard, Br. 20, 22, and he does not dispute that they and Gonzales were "key participants" in the kickback scheme, Br. 27; *see* ROA.9601-9602, 9639-9640, 10121-10122, 10976, 12276-12277. Nor does Theiler contest that physicians were

86

"referring through ITH the way that they had also been referring through Little River." ROA.9259. Nor, finally, does Theiler deny that he met with Integrity executives to "solidify the relationship" with Integrity, ROA.9258; that he met with an Integrity MSO to "see how an MSO worked," ROA.9255; or that, after the MSO meeting, he reminded Parnell not to send him "any emails about MSOs," ROA.9256.

Given those facts and the rest discussed above, the jury did not have to believe that Theiler had now innocently tripped over *two* unlawful arrangements. Little River and Integrity were vital to Boston Heart's financial health, and both were at the center of Theiler's attention. As Theiler put it in Kraus's January 2016 performance review:

- "Little River and ITH" were two of Boston Heart's "largest clients."

- The relationship with Little River "progressed largely due to the activities of the senior management team."

- "There was also a senior management meeting with ITH."

- The "sustainability of these two accounts" was "critical not only to the region, but to the company."

- The "senior management team" had spent "considerable time" working "to assure that the accounts are sustainable."

ROA.6769-6771.

87

Theiler mocks any reliance on his "travel itinerary" and his review of Kraus's performance, noting that they were not a "private memo whispering about kickbacks" or an "admission of criminality." Br. 22-23. But they show who Theiler was working with, what his priorities were, and why he cannot use physical distance or his senior position to claim ignorance. *See, e.g.*, Br. 2, 15, 17, 26.

If two unlawful arrangements were not enough, Theiler worked on a third with Stamford. Like Little River, Stamford paid O'Neal, Howard, Gonzales, and Ruben Marioni to pay physicians to order Boston Heart tests. ROA.5721, 5729-5730, 8386-8394, 12361-12362. Unlike the Little River deal, however, the Stamford deal did not "originate[ ] from the bottom." Br. 6. Rather, it was the result of Theiler's close coordination with Robert O'Neal. Or so a rational jury could conclude from Theiler's conduct in 2016.

To recap, in January 2016, Theiler and O'Neal met "to discuss how Boston Heart can be involved in [O'Neal's] pursuit of hospital growth." ROA.4561; *see* ROA.4525, 10185-10188. In February, Theiler and Shore had a call with O'Neal, and they learned that O'Neal would soon "have" several hospitals to work with. ROA.4562-4564. A few days after the call

88

with O'Neal, Theiler asked Rob Rossi some "questions about MSOs." ROA.10010. Two days after that, Rossi sent Theiler a legal writeup saying, among other things, that an MSO "must service physicians." ROA.4584; *see* ROA.4581. Theiler knew that *Little River's* MSOs provided no management services to physicians. ROA.4347. So one can infer that, if Theiler were an innocent sales VP pursuing a new hospital to replace Little River, he would have approached O'Neal and other Stamford marketers "with caution," as he pointedly advised Shore to do. ROA.4852.

But that is not what Theiler did. In March 2016, he and Shore traveled to Texas to meet with O'Neal in person. ROA.11301, 11461, 11803, 12332. When Shore left the room, Theiler used the opportunity to speak with O'Neal alone. ROA.12333-12335, 12347-12348. The two of them discussed the Stamford deal and the prospect of bringing even *more* hospitals "into the fold." ROA.12333-12334, 12348. Theiler added that "he appreciated working with the relationship," "their stock had gone sky high," and "he needed a story line."[18] ROA.12334.

---

[18] "Needing a story line" could be taken multiple ways, but none is innocuous. When the district court denied acquittal, it provided the likeliest explanation: Theiler sought "to concoct a 'storyline' to explain the unusual success in Texas." ROA.7116.

That same month, March 2016, Howard told Gonzales (to Gonzales' dismay) that Boston Heart was "not on board yet" with O'Neal and his "new hospital." ROA.4007. Referring to Shore, Howard complained that "the head of hospitals at Boston is the issue." ROA.4007; *see* ROA.10236. Howard added that she was going to call Theiler to see "if Boston will be offered." ROA.4007.

Taken together, the foregoing evidence suggests that Theiler, O'Neal, and Howard viewed Shore as an obstacle to the Stamford deal, and that Theiler marginalized Shore while pretending to exercise "caution." ROA.4852; *cf. Sanders*, 952 F.3d at 278 (jury could infer that defendant "knew he was crossing lines, because he felt a need to tell employees not to break the law"). Later developments reinforced the point. In April 2016, after O'Neal had gotten more than two weeks of "radio silence" from Shore, O'Neal told Theiler—in an email excluding Shore—that O'Neal needed Boston Heart to execute a non-disclosure agreement so that their "relationship" could "proceed." ROA.4579-4580. O'Neal suggested that, absent a signature, he would take his business elsewhere. ROA.4580 ("As it is now we will proceed without the relationship."). The next day, Theiler replied—in an email excluding

90

Shore—that the NDA was now finalized and that Theiler hoped to talk with O'Neal "to ensure things are moving well from your perspective." ROA.4579.

In May 2016, with the Integrity relationship on the "decline," ROA.4765, Theiler was "looking to close" the Stamford deal, ROA.5345. That month, Theiler worked with O'Neal and Stamford CEO Rick DeFoore to finalize the Stamford agreement. ROA.6591-6592. And on June 1, the day that Kim Bracuti signed the agreement for Boston Heart, Theiler told O'Neal and DeFoore—but not Shore—that "[w]e should set up a call to discuss next steps." ROA.4864.

On appeal, Theiler says little about the Stamford deal. He notes that Shore participated in the February 2016 call with O'Neal, and that Theiler's notes of the call did not disclose "any unlawful conduct involving an MSO." Br. 21; *see* ROA.4562-4564. But Theiler does not mention the times that he and O'Neal—the conspiracy's "architect," ROA.13452—cut Shore out of communications central to the Stamford deal. ROA.12333-12335, 12347-12348 (conversation in Texas); ROA.4579-4580 (emails about NDA); ROA.4864 (emails about "next steps"). The jury did not have to accept that Theiler was just "doing his job," Br. 22, when he facilitated

91

this *third* corrupt hospital deal while sidelining the head of hospitals. *See Willett*, 751 F.3d at 342 (continuing a scheme suggests guilty knowledge); *Tooker*, 957 F.2d at 1217 (concealment suggests guilty knowledge).

### 3. The Ivers email

In June 2016, Michael Ivers copied Theiler on Ivers' email about Boston Heart's "Compliancy Disaster." ROA.4577. To repeat, Ivers reported that people associated with Little River and Integrity had "broken the law" on "physician referral," and that physicians ordering Boston Heart's tests were "being incentivized" through MSOs. ROA.4577. Ivers made clear that his email was based in part on information from Shore, and that Shore had said the situation was a "train wreck." ROA.4577-4578. Also, Ivers called out Theiler for "concealing customer data specific to the Texas market and LRH and ITH." ROA.4577-4578.

Theiler does not claim that he took any remedial measures in response to Ivers' email, and no evidence suggests that he did. He argues instead that his "job description" did not include investigating the email. Br. 21. But a jury armed with common sense could find that the job of a sales VP is to further his company's *lawful* sales, not to pursue profits without regard to reported illegality. Besides, the question is not what

92

Theiler's job required but what can be inferred from his reaction to the email. Again, if a defendant "holds a position of authority within a company," the jury may infer the defendant's awareness of "malfeasance" when he "remains within 'proximity to the fraudulent activities'" and "fails to take remedial action in response to an employee's concerns about company practices." *Hesson*, 746 F. App'x at 334 (quoting *Willett*, 751 F.3d at 340). Those principles apply with full force here.

If Theiler were innocent, and if Ivers' email had surprised him, he would not have needed to "engage in his own vigilante search" to prevent further illegality, *contra* Br. 21. He could have simply told compliance personnel what he already knew. He could have disclosed, for instance, that physicians were "partnering" with Little River's MSOs and sharing in the "profits," ROA.4849; the physicians included psychiatrists and neurologists, ROA.4551-4552; the MSOs were operating "way outside" Little River's geographic area, ROA.4420; Little River was looking to "acquire practices" in urban areas to pass the "sniff test," ROA.4347; the MSOs performed no management services for the physician offices with which they "partner[ed]," ROA.4347, 4849; the MSOs were the most common source of referral through Little River to Boston Heart,

93

ROA.4551-4557; and the new hospital deal with Stamford involved Robert O'Neal, a person warranting "caution," ROA.4852.

Rather than reporting what he knew or taking any corrective step, Theiler pushed forward: he told O'Neal, once "all Stamford accounts were turned on," ROA.10388, that he would "help" O'Neal "in any way" he could, ROA.4579. Taken with all that came before, Theiler's pressing ahead with this third unlawful arrangement proved beyond any doubt that he knowingly participated in the AKS conspiracy.

### D. The jury rationally found that Hardaway knew of and joined the conspiracy.

Hardaway claims there was insufficient evidence that he "knew that the MSO payments to doctors were designed or intended to 'induce' referrals."[19] Br. 26; *see* Br. 29-41. The jury rationally found him guilty.

### 1. Little River and Rise MSO

Hardaway was the on-the-ground salesman who brought the Little River deal to Boston Heart. ROA.9085-9086, 9202-9203, 11478. He interacted with MSO representatives in the field, and he worked with

---

[19] Hardaway also claims there was insufficient evidence that he "knew the payments were intended specifically to induce *federal* referrals." Br. 26 (emphasis in original); *see* Br. 41-44. That contention is addressed in Point II below, pp. 102-108, alongside Hertzberg's similar claim, Hertzberg Br. 58-59.

them in onboarding physicians who agreed to order Boston Heart tests through Little River. ROA.8260-8265, 8295, 9189-9190, 10481. Ruben Marioni was one of the MSO representatives with whom Hardaway interacted, and Marioni's testimony alone defeats Hardaway's claim of unwitting involvement. ROA.8260-8265. Based on conversations with Hardaway, Marioni testified that Hardaway knew that Marioni's MSO "made payments to physicians," and knew that "those payments were intended to induce referrals." ROA.8264.

Hardaway says that Marioni "erroneously claimed" that Hardaway had such knowledge. Br. 33 n.10. In other words, Hardaway disagrees with Marioni's testimony and believes that it should be disregarded for that reason. He argued much the same to the jury. ROA.13550 ("Mr. Marioni lied to you" in "saying that Mr. Hardaway had knowledge of his MSO paying physicians"). But the jury had every right to believe Marioni's testimony, and Hardaway cannot challenge Marioni's credibility on appeal.[20] *Gibson*, 875 F.3d at 185.

---

[20] Hardaway says that Marioni "could not identify him in court." Br. 18. To the contrary, Marioni identified Hardaway and indicated that he had been unable to do so at first because the courtroom was crowded. ROA.8237-8238; *see* ROA.8156-8157.

95

Hardaway seeks recourse (Br. 14) in Jeffrey Parnell's testimony that, when *Parnell* visited a physician's office with "the MSO guys," "[t]hey would usually ask" Parnell to leave the room, and he would oblige. ROA.9414; *see* ROA.9188 ("normally, I would leave the room and the MSO rep would go over whatever they were going over"). But Hardaway is not Parnell, and he cites no evidence that he behaved exactly as Parnell did. And even assuming Hardaway "normally" left the room like Parnell did, the jury could take it as a conscious effort to preserve deniability. It is difficult to draw any other conclusion from the rest of the evidence, especially Marioni's testimony and Hardaway's healthcare experience. ROA.8264-8265 (Q: "Did they [i.e., Hardaway and Parnell] know that those payments were intended to induce referrals?" Marioni: "Yes, sir, they did." Q: "Did they seem to be familiar with those types of arrangements?" Marioni: "Yes, sir, they did."); ROA.10968-10969 (case agent: given the defendants' experience, they could be expected to understand "what an unlawful arrangement is"); *see Marchetti*, 96 F.4th at 828 (jury did not have to find that defendant was "caught up unknowingly in somebody else's conspiracy" when he "was experienced in the healthcare field" and "engaged in suspicious activities").

96

Hardaway's stake in his own MSO bolsters the other evidence of guilt. Through LGRB and Rise MSO, Hardaway and Stan Jones had a "marketing contract" with Little River.[21] ROA.8731; *see* ROA.8795, 13088. Whenever Parnell got a lead on a physician seeking to "invest" in an MSO, he would send the physician to Jones. ROA.9242-9243; *see* ROA.9206, 9353-9354, 9418-9419. To Parnell's knowledge, Hardaway "was doing the same thing." ROA.9419-9420. Many physicians then bought "shares" in Rise and received "profits." ROA.9422. Little River paid Rise for the physicians' "commercial samples." ROA.9422-9423. And the "Rise-invested" physicians in turn ordered Boston Heart blood tests through Little River, not only for patients covered by commercial insurance but also for patients covered by federal payors. ROA.9424. In sum, Rise operated much like the MSOs whose practices Hardaway claims not to have understood.[22] Br. 3, 12-15, 31-36.

---

[21] The agreement was in place from May to December 2015. ROA.3348, 8851-8852, 9037, 9087-9089. Half a year amidst a kickback scheme is not an especially short time, *contra* Br. 15.

[22] Hardaway argues that "Rise operated in a fully compliant manner," or at least that he believed as much. Br. 40; *see* Br. 4, 15-17, 39-41. But that is no response to what Hardaway knew about *Marioni's* MSO. In any case, Hardaway's argument assumes that Rise was compliant because it was not formally "getting paid on federal specimens." ROA.13118-13119; *see* ROA.9418-9433. That assumption of legality is incorrect for reasons explained in Point II below.

97

Hardaway admits his knowledge that (1) Little River paid the MSOs, and (2) the MSOs paid physicians. Br. 31-32. It would be difficult to do otherwise, because he was copied on Kraus's December 2015 draft executive summary, which explained the MSO model as follows:

> Little River will employ Marketers. These Marketers represent Management Service Organizations (MSO"s), which allow the practitioners to become investors in these MSO's. The practitioners become investors by purchasing shares in the MSO. Little River will remunerate the Marketers/MSO, which in turn disperse their profits among the investors.

ROA.4391 (punctuation and "disperse" as in original).

Undeterred, Hardaway suggests he innocently believed that (1) Little River paid the MSOs to "advertise its services," "including Boston Heart tests," and (2) the MSOs gave the physicians a genuine return on investment rather than remuneration for ordering Boston Heart's tests through Little River. Br. 32, 37. A rational jury could reject both parts of that argument, especially because they are in tension with one another. The typical management services organization *receives* money from a physician in return for the MSO's management services. ROA.8004-8009, 10974-10975. The typical MSO does not *pay* "investor" physicians a cut of the profits the MSO earns from "advertising" someone else's medical

98

tests, at least if the "advertising" is directed at the same "investor" physicians who order the tests and generate the profits in the first place. *See* ROA.8029 (even when an MSO has a "marketing group," it does not "pay doctors for patient referrals," "[b]ecause that would be illegal").

The jury could find that Hardaway knew the undisputed truth of the kickback scheme: the shared "profits" were cover for unlawful inducements to the "investor" physicians. Even apart from Hardaway's knowledge about Marioni's MSO, ROA.8264-8265, Hardaway was on at least one Boston Heart sales call in which the participants discussed the "influence" the MSOs provided, ROA.10161-10162. That call was no earlier than October 2015, because Laura Howard participated. ROA.10146, 10161-10162. By then, any innocent salesman in Hardaway's position would see a major red flag in the MSOs' exertion of influence over their purported investors, especially because the so-called investors were ordering a heavy volume of tests and producing an unusual amount of income for everyone involved. Hardaway knew of the steep growth in revenue from Boston Heart's arrangement with Little River. ROA.4329, 4640, 4826, 5357. He knew that, through the arrangement, Boston Heart collected roughly $900 per test, which was

99

more than twice the usual amount. ROA.4329, 4640, 9231. Further, Hardaway knew how many "accounts" LGRB and Rise "brought" to Little River, and how many Boston Heart tests were ordered as a result. ROA.5308 ("For BH, LGRB did 109 in June and 492 in July."); ROA.4831 (in October, "Rise did 283 tests" in one week).

Hardaway also had every reason to further the kickback scheme: he personally profited from it, twice over. He received "[s]ome serious coin" in enhanced Boston Heart commissions, and he "g[o]t paid" from Little River through LGRB and Rise. ROA.4329, 4399; *see* ROA.8731, 9202-9203, 9234. By October 2015, Hardaway was one of Boston Heart's most productive sales representatives, ROA.3020, and "some reps were asking questions about [his] numbers," ROA.4548. The jury could infer that, with such a significant stake, Hardaway knew the real reason for the numbers: Little River paid MSOs to pay physicians to order Boston Heart tests, thereby generating more money for Hardaway and others.

### 2.    Expansion to Integrity and Stamford

Hardaway participated in the conspiracy's expansion to Integrity and Stamford. Through Hardaway and Parnell—and their dealings with Benchmark, a "dirty" MSO that even Little River had "booted"—Boston

100

Heart had "about 25 accounts with Integrity." ROA.4339, 4387. Physicians were "referring through ITH the way that they had also been referring through Little River." ROA.9258-9259. Hardaway joined Theiler at the January 2016 meeting with Integrity executives. ROA.9258. And Boston Heart personnel, including Hardaway, told Ruben Marioni that: Boston Heart was "trying to do business with Stamford"; Stamford was "replicating" the Little River model; and Marioni should "move [his] MSO physicians to Stamford." ROA.8386-8387.

As with Theiler, the jury was not required to believe that Hardaway had inadvertently stumbled over not just one unlawful arrangement but three. To sum up the highlights: Knowing that Marioni's MSO paid physicians to order Boston Heart tests through Little River, and that Boston Heart was set to repeat the same model with Stamford, Hardaway advised Marioni to move his MSO physicians to Stamford, which in context could only mean paying the physicians to start ordering Boston Heart tests through Stamford, all under the guise of a return on investment. That was a devastating combination of facts, even if Hardaway was not otherwise "involved with Stamford," Br. 17.

### 3. The "sign-on bonus"

Confirming Hardaway's knowledge that the MSO payments were inducements, not shared profits, his own MSO offered one of Marioni's "high-volume" physicians a $10,000 "sign-on bonus." ROA.8292, 8394-8396. That offer could not have been a return on any investment, because the physician had not joined or invested in Rise. Instead, the offer's very purpose was to get the physician to switch from Marioni's MSO to Hardaway's. ROA.8394-8396. The offer was not successful, ROA.8395, but it confirmed that Hardaway knew of and joined the kickback scheme.

## II. A Rational Jury Could Find a Federal Nexus.

### A. Background and standard of review

Hertzberg and Hardaway claim there was insufficient evidence of a federal nexus under the AKS. Hertzberg Br. 58-59; Hardaway Br. 41-44. They preserved that argument in their motions for acquittal. ROA.18959, 22562-22577. This Court reviews de novo the district court's denial of their motions, ROA.7143, but it reviews the verdict under the rational-jury standard discussed above (pp. 57-59).

**B.     The government only had to prove knowledge that the incentivized physicians ordered tests that *could* be reimbursed by federal payors.**

As relevant here, the AKS makes it a crime to knowingly and willfully pay a kickback "to any person to induce such person" to order any item "for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(B).

In *Shah*, this Court rejected a physician's argument that, to prove an AKS violation, the government had "to show he knowingly referred federally insured patients for remuneration." 95 F.4th at 352. The Court explained that the AKS prohibits kickbacks for items "for which payment *may* be made in whole or in part under a Federal health care program." *Id.* at 350 (emphasis added; quotation omitted); *see id.* at 352 & n.30. Given the word "may," the Court reasoned that "[a]ll" the government "had to show was that [the physician] knowingly agreed to accept remuneration for referring patients that *could* be federally insured." *Id.* at 352 (emphasis in original); *see id.* at 354 ("The Government did not need to prove that the defendants knew their conduct targeted *federal* healthcare programs." (emphasis in original)). The Court found "[f]urther support" for that view in 42 U.S.C. § 1320a-7b(h), "which provides that 'a

103

person need not have actual knowledge of this section or specific intent to commit a violation of this section.'" *Shah*, 95 F.4th at 352 & n.33.

Hardaway misreads *Shah*, citing it to require proof that he knew the MSO payments to physicians "were intended specifically to induce *federal* referrals." Br. 26 (emphasis in original). He says the government could not carry that burden because, in his telling, Little River did not pay MSOs for federal samples. Br. 11-12, 15 n.5, 29, 41-42. Under *Shah*, however, the inquiry turns on whether the physicians ordered tests that *could* be reimbursed by federal payors, not on whether Little River "targeted" such reimbursement. 95 F.4th at 354; *see id.* at 353 (it did not matter that, "on paper, the agreements sought to avoid federal-pay patients" if defendant knew referrals "may" have included such patients).

Little River fashioned contracts under which it purported not to pay MSOs for federal samples. ROA.2273, 2280, 2297, 2301. But that did not mean the physicians ordered no tests reimbursed by federal payors. For one thing, Marioni testified that the parties did not comply with that contract provision, and that Little River paid him for sending referrals that were "both commercial and federal." ROA.8200-8201, 8241; *see* ROA.8565-8566. Also, Marioni testified that Jeffrey Madison and Little

104

River's lawyer, Ryan Downton,[23] knew that the contract provision was "False." ROA.8201.

Further, as the district court observed, the jury could find that the MSOs' payments "were in fact made to induce physicians to refer *all* their patients," including those covered by federal insurance. ROA.7104 (emphasis in original); *see* ROA.8520 (Marioni testified that he "created a vehicle" that made federal referrals "spike" by paying physicians who were "sending everything"). Little River accepted commercial and federal samples alike. ROA.8520-8521 (Madison "welcomed and applauded" both types of samples); *see* ROA.3334, 8107, 8322-8323, 8564-8567, 8649, 9142, 9501-9502, 9567, 10139, 11016-11017, 11556-11557, 12265, 12277-12278, 12539. Indeed, Little River *sought* both types of samples, and it would not permit physicians to exclude their federal samples.[24] ROA.8196-8197, 9523, 9612, 9759-9760.

---

[23] Downton testified in Madison's defense. ROA.12891-13209. He claimed that Little River's "position" had always been: "We don't pay for federal." ROA.12990. Hardaway relies on that and other aspects of Downton's testimony. *See, e.g.*, Br. 11-12, 16. The jury could reject it in favor of contrary evidence like Marioni's testimony. *Gibson*, 875 F.3d at 185.

[24] For logistical reasons, the typical physician did not want to send commercial and federal samples to two separate places. ROA.8323, 8495-8497, 8520-8521, 9142, 12277-12278. And Little River did not want to be perceived as "cherry-picking" only commercial samples, lest physicians take *all* their business elsewhere. ROA.8323, 8646, 9002.

105

**C.   Hertzberg and Hardaway knew, at minimum, that the tests *could* be reimbursed by federal payors.**

The evidence above shows that Little River and the MSOs intended all along for the "investor" physicians to order Boston Heart tests for commercial *and* federal patients. The remaining question is whether Hertzberg and Hardaway recognized the mere "possibility" of federal reimbursement. Hertzberg Br. 58. They did.

***Hertzberg.*** Hertzberg knew that Little River's two rural hospitals were "paid a premium" "by government and private payors." ROA.4668. That fact was reflected in the Little River "overview" that Hertzberg sent to Jonathan Lapin in early December 2015. ROA.4665, 4668. The following week, Theiler sent Hertzberg an executive summary reporting that Little River's "Critical Access" status allowed it "to receive cost-based reimbursement from Medicare, instead of standard fixed reimbursement rates." ROA.4570-4572.

The jury could find that Hertzberg—an intelligent and experienced healthcare CEO, ROA.10599, 10967-10968, 12809-12811—was aware that the favorable government rates were among the ones that Little River had sought to leverage from the outset. *See* ROA.4847. There would have been no need for the Little River summaries to mention the

106

government rates if there were no possibility that Little River "might" collect federal reimbursement.[25] *Shah*, 95 F.4th at 354.

***Hardaway.*** By April 2015, Hardaway knew that Little River planned to use two different Boston Heart blood panels: "the c panel for commercial and m panel for Medicare." ROA.4406-4407. Hardaway told Jeff Craven as much in an April 6 email. ROA.4406. About a week later, on April 14, Hardaway sent Jeffrey Madison a text saying that he "wanted to discuss logistics" and how to "properly coordinate blood samples and paperwork and copies of insurance for you guys to bill." ROA.3164. Madison replied: "Let's discuss tonight." ROA.3164.

Those messages would suffice to prove Hardaway's knowledge that Little River "might" bill federal payors. *Shah*, 95 F.4th at 354. But there was plenty more evidence. In May 2015, Kraus emailed Hardaway and Jeffrey Parnell about a dinner that Kraus had had with a Little River MSO and several physicians. ROA.4325. Kraus said: "Gray, I'd like to understand how Little River is working with Medicare Patients. Call you

---

[25] Notably, Hertzberg also knew that, as part of Boston Heart's arrangement with Integrity, *Boston Heart* was "billing Government Payors directly" for some of the tests. ROA.5772-5792. From February to May 2016, Andy Flynn repeated that point at least 11 times in his updates to Hertzberg. ROA.5772-5792.

107

tomorrow." ROA.4325. Taking Kraus's email with the other messages noted above, the jury could infer that Kraus sought Hardaway's input because Hardaway already knew how Little River was working with Medicare patients. And Hardaway had good reason to know: Little River paid his MSO, Rise, for commercial samples, and "Rise-invested doctors" in turn sent commercial *and* federal samples to Little River. ROA.9423-9424; *see* ROA.4399, 11174. In an August 2015 email to Stan Jones, Hardaway estimated that 60% of the samples for May and June were commercial. ROA.4399. That meant the other 40% were federal. ROA.11174. No doubt Hardaway realized as much.

## III. A Rational Jury Could Find That Hertzberg and Hardaway Did Not Withdraw from the Conspiracy.

### A. Background and standard of review

On January 12, 2022, the grand jury charged the defendants with the AKS conspiracy under 18 U.S.C. § 371. ROA.119, 122. The governing statute prescribed a five-year limitations period. 18 U.S.C. § 3282(a). Thus, a defendant would have a complete defense if he were able to prove, by a preponderance of evidence, that he withdrew from the conspiracy before January 12, 2017. *See Smith v. United States*, 568 U.S. 106, 111 (2013); *United States v. Heard*, 709 F.3d 413, 427-428 (5th Cir. 2013). The

district court instructed the jury on that "affirmative defense of withdrawal." ROA.2183-2185. Hertzberg and Hardaway both argued the defense to the jury — Hertzberg expressly, ROA.7692, 13432-13435, and Hardaway implicitly, ROA.7726-7727, 13570. As the verdict reflects, the jury was unpersuaded. ROA.2188-2189. So too was the court: it rejected the defendants' claims that the evidence *required* the jury to find withdrawal. ROA.7113-7114, 7121; *see* ROA.18965-18968, 22583-22585.

On appeal, Hertzberg and Hardaway renew their claims of withdrawal. Hertzberg Br. 60-63; Hardaway Br. 44-45. The Court reviews for whether the jury "reasonably could have found" that the defendants "did not withdraw." *United States v. Torres*, 114 F.3d 520, 525 (5th Cir. 1997); *see United States v. McClaren*, 13 F.4th 386, 407 (5th Cir. 2021) (affirming where jury was not "required" to find withdrawal).

## B.    Hertzberg and Hardaway did not prove withdrawal.

Because "withdrawal is an affirmative defense," "the burden of proof is on the defendant." *Heard*, 709 F.3d at 427; *see Smith*, 568 U.S. at 109-114. To carry it, "the defendant must show that he has committed affirmative acts inconsistent with the object of the conspiracy that are communicated in a manner reasonably calculated to reach conspirators."

109

*Heard*, 709 F.3d at 428 (quotation omitted). "Mere cessation" is not enough. *Id*. Nor is "reduced … participation." *United States v. Hoffman*, 901 F.3d 523, 545 (5th Cir. 2018). Instead, the defendant "must show that he acted affirmatively to defeat or disavow the purpose of the conspiracy." *United States v. Killian*, 639 F.2d 206, 209 (5th Cir. Unit A Mar. 1981).

**Hertzberg.** Hertzberg asserts two affirmative acts of withdrawal: (1) her resignation from Boston Heart; and (2) her alleged "refusal" to sign the Stamford agreement. Br. 60-61. Those asserted acts do not support acquittal, much less require it.

Hertzberg gave notice of her resignation on May 31, 2016, in a counseled letter to Jonathan Lapin. ROA.6601-6605. Nothing suggests that she did so to "disavow" the conspiracy. *Killian*, 639 F.2d at 209. All indications are that she resigned because of the conflict with Eurofins, *see, e.g.*, ROA.4653, 4781, 6525, 9945-9946, 9992-9996, 10507-10508, 10582, 10629-10630, and that "the board had wanted her to be gone" whether she resigned or not, ROA.10270. And far from taking steps to "defeat" the conspiracy, *Killian*, 639 F.2d at 209, Hertzberg furthered it even after her May 31 notice. In mid-June, in the wake of Michael Ivers' email, ROA.4577-4578, Hertzberg confronted Ivers and removed him

110

from hospital sales, ensuring that he no longer reported to JoAnna Shore, ROA.11906-11908, 11958-11959.

On July 26, 2016, Hertzberg announced her resignation in a company-wide call. ROA.4073, 10270-10271, 11785-11786. But she remained with Boston Heart—as a paid "Advisor" on "Garden Leave"— until September 15, 2016. ROA.2917-2918; *see* ROA.10605-10606. Before September 15, Boston Heart set up accounts with Stamford, ROA.10072; Boston Heart's acting CEO signed the Stamford agreement, ROA.6597, 6599, 10584, 10648-10651; "all Stamford accounts were turned on," ROA.10388; and Stamford began ordering Boston Heart tests, ROA.10072-10073. Throughout those events, Hertzberg knew that she herself had approved the pricing for Stamford. ROA.5345. Yet she stood by and did nothing as the kickback scheme expanded to this third hospital. That is not affirmative withdrawal.

Hertzberg relies on Second and Eleventh Circuit cases recognizing that a corporate conspirator's resignation from a company may help prove withdrawal. Br. 61-62 (citing *United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988); *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 839 (11th Cir. 1999)). But as both courts have made clear,

111

resignation from employment does not alone *require* a jury to find withdrawal. *United States v. Hoskins*, 44 F.4th 140, 156 (2d Cir. 2022) ("*Nerlinger* does not suggest that, without additional affirmative action, resignation is sufficient to withdraw."); *United States v. Bergman*, 852 F.3d 1046, 1064 (11th Cir. 2017) ("Even *Morton's Market* does not state that all resignations constitute effective withdrawal no matter the circumstances."); *cf. United States v. Wentland*, 582 F.2d 1022, 1026 (5th Cir. 1978) (district court did not plainly err in failing to instruct jury on withdrawal where defendant's resignation was "forced" upon him).

The Second Circuit has further held that, even if a defendant resigned, he cannot show withdrawal if he continued to receive "benefits from the conspiracy." *United States v. Berger*, 224 F.3d 107, 118 (2d Cir. 2000). That principle alone would preclude acquittal here, because Hertzberg retained her "earnout" stake for several years before releasing it in 2019. ROA.11286, 11292-11293, 11312-11313.

Regardless of the earnout, Hertzberg performed no "additional affirmative action" beyond her resignation. *Hoskins*, 44 F.4th at 156. She insists that she "refused" to sign the Stamford agreement. Br. 60-61; *see* Br. 31 (she purportedly made a "decision not to sign" it). But as discussed

above (pp. 73-74), no evidence suggests that the agreement was ever presented for Hertzberg's signature, let alone that she affirmatively refused to sign it despite having approved the Stamford pricing. ROA.5345. Instead, because Rob Rossi mistakenly believed that Kim Bracuti had authority to sign the Stamford agreement, Bracuti did so. ROA.6591, 9981-9982. The error was only discovered after Jonathan Lapin stripped Hertzberg of authority to sign any contract for Boston Heart. ROA.2938-2939, 9982-9986, 10582-10583. In short, Hertzberg did not "refuse" to sign the Stamford agreement any more than did anyone else who was never asked to sign it. *See* BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "refusal" to mean "denial or rejection of something offered or demanded").

***Hardaway.*** Hardaway's claim of withdrawal rests on his bare departure from Boston Heart. Br. 44-45; *see* ROA.10031-10032. The jury could find that that was not enough. Nothing suggests that Hardaway resigned to "disavow" or "defeat" the conspiracy. *Killian*, 639 F.2d at 209. Nor does he point to any "additional affirmative action" besides quitting the company. *Hoskins*, 44 F.4th at 156. He does not even show that his departure was "communicated in a manner reasonably calculated to

113

reach conspirators." *Heard*, 709 F.3d at 428 (quotation omitted). He says that he "publicly" resigned, Br. 45, but he supplies no citation, and the record points the other way. Theiler learned of Hardaway's departure from another executive, not Hardaway. ROA.4768, 11310-11311, 11475-11476. And Theiler "notified" Hertzberg, ROA.4768, who would not have needed the notification if Hardaway had told her.

Finally, when Hardaway left Boston Heart, he did not leave Rise MSO or give up his ownership in it. ROA.10247, 10886-10887. Instead, he was still "involved" with Rise, ROA.10886-10887, though it now worked with True Health rather than Boston Heart, ROA.10247. And context suggests that, during this period, Rise offered one of Ruben Marioni's "high-volume" physicians a $10,000 "sign-on bonus." ROA.8292, 8394-8396; *see supra* note 9.

Accordingly, the jury was not "required to find" that Hardaway had affirmatively "turned over a new leaf." *Heard*, 709 F.3d at 428-429.

## IV. The District Court Did Not Plainly Err in Failing to Immediately Disclose Jury Note 4.

Invoking Federal Rule of Criminal Procedure 43 and the Sixth Amendment, Kraus and Hardaway claim that the district court violated their right to be present by failing to notify the parties immediately upon

receipt of a note that the jury sent 35 minutes after a similar note to which the court was already responding. Kraus Br. 10-18; Hardaway Br. 45-52. But Kraus and Hardaway forfeited any objection. And they do not show obvious error, much less reversible prejudice or unfairness.

## A.    Background and standard of review

The trial lasted about six weeks. ROA.25-34. On day 20, after the parties rested, ROA.13331-13332, the district court gave the jury a copy of its closing charge, ROA.13333; *see* ROA.2162-2186, and it read the instructions aloud, ROA.13333-13363. Borrowing from a pattern instruction, the court instructed the jurors on their duty to deliberate. ROA.2185; *see* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) § 1.26 (2024). In relevant part, the instruction stated:

> It is your duty to consult with one another and to deliberate in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. During your deliberations, do not hesitate to reexamine your own opinions and change your mind if convinced that you were wrong. But do not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

ROA.2185; *see* ROA.13361. No one objected to that instruction during the charge conference or after the charge itself. ROA.13248-13285, 13363.

115

On day 21, after closing arguments, the jury retired to deliberate at 9:49 a.m. ROA.13662. Soon thereafter, the jury sent the district court a first note identifying Juror 7 as the foreperson. *See* ROA.7122. Later that day, the jury sent a second note, this one stating that Juror 1 wanted to speak with the judge. ROA.14983. But no discussion ever took place, because Juror 1 withdrew the request.[26] *See* ROA.7122. The jurors deliberated that afternoon until 4:50 p.m., when the court excused them for the day. ROA.13663.

On day 22, the jury resumed deliberations at 9:00 a.m. ROA.13668. At 10:55 a.m., the jury sent Note 3, which stated: "Juror #12 is unwilling to change his mind based on the evidence provided and the instructions you provided." ROA.14984. The district court brought counsel and the defendants into the courtroom at 11:34 a.m. ROA.2133, 13668. After reading Note 3 to the parties, ROA.13668, the court said:

> So I am proposing to return this response in writing: I refer you to the instructions already provided. I further instruct you to continue deliberating until you have reached a unanimous decision.

---

[26] In his fact statement, Kraus points out that the first note was lost and is not in the record. Br. 4-5. He also mentions the second note. Br. 5. But he does not brief, and he thereby waives, any claim about either note. *See United States v. Scroggins*, 599 F.3d 433, 446-447 (5th Cir. 2010).

116

> And then I would like to read a line -- or add a line from the Allen Charge: You may be as leisurely in your deliberations as the occasion may require, and you should take all the time which you feel is necessary.

ROA.13668. The court asked: "Any objections?" ROA.13668. Counsel for several parties said no. ROA.13668-13669. Counsel for Kraus and Hardaway said nothing. ROA.13668-13669.

The district court recessed at 11:35 a.m. ROA.13669. But before the court responded to Note 3, the jury sent Note 4, listing the time as 11:30 a.m. ROA.14986. Note 4 said: "Juror #12 informed the jurors that his 'moral compass' would not allow him to be open minded. He also stated he would 'hang this jury.'" ROA.14986. The court did not at that point advise the parties of Note 4. *See* ROA.2133, 13669. As the court later explained, it received Note 4 while in the process of responding to Note 3. ROA.7123, 13674. And because Note 4 was "very similar" to Note 3, to which the court was already responding, the court "did not directly respond to" Note 4. ROA.13674; *see* ROA.7123. Instead, per its discussion with the parties, the court gave the following response to Note 3:

> I refer you to the instructions already provided. I further instruct you to continue deliberating in good faith until you reach a unanimous decision. You may be as leisurely in your deliberations as the occasion may require and should take all the time that you feel is necessary.

117

ROA.14985. The response listed a time of 11:35 a.m. ROA.14985. Without further communications with the court, the jury deliberated that afternoon until 4:55 p.m. ROA.13669.

On day 23, the jury resumed deliberations at 9:00 a.m. ROA.13674. At 11:00 a.m., the jury reported that it had reached a verdict. ROA.14987. The district court convened the parties. ROA.13674. At or about 11:23 a.m., with all defendants in the courtroom, the court told the parties about Note 4. ROA.2134, 13674. Specifically, as mentioned above, the court explained:

> I did want to note for the record, we did receive a second note from the jury in the process of our responding to the first note. It was very similar to the first note, regarding Juror No. 12. I did not directly respond to it. That will be filed with the other jury notes after the verdict.

ROA.13674. No one objected, or asked the court to read the note, or sought other relief, or made any comment of any kind. ROA.13674. The court had the jurors brought into the courtroom, and it asked them to be seated. ROA.13674. They were seated at 11:27 a.m. ROA.2134. The court asked the foreperson if the jury had unanimously reached a verdict. ROA.13674. The foreperson said yes, and the jury returned its guilty verdict. ROA.13674-13675. After reading the verdict aloud, the court

118

asked each juror if this was "your verdict." ROA.13675-13676. Each juror stood and said yes. ROA.13675-13676; *see* ROA.7127.

Because Kraus and Hardaway did not object when the district court advised the parties of Note 4, they forfeited any claim that the timing of the disclosure effectively excluded them from an earlier stage of the trial. *See* Fed. R. Crim. P. 51(b). This Court reviews for plain error a forfeited claim that a defendant was excluded from a critical stage of the trial. *United States v. Thomas*, 724 F.3d 632, 641 (5th Cir. 2013); *see* Fed. R. Crim. P. 52(b). Similarly, the Court reviews for plain error a forfeited claim that the district court mishandled a jury note. *United States v. Boyd*, 773 F.3d 637, 646 (5th Cir. 2014).

"Relief under the plain-error standard will be difficult to get, as it should be." *United States v. Daniel*, 933 F.3d 370, 382 (5th Cir. 2019) (quotation omitted). To prevail, Kraus and Hardaway must show that (1) there was an error or defect; (2) it was clear or obvious; (3) it affected their substantial rights; and (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Puckett v. United States*, 556 U.S. 129, 135 (2009). Under the second prong, a defect is typically not clear or obvious unless the district court was "derelict in countenancing

119

it, even absent the defendant's timely assistance in detecting it." *United States v. Miller*, 406 F.3d 323, 330 (5th Cir. 2005) (simplified). And under the third prong, "the defendant must demonstrate that the error affected the outcome of the district court proceedings." *United States v. Escalante-Reyes*, 689 F.3d 415, 424 (5th Cir. 2012) (en banc) (quotation omitted).

Kraus (Br. 9-11) and Hardaway (Br. 25) urge de novo review, arguing that they had no opportunity to object and that it would have been futile besides. They are wrong on both the facts and the law. Before the district court brought the jury into the courtroom for the verdict, the court told the parties that it had received Note 4, and it expressed its view that the note was "very similar" to Note 3 "regarding Juror No. 12." ROA.13674. Thus, the parties knew the general subject of the note, and they could have requested specifics if they thought it necessary. Kraus and Hardaway were each represented by several attorneys. ROA.13672. Throughout the six-week trial, they had not hesitated to object or seek clarification from the court. Yet when the court mentioned Note 4, no one objected to the timing or asked what the note said. ROA.13674. And although the court had seen no need to respond to Note 4 given its

120

similarity to Note 3, nothing suggests that it would have denied a request to read the note or refused to hear objections (even if it overruled them).

On these facts, Hardaway cannot draw support (Br. 25) from *United States v. Hillsman*, 480 F.3d 333 (5th Cir. 2007). There, the district court presented a jury note to the parties, and they agreed on a response, but the court gave a different response without providing an opportunity to object. *Id.* at 334-335. That did not happen here.

Nor does governing law support a futility exception, *contra* Kraus Br. 11. In *Greer v. United States*, 593 U.S. 503 (2021), the Supreme Court rejected such an exception as "lack[ing] any support" in the rules or in the Court's cases. *Id.* at 512. Among other things, the Court emphasized that Rule 51(b) "focus[es] on a party's *opportunity* to object … rather than a party's likelihood of *prevailing* on the objection." *Id.* (emphases in original). And this Court has relied on *Greer* to hold that "[f]utility is not an excuse in the plain-error context." *United States v. Pierre*, 88 F.4th 574, 578 n.3 (5th Cir. 2023) (quotation omitted).

Finally, de novo consideration would reward Kraus and Hardaway for "sandbagging" the district court. *Puckett*, 556 U.S. at 134 (quotation omitted). Under Rule 51(b), the requirement of a contemporaneous

121

objection (1) gives the district judge a timely opportunity to "correct or avoid [a] mistake so that it cannot possibly affect the ultimate outcome," and (2) prevents a litigant from "remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor." *Id.* Here, those principles foreclose anything short of plain-error review. On day 23 of a six-week trial, the defendants entered the courtroom for the verdict, ROA.13674, knowing that the jury had experienced at least some measure of disagreement, ROA.13668. Kraus, Hardaway, and/or their attorneys might have thought that they stood a reasonable chance of acquittal; that those odds were better than they might be during any retrial; and that, if the defendants did *not* win outright acquittal a few moments later, they could still seek a retrial in their post-trial motions. But the rules do not permit a cost-free "second bite at the apple." *Puckett*, 556 U.S. at 140. Instead, they subject a belated claim to the strictures of plain-error review. *Id.* at 134-135, 140.

### B. Kraus and Hardaway do not show obvious error in the timing of disclosure.

In general, Rule 43 "guarantees a defendant the right to be present at every stage of the trial." *United States v. Bieganowski*, 313 F.3d 264, 293 (5th Cir. 2002). Consequently, "[w]hen a communication is received

from the jury, counsel should be informed of its substance and afforded an opportunity to be heard *before a supplemental charge is given.*" *United States v. McDuffie*, 542 F.2d 236, 241 (5th Cir. 1976) (emphasis added); *see United States v. Davis*, 609 F.3d 663, 675-676 (5th Cir. 2010) (finding error in failure to notify parties before responding to jury); *United States v. Benavides*, 549 F.2d 392, 393 (5th Cir. 1977) (same). But as the district court recognized in its post-trial denial of a retrial, a defendant does not have "an absolute right to be immediately notified of every juror note or to propose a response" even when no response is given. ROA.7125. "Rather, a defendant has a right to be heard before a court gives a supplemental charge." ROA.7125 (citing, *inter alia*, *Bieganowski*, 313 F.3d at 293).

Here, the district court did not respond to Note 4, and it "informed the parties about the note the next time they assembled in the courtroom." ROA.7126. So Kraus and Hardaway can only fault the timing of disclosure. But they cite no authoritative precedent finding error in circumstances like these. Instead, they rely on cases in which courts *responded* to jury notes without informing the parties or giving them an

123

opportunity to be heard.[27] Kraus Br. 11-12; Hardaway Br. 46-47. Effectively, then, Kraus and Hardaway ask this Court to extend its precedent to a situation it has not previously addressed. *See, e.g.*, Kraus Br. 17 (acknowledging absence of Fifth Circuit precedent for a "non-response" case like this). And arguments that "require the extension of existing precedent … cannot meet the plain error standard." *United States v. Cisneros*, 130 F.4th 472, 477 (5th Cir. 2025) (per curiam) (quotation omitted); *see Miller*, 406 F.3d at 330 (holding similarly).

In sum, even if the most cautious approach might have been to mention Note 4 upon receipt, the district court was by no means "derelict" in the timing of disclosure. *Miller*, 406 F.3d at 330 (quotation omitted).

## C.    **Kraus and Hardaway do not show prejudice.**

Nor do Kraus and Hardaway show that the timing of the disclosure "affected the outcome of the district court proceedings." *Escalante-Reyes*,

---

[27] Hardaway cites one case, *United States v. Wilson*, 203 F. App'x 140 (9th Cir. 2006), in which the Ninth Circuit found (harmless) error in a district judge's failure to inform the defense of a "deadlock question" to which the judge did not respond. *Id.* at 141-142; *see* Br. 48-49. But *Wilson* is distinguishable: there, unlike here, the judge apparently did not disclose the question *at all* before the verdict. *Wilson*, 203 F. App'x at 141-142; *see* Br. for Appellant, *United States v. Wilson*, No. 05-50679, 2006 WL 2967439, at 15 (9th Cir. Mar. 27, 2006) (stating that the court "did not notify counsel or Ms. Wilson" of the deadlock question, which was "read into the record after the verdict"). In any event, the unpublished decision in *Wilson* is not precedent even in the Ninth Circuit, to say nothing of this circuit.

689 F.3d at 424 (quotation omitted). Even when a court *responds* to a jury note without consulting the defendant, reversal is not appropriate absent prejudice, coercion, or other impairment of the defendant's substantial rights. *Bieganowski*, 313 F.3d at 293-294; *Davis*, 609 F.3d at 676-677; *United States v. Sylvester*, 143 F.3d 923, 928-929 (5th Cir. 1998). It follows that Kraus and Hardaway face a steep climb in proving prejudice from a *lack* of response that, in their telling, owes to a belated disclosure.

Kraus and Hardaway argue that, had the district court immediately notified them of Note 4, they would have moved for a mistrial or a supplemental charge under *Allen v. United States*, 164 U.S. 492 (1896). Kraus Br. 16-18; Hardaway Br. 51-52. But the record does not show that they would have sought either form of relief: they had just given tacit approval to the court's response to Note 3, *see* ROA.13668-13669, and little had changed a few moments later with the court's receipt of Note 4, *see* ROA.7127 ("Note 4 was remarkably similar to and closely followed Note 3, and no one moved for a mistrial or requested an *Allen* charge in responding to Note 3.").

Further, Kraus and Hardaway would have had no strong argument for a mistrial or an *Allen* charge, because Notes 3 and 4 did not establish

125

a genuine deadlock. Rather, the two notes together suggested that, before the district court responded to Note 3, Juror 12 was refusing to engage in deliberations *at all*, despite the court's instruction to "consult with one another," to "deliberate in an effort to reach agreement if you can do so," and to "decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors." ROA.2185; *see* ROA.14984 (Note 3 indicated that Juror 12 was "unwilling to change his mind" based on the "evidence" and "instructions"); ROA.14986 (Note 4 indicated that Juror 12 had said he could not be "open minded"). Once the court's response to Note 3 reminded the jury of "the instructions already provided," ROA.14985—which included an instruction on the duty to deliberate, ROA.2185—there was no further sign of deadlock.

Further still, even if the jury *were* deadlocked when the district court received Note 4, disclosure at that point would have made no demonstrable difference because, as the court later explained, it would have denied an immediate motion for a mistrial or an *Allen* charge. ROA.7127. The court was uniquely positioned to know how it would have ruled on such a motion, so its reasoning is worth quoting at length:

126

> District courts have broad discretion to give *Allen* charges when the jury indicates deadlock. And here, the jury had been deliberating for less than a day following a long, complex trial with multiple defendants. It would have been inappropriate to issue an *Allen* charge, or any other response, at that early point in the deliberative process. Any *Allen* charge, moreover, would not have changed the outcome given the early stage of deliberations and the length of time between Note 4 and the verdict.

ROA.7127-7128 (citations and quotation marks omitted). That analysis was sound. Having just responded to Note 3 by referring the jury to the court's previous instructions—and having heard no objection to that approach—the court would not have erred in declining to respond yet again moments later, this time to the obviously-related Note 4.

In claiming prejudice, Kraus (Br. 15-17) and Hardaway (Br. 27, 47-48) rely on *United States v. Mejia*, 356 F.3d 470 (2d Cir. 2004). But *Mejia* is not binding in this circuit, and it would not help Kraus and Hardaway if it were. The district court well explained the differences between that case and this one. In *Mejia*, after a six-day trial, "the jury had been deadlocked for several days." ROA.7126; *see Mejia*, 356 F.3d at 472-473. Here, after a *six-week* trial, the jury had been deliberating for just over a day when it sent Note 4. ROA.7126-7127; *see* ROA.13662, 14986. In *Mejia*, the court had "*ex parte* communication with the jury" when it

127

"responded to a jury note identifying a single holdout without consulting the parties." ROA.7126 (quotation omitted). Here, the court "did not communicate *ex parte* with the jury regarding Note 4," and it "had just responded to the very-similar Note 3" "with the consent of counsel." ROA.7126. In *Mejia*, the jury returned a guilty verdict "[l]ess than an hour" after the court gave the jury "a copy of its instructions with highlighted sentences." ROA.7126. Here, the jury deliberated for more than seven additional hours after the court responded to Note 3. ROA.7127; *see* ROA.13669, 13674, 14985, 14987.

Hardaway also relies on *United States v. Bass*, 490 F.2d 846 (5th Cir. 1974), *overruled on other grounds*, *United States v. Lyons*, 731 F.2d 243, 246 (5th Cir. 1984) (en banc); *see* Br. 27, 49-51. But *Bass*, too, is inapposite. There, the district court gave an instruction in response to a jury note, but the court "did not advise counsel … of its receipt of the note or of its contents until … after the jury had returned its verdict." *Bass*, 490 F.2d at 853-854 & n.7. Again, that did not happen here: the court effectively negated the alleged error by disclosing Note 4 *before* the verdict. ROA.13674.

128

**D.     Kraus and Hardaway do not show a serious effect on the fairness, integrity, or public reputation of judicial proceedings.**

For many of the same reasons, Kraus and Hardaway cannot show fourth-prong unfairness warranting an exercise of the Court's "remedial discretion." *United States v. Comrie*, 842 F.3d 348, 350 (5th Cir. 2016); *see Puckett*, 556 U.S. at 135 (noting discretion). The defendants and their attorneys were personally present in the courtroom when the district court advised the parties of Note 4, which the court accurately described as "very similar" to Note 3. ROA.13674; *see* ROA.2134. Because the court disclosed the note before the jury entered the courtroom and returned its verdict—and because Kraus and Hardaway could have made themselves heard at that point—the disclosure negated any earlier exclusion from the trial. And after the trial, when the defendants raised the issue for the first time, the court explained why it justifiably would have denied any immediate motion for a mistrial or an *Allen* charge upon receiving Note 4. In those circumstances, vacatur would be a windfall undermining rather than vindicating the fairness and reputation of the proceedings.

129

## V. The District Court Did Not Plainly Err in Its Response to Jury Note 3.

### A. Background and standard of review

Kraus claims that, in view of Note 4, the district court's response to Note 3 "constituted an erroneous *Allen* charge." Br. 19; *see* Br. 19-23. Kraus forfeited that claim by failing to raise it at any point before the verdict: he did not object to the response to Note 3 when the court proposed it, ROA.13668-13669, or when the court advised the parties of Note 4, ROA.13674. At most, then, review is for plain error.[28] *United States v. McClatchy*, 249 F.3d 348, 359 (5th Cir. 2001); *see supra* pp. 119-120.

### B. Kraus does not show obvious error.

Kraus shows no error, obvious or otherwise. When reviewing a district judge's response to a jury note, this Court looks to the "entire charge," recognizing that the judge has "wide latitude in deciding how to respond." *United States v. Hale*, 685 F.3d 522, 544-545 (5th Cir. 2012)

---

[28] Kraus's attorneys came close to waiving or inviting any error by sitting silent when the court asked if there were "[a]ny objections" to its proposed response to Note 3. ROA.13668-13669; *cf. United States v. Martinez-Rivera*, No. 24-20031, 2025 WL 985711, at *2 (5th Cir. Apr. 2, 2025) (when "counsel confirmed that she had no objections to the PSR," she "arguably" waived "any objections in the PSR").

(per curiam) (quotations omitted). Kraus does not show that the district court obviously exceeded that latitude.

Neither the district court nor the parties intended the response to Note 3 to be an *Allen* charge. As the court cogently put it:

> The response to Note 3 was no *Allen* charge. Because the note came so soon after the jury began deliberations (following a multi-week trial with five defendants), the Court's response merely reminded them of the Court's prior instructions—to deliberate in good faith and not to "give up your honest beliefs … because of the opinion of your fellow jurors." The jury here, moreover, continued to deliberate for an additional seven hours, returning the verdict the following morning—twenty-four hours after receiving the Court's response to Note 3. This length of delay between the Court's response and the verdict demonstrates a lack of coercion. *See, e.g., United States v. Andaverde-Tinoco*, 741 F.3d 509, 517–18 (5th Cir. 2013) (evaluating Fifth Circuit cases holding shorter periods between charge and verdict as not being coercive). Indeed, following the verdict, the Court polled each juror, who stood and affirmed the verdict in open court, further indicating a lack of coercion[.]

ROA.7127 (some citations omitted). Kraus therefore misses the mark in complaining (Br. 20-21) that the response included only part of the pattern *Allen* charge.

It does not matter that the response did not say that each juror had "a duty conscientiously to adhere to his own honest opinion." Br. 21 (quotation omitted). With the parties' approval, ROA.13668-13669, the

131

response covered that concept by directing the jury "to the instructions already provided," ROA.14985. The court had read those instructions aloud, ROA.13333-13363, and the jurors had a written copy, ROA.2162-2186. The instructions included one on the duty to deliberate, and it cautioned the jurors not to "give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict."[29] ROA.2185.

Considered against the entire charge, the response to Note 3 was sensible, not "derelict." *Miller*, 406 F.3d at 330.

### C.    Kraus does not show prejudice or a serious effect on the fairness, integrity, or public reputation of judicial proceedings.

Finally, even assuming obvious error, Kraus cannot show third-prong prejudice or fourth-prong unfairness. As discussed (pp. 125-126), Notes 3 and 4 reflected no genuine deadlock but instead indicated that, for a time, Juror 12 had refused to engage in deliberations at all. ROA.14984, 14986. The juror's conduct was at odds with the closing

---

[29] This case is easily distinguishable from *Smalls v. Batista*, 6 F. Supp. 2d 211 (S.D.N.Y. 1998), *aff'd*, 191 F.3d 272 (2d Cir. 1999), on which Kraus relies, Br. 22-23. In *Smalls*, unlike here, the defense objected when the state trial court (1) repeatedly urged the jurors "to convince the others of the correctness of your views" but (2) failed to include "cautionary language which would discourage jurors from surrendering their own conscientiously held beliefs." 191 F.3d at 275, 279-280.

charge. ROA.2185. So it made good sense for the district court (1) to remind the jurors of the closing charge and the need to deliberate in good faith, but (2) not to give a premature *Allen* charge on just the second day of deliberations after a six-week trial. *See United States v. Straach*, 987 F.2d 232, 242 (5th Cir. 1993) ("A judge may encourage jurors who are having difficulty reaching a verdict to deliberate longer, and to give due consideration and respect to the views of their peers."); *see also United States v. Miles*, 360 F.3d 472, 482-483 (5th Cir. 2004) (judge did not err in declining to give an *Allen* charge the first time the jury sent a note).

Subsequent events proved the wisdom of the district court's approach. Once the court responded to Note 3 (having already received Note 4), the jury sent no further notes suggesting a deadlock or any other problem. That shows the response worked. The jury deliberated for more than seven additional hours before returning a verdict that each juror affirmed in open court. ROA.7127, 13669, 13674-13676, 14985, 14987. That shows the response was not coercive. Kraus has not proven otherwise, or that fairness demands a costly retrial triggered by Juror 12's temporary refusal to deliberate. *See United States v. Ebron*, 683 F.3d 105, 128-129 (5th Cir. 2012) (when faced with "one juror's alleged failure

133

to follow instructions," the district court had discretion to take steps short of declaring a mistrial, especially because a mistrial "ought to be used with the greatest caution" (quotation omitted)).

## VI.  The District Court Did Not Abuse Its Discretion in Refusing Hardaway's Good-Faith Instruction.

### A.  Background and standard of review

The defendants proposed an instruction on good faith. ROA.1941-1942. Among other things, it would have said: good faith is a complete defense because it is "inconsistent with willfully providing improper remuneration"; good faith includes "a belief or opinion honestly held or an absence of malice or ill will"; and "[i]n determining whether a defendant acted in good faith, you may consider whether he or she had discussions with legal counsel or involved legal counsel in the relevant transactions," "even if the defendant does not rely on any specific advice of counsel as discussed below." ROA.1941-1942. Over Hardaway's objection, ROA.13260-13265, 13277-13281, the district court declined to give the instruction, ROA.2162-2186, 13260, 13274-13275. It reasoned that the defense could argue good faith "based on the instructions given," ROA.13274, including the instructions on knowledge and willfulness, ROA.13260, 13276.

134

Hardaway claims that the district court erred in denying the good-faith instruction. Br. 53-58. This Court reviews the denial "under an exceedingly deferential abuse of discretion standard." *Shah*, 95 F.4th at 376 (quotation omitted). The Court will find an abuse only if (1) the instruction was "substantively correct"; (2) it was "not substantially covered" in the closing charge; and (3) it concerned an "important point," such that its omission "seriously impair[ed] the defendant's ability to effectively present a particular defense." *Id.* at 377 (quotation omitted). The erroneous refusal of a proposed instruction is "subject to harmless error review." *United States v. Jones*, 664 F.3d 966, 978 (5th Cir. 2011).

## B.    The court was within its discretion.

As an initial matter, Hardaway does not show that the defense's good-faith instruction was substantively correct. He cites no precedent for the notion that, when a defendant "had discussions with legal counsel or involved legal counsel in the relevant transactions," those discussions or involvement bear on the defendant's good faith even if he did "not rely on any specific advice" that the attorney gave. ROA.1941-1942. At best that statement is confusing, and at worst it is wrong. *See Carr*, 740 F.2d at 347 (advice of counsel may be "considered by the jury in determining

135

the [defendant's] guilt" when, *inter alia*, the defendant "followed" the advice (quotation omitted)).

Regardless, the closing charge required the government to prove that Hardaway "knew the unlawful purpose" of the kickback conspiracy and "willfully" joined in it. ROA.2177. The district court defined "knowingly" to mean "that the act was done voluntarily and intentionally, not because of mistake or accident." ROA.2180. It defined "willfully" to mean "that the act was committed voluntarily and purposely with the specific intent to do something that the law forbids," i.e., "with the bad purpose either to disobey or disregard the law." ROA.2180. Those instructions enabled Hardaway to argue, and he did argue, that Rise MSO was "vetted by lawyers"; it was "never paid on a federal sample"; "no doctor that invested in Rise was ever paid for a federal referral"; and, for those combined reasons, Hardaway believed that his actions were lawful. ROA.13545, 13565; *see* ROA.13544 (invoking willfulness instruction); ROA.13571 (noting that if Hardaway "had a good-faith belief his actions were lawful, then he cannot have acted willfully").

Routinely, including in the AKS context, this Court has affirmed the denial of a good-faith instruction when the mens rea instructions

136

covered the same ground and enabled the defendant to claim good faith. *Shah*, 95 F.4th at 377; *see also, e.g., United States v. Page*, __ F.4th __, 2025 WL 3534588, at *12 (5th Cir. Dec. 10, 2025); *United States v. Giraldi*, 86 F.3d 1368, 1376 (5th Cir. 1996). Hardaway argues (Br. 54-56) that a different result is warranted here because the district court gave an instruction on the circumstances in which a defendant has "relied in good faith on the advice of counsel." ROA.2182-2183. But as the court recognized, that instruction did not preclude any defendant from arguing that he "lacked scienter" because he believed "that a lawyer had looked at this and never raised a red flag."[30] ROA.13305; *see* ROA.13305-13308, 13320-13322.

## C.    Any error was harmless.

Even if the district court had given the proposed good-faith instruction, it would not have changed the outcome. Effectively, Hardaway's defense was that, because *Rise* was "vetted by lawyers,"

---

[30] In closing, the government pointed out that Hardaway had urged "some version" of reliance on counsel but that "the record is devoid of any attorney's name, or identity, what information that attorney was supposedly given, what advice they rendered, or whether it was strictly followed by Mr. Hardaway." ROA.13655. That argument was a legitimate response to the assertion that Rise was "vetted by lawyers." ROA.13545. The government's argument could not have "misled" the jury about governing law, *contra* Br. 56, especially because the district court told the jury to "follow only the law as I instruct you," ROA.2163.

ROA.13545, he believed in good faith that *all* the MSOs "were operating in compliance with the law," Br. 56; *see* ROA.13565. But that logic is flawed, especially because Marioni testified that Hardaway knew (1) that *Marioni's* MSO "made payments to physicians," and (2) that "those payments were intended to induce referrals." ROA.8264. In short, Hardaway's vetted-by-lawyers defense was weak, and the jurors would have rejected it even if instructed that they "may consider" a defendant's "discussions" with or "involve[ment]" of counsel. ROA.1941-1942.

## CONCLUSION

The district court's judgments should be affirmed.

Respectfully submitted,

JAY R. COMBS
United States Attorney
Eastern District of Texas

s/ Stephan E. Oestreicher, Jr.
STEPHAN E. OESTREICHER, JR.
TRACI L. KENNER
Assistant United States Attorneys
101 E. Park Blvd., Suite 500
Plano, Texas 75074
(972) 415-6202

138

## CERTIFICATE OF SERVICE

The foregoing Brief for Appellee United States was this day electronically served on counsel for defendants Hertzberg, Theiler, Kraus, and Hardaway through use of the Court's ECF system.

**DATED: JANUARY 2, 2026**

s/ Stephan E. Oestreicher, Jr.
STEPHAN E. OESTREICHER, JR.
Assistant United States Attorney
101 E. Park Blvd., Suite 500
Plano, Texas 75074
(972) 415-6202

## CERTIFICATE OF COMPLIANCE

The foregoing Brief for Appellee United States was prepared in a 14-point, proportionally spaced, serif font (Century Schoolbook), with footnotes appearing in 12-point type; the brief was drafted in Microsoft Word 365; and the brief contains 27,981 words, as counted by Microsoft Word and excluding the parts exempted by Fed. R. App. P. 32(f). On December 23, 2025, the government filed an unopposed motion for leave to file an extra-length brief not to exceed 28,000 words. *See* Fed. R. App. P. 32(a)(7); 5th Cir. R. 32.4. At the time of this submission, that motion is pending.

s/ Stephan E. Oestreicher, Jr.
STEPHAN E. OESTREICHER, JR.
Assistant United States Attorney
101 E. Park Blvd., Suite 500
Plano, Texas 75074
(972) 415-6202
